IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

WALTER J. ROACHE,

                     Plaintiff,

      v.

THE ATTORNEY GENERAL'S
OFFICE; *et al.,*

                 Defendants.

_____

Civil Action No.
9:12-CV-1034 (LEK/DEP)


APPEARANCES:

FOR PLAINTIFF:

WALTER J. ROACHE, *Pro Se*
Central New York Psychiatric Center
9005 Old River Road
P.O. Box 300
Marcy, NY 13403

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN
New York State Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

OF COUNSEL:


CATHY Y. SHEEHAN, ESQ.
Assistant Attorney General

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Walter J. Roache, a convicted sex offender who, since the completion of his prison sentence, has been held at the Central New York Psychiatric Center ("CNYPC") for the purpose of undergoing sex offender treatment, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights under the United States Constitution. In his complaint, plaintiff maintains that his involuntary commitment at the CNYPC beyond the end of his penal confinement violates his due process and equal protection rights under the Fourteenth Amendment.

In response to plaintiff's complaint, defendants have moved seeking its dismissal for failure to state a claim upon which relief may be granted, arguing that Roache's confinement at the CNYPC comported with due process and equal protection, the complaint fails to allege the requisite personal involvement of one of the named-defendants, and all of the individual defendants are entitled to dismissal based on immunity from suit. Also pending before the court is plaintiff's third motion for appointment of *pro bono* counsel.

For the reasons set forth below, I recommend that defendants' motion be granted, plaintiff's complaint be dismissed with leave to replead, and plaintiff's motion to appoint counsel be granted.

I.    BACKGROUND[1]

Plaintiff was convicted in Orange County, New York, of a criminal sex offense. Defs.' Memo. of Law App. B (Dkt. No. 17-1) at 20. He finished serving the sentence of incarceration resulting from that conviction on February 2, 2010. Complaint (Dkt. No. 1) at 5.

On January 27, 2010, pursuant to New York Mental Hygiene Law ("MHL") article 10, the Office of the New York State Attorney General, one of the defendants in this action, filed a petition in Oneida County Supreme Court requesting an order directing that plaintiff be detained as a sex offender requiring civil management following the completion of his period of penal confinement. Defs.' Memo. of Law App. B (Dkt. No. 17-1) at 1. As a result of that filing, an order to show cause was issued by Supreme Court Justice David

---

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). In addition, in support of their arguments, the parties have submitted copies of various state court orders issued in the underlying state proceedings pursuant to New York State Mental Hygiene Law Article 10. Defs.' Memo. of Law Apps. B-E (Dkt. No. 17-1) at 19-34; Plf.'s Resp. Exh. A (Dkt. No. 19) at 22-29. In deciding defendants' motion, I have taken judicial notice of, and thus considered, those orders pursuant to Rule 201(b) of the Federal Rules of Evidence. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) (holding that, on a motion to dismiss, a court "may consider all papers and exhibits appended to the complaint, as well as any matters of which judicial notice may be taken"); *see also Hill v. Goord*, 63 F. Supp. 2d 254, 256 (E.D.N.Y. 1999) (finding that it could take judicial notice of court orders and documents related to the plaintiff's related state case and parole hearings).

3

A. Murad, scheduling a probable cause hearing to be held on February 2, 2010, pursuant to the relevant provisions of MHL article 10. Plf.'s Resp. Exh. A (Dkt. No. 19) at 22-23. On January 29, 2010, however, while represented by counsel, plaintiff exercised his right, pursuant to MHL § 10.06(b), to demand removal of the proceedings to Orange County, where his criminal sex offense conviction was entered. Defs.' Memo. of Law App. A (Dkt. No. 17-1). Supreme Court Justice James C. Tormey, III, granted plaintiff's transfer over the Attorney General's objection, and ordered that the pending probable cause hearing be rescheduled in Orange County "within a time frame which as closely as possible adheres to the provisions of [MHL] Article 10." *Id.* at 23. That order also directed that the plaintiff be held in the custody of either the New York State Department of Corrections and Community Supervision ("DOCCS") or the New York State Department of Mental Hygiene pending the probable cause hearing and determination. *Id.* Throughout the course of the relevant proceedings in Oneida County, the State of New York was represented by Assistant Attorney General James J. Williams, Esq., one of the named defendants in the action. Complaint (Dkt. No. 1) at 5.

Following transfer of the matter, a probable cause hearing was conducted in Orange County Supreme Court on April 23, 2010. Defs.' Memo. of Law App.

C (Dkt. No. 17-1) at 26. The same day, having found "probable cause to believe that [plaintiff] is sufficiently dangerous to require confinement pending disposition of this matter and that lesser conditions of supervision will not suffice to protect the public during the pendency of the proceedings," Supreme Court Justice Nicholas De Rosa ordered that, upon his release from the custody of the DOCCS, plaintiff be "committed to a secure treatment facility designated by the Commissioner of the New York State Office of Mental Health [("OMH")]." *Id.* at 26-27.

In accordance with MHL article 10, a jury trial was ultimately conducted to determine whether plaintiff is a sex offender is in need of civil management. Defs.' Memo. of Law App. D (Dkt. No. 17-1); Plf.'s Resp. Exhs. (Dkt. No. 19). Plaintiff was represented by counsel during that proceeding, and Assistant New York Attorney General Robert J. Conflitti, Esq., another of the named defendants in this action, appeared on behalf of the State of New York. Defs.' Memo. of Law App. D (Dkt. No. 17-1) at 29; Plf.'s Resp. Exhs. (Dkt. No. 19) at 25. At the close of trial, following a jury determination that plaintiff is a sex offender requiring civil management, Justice DeRosa entered an order dated October 26, 2011, directing that the OMH retain custody of the plaintiff pending

a hearing pursuant to MHL § 10.07(f).[2] Defs.' Memo. of Law App. D (Dkt. No. 17-1) at 30; Plf.'s Resp. Exhs. (Dkt. No. 19) at 26.

The hearing pursuant to MHL § 10.07(f) was conducted on January 3 and 5, 2012. Defs.' Memo. of Law App. E (Dkt. No. 17-1). Plaintiff was represented

---

[2]     That section provides that

> [i]f the jury, or the court if a jury trial is waived, determines that the respondent is a detained sex offender who suffers from a mental abnormality, then the court shall consider whether the respondent is a dangerous sex offender requiring confinement or a sex offender requiring strict and intensive supervision. The parties may offer additional evidence, and the court shall hear argument, as to that issue. If the court finds by clear and convincing evidence that the respondent has a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the respondent is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility, then the court shall find the respondent to be a dangerous sex offender requiring confinement. In such case, the respondent shall be committed to a secure treatment facility for care, treatment, and control until such time as he or she no longer requires confinement. If the court does not find that the respondent is a dangerous sex offender requiring confinement, then the court shall make a finding of disposition that the respondent is a sex offender requiring strict and intensive supervision, and the respondent shall be subject to a regimen of strict and intensive supervision and treatment in accordance with section 10.11 of this article. In making a finding of disposition, the court shall consider the conditions that would be imposed upon the respondent if subject to a regimen of strict and intensive supervision, and all available information about the prospects for the respondent's possible re-entry into the community.

N.Y. MHL § 10.07(f).

by counsel at that hearing, and the State of New York again appeared through defendant Conflitti. *Id.* at 32. On March 2, 2012, Justice DeRosa issued his decision finding plaintiff to be a dangerous sex offender requiring confinement. *Id.* at 32-33. Justice DeRosa credited the testimony of two mental health professionals, both of whom testified at the hearing and opined "to a reasonable degree of professional certainty that [plaintiff] is at a high risk to re-offend[.]". *Id.* Accordingly, Justice DeRosa ordered that plaintiff "be committed to a secure facility for care, treatment and control until such time as he no longer requires confinement." *Id.* at 33.

II.     PROCEDURAL HISTORY

Plaintiff commenced this action on June 6, 2012, by the filing of a complaint and accompanying applications for leave to proceed *in forma pauperis* and appointment of counsel. Dkt. Nos. 1-3. Named as defendants in plaintiff's complaint are the Office of the New York State Attorney General, New York State Attorney General Eric T. Schniederman, and Assistant Attorneys General James J. Williams and Robert J. Conflitti. Complaint (Dkt. No. 1) at 1-3. Plaintiff's complaint asserts due process and equal protections claims, in violation of the Fourteenth Amendment to the United States Constitution, and seeks as relief $5 million for each year of his civil confinement. *See generally*

Complaint (Dkt. No. 1).

In lieu of answering plaintiff's complaint, defendants filed the pending motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on November 16, 2012. Dkt. No. 17. In their motion, defendants argue that they are entitled to dismissal based on various grounds, including the complaint's failure to allege sufficient facts plausibly suggesting either the existence of a due process violation or the requisite personal involvement as it relates to defendant Schneiderman, and additionally argue that all of the defendants are entitled to immunity from suit. *See generally* Defs.' Memo. of Law (Dkt. No. 17-1). Plaintiff has since responded in opposition to the motion, and on February 1, 2013, he filed a motion to appoint counsel, his third such request. Dkt. Nos. 19, 21.

Defendants' motion, which is now fully briefed and ripe for determination, as well as plaintiff's request for counsel, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Defendants' Motion to Dismiss

1.    Dismissal Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing

*Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint,

however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

## 2.  MHL Article 10 Generally

In 2007, the New York State legislature enacted MHL article 10, known as the Sex Offender Management and Treatment Act ("SOMTA"), creating a statutory scheme prescribing the procedures to be followed with respect to convicted sex offenders that might require civil commitment or supervision following completion of their prison terms. MHL Article 10; *Mental Hygiene Legal Servs. v. Spitzer* ("*MHLS-I*"), No. 07-CV-2935, 2007 WL 4115936 (S.D.N.Y. Nov. 16, 2007), *aff'd by Mental Hygiene Legal Servs. v. Paterson*, No. 07-5548, 2009 WL 579445 (2d Cir. Mar. 4, 2009); *State ex rel. Harkavy v. Consilvio*, 8 N.Y.3d 645, 651 (2007).[3] MHL article 10 provides elaborate

---

[3]     Copies of all unreported decisions have been appended to this report for the convenience of the *pro se* plaintiff.

measures for review of a detained sex offender's case prior to his release from prison to determine whether further confinement under the SOMTA is necessary. *See generally* MHL Article 10. The specific provisions of MHL article 10 that are relevant to this action are highlighted below.

When a "detained sex offender," also referred to as the "respondent," nears release from confinement or parole, a case review team, comprised of three individuals, at least two of whom must be mental health professionals, determines whether that person is "a sex offender requiring civil management." MHL §§ 10.05(e), 10.06(a). Upon a determination that the respondent is a sex offender requiring civil management, the case review team provides notice of that finding to the respondent and the attorney general. MHL § 10.05(g). The attorney general may then file a sex offender management petition in the supreme or county court of the county where the respondent is located. MHL § 10.06(a). Within ten days of the filing of that petition, the respondent has the right to file a notice of removal to the county of the underlying criminal sex offense charges. MHL § 10.06(b). The attorney general may respond by moving for retention of venue for good cause. *Id.*

Within thirty days of the filing of the attorney general's sex offender management petition, the court before which the petition is pending must

conduct a hearing to determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management. MHL § 10.06(g). If, however, the respondent is not at liberty at the time the petition is filed by the attorney general but becomes eligible for release prior to the probable cause hearing, "the court shall order the stay of such release pending the probable cause hearing," and the probable cause hearing "shall commence no later than seventy-two hours from the date of the respondent's anticipated release date." MHL § 10.06(h).

Assuming the court presiding over the petition finds probable cause to believe that the respondent is a sex offender in need of civil management, MHL article 10 instructs that (1) the presiding court issue an order directing that the respondent be committed to a secure treatment facility, (2) the court set a trial date, and (3) the respondent "shall not be released" pending trial. MHL § 10.06(k). A jury trial must take place within sixty days of the probable cause hearing to determine whether the respondent is a detained sex offender who suffers from a mental abnormality.[4] MHL § 10.07(a). Upon a jury's finding that

---

[4]    "Mental abnormality" is defined as follows:

> [A] congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person

the respondent suffers from a mental abnormality under MHL article 10, the "court shall consider whether the respondent is a dangerous sex offender requiring confinement or a sex offender requiring strict and intensive supervision."[5] MHL § 10.07(f). The time frame for determining whether the respondent is a dangerous sex offender requiring confinement is not defined by MHL article 10.

### 3. Plaintiff's Due Process Claim

At the heart of plaintiff's complaint is his contention that his due process rights have been violated. *See generally* Complaint (Dkt. No. 1). In their motion, defendants argue that plaintiffs' due process claim lacks merit. Defs.' Memo. of Law (Dkt. No. 17-1) at 7-9.

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was

---

having serious difficulty in controlling such conduct.

MHL § 10.03(i).

[5]     The term "dangerous sex offender requiring confinement" is defined by MHL article 10 to mean

a person who is a detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility.

MHL § 10.03(e).

deprived of that interest without being afforded sufficient process. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). In this case, the first element of the test is easily satisfied. The Supreme Court has held that, "for the ordinary citizen, commitment to a mental hospital produces a massive curtailment of liberty and in consequence requires due process protection." *Vitek v. Jones*, 445 U.S. 480, 491-92 (1980) (quotation marks and citations omitted); *see also Abdul-Matiyn v. Pataki*, No. 06-CV-1503, 2008 WL 974409, at *10 (N.D.N.Y. Apr. 8, 2008) (Hurd, J., *adopting report and recommendation by* Homer, M.J.) ("Involuntary confinement, including civil commitment, represents a significant deprivation of liberty requiring due process.").

Turning to the second element, focusing upon the procedural safeguards afforded to a person civilly detained under MHL article 10, plaintiff's complaint in this case alleges that his due process rights were violated in five ways during the course of the underlying SOMTA proceedings. First, plaintiff argues that his confinement between February 2 and 5, 2010 violated his rights because the court order authorizing confinement was not signed by a judge. Complaint (Dkt. No. 1) at § 6, ¶ 1. Second, he contends that he was entitled to a probable

cause hearing on February 2, 2010, but did not receive one until April 23, 2010. *Id.* at § 6, ¶¶ 4, 5. Third, plaintiff complains that the Orange County Supreme Court ordered his detention pending a trial without finding that he was dangerous. *Id.* at § 6, ¶ 6. Fourth, plaintiff points out that his trial was held more than sixty days after the probable cause hearing, in violation of MHL article 10. *Id.* Fifth, he maintains that defendants violated a permanent injunction issued by a court in the Southern District of New York enjoining the attorney general from enforcing MHL § 10.06(k) by detaining him after the injunction order was issued. *Id.*

a.    Plaintiff's Custody Between February 2 and 5, 2010

In this case, although plaintiff alleges that he was held between February 2 and 5, 2010, without a court order authorizing his detention, defendants have submitted evidence to the contrary. On January 29, 2010, the Oneida County Supreme Court issued an order regarding plaintiff's notice of removal pursuant to MHL § 10.06(b). Defs.' Memo. of Law App. B (Dkt. No. 17-1). In his order, Justice Tormey directed that the petition be removed to Orange County, and the probable cause hearing be held "within a time frame which as closely as possible adheres to the provisions of Article 10," and authorized the State of New York to "retain [plaintiff] pursuant to [MHL] § 10.06(h)" pending the

probable cause hearing. *Id.* at 23-24. Accordingly, because his custody was pursuant to court order, plaintiff's allegations that his due process rights were violated as a result of his detention absent a court order are unfounded.

              b.    <u>Timing of Plaintiff's Probable Cause Hearing and Trial</u>

Under ordinary circumstances, MHL article 10 provides that a probable cause hearing must be held within thirty days of the filing of the attorney general's petition to determine whether there is probable cause to believe the respondent is a sex offender requiring civil management. MHL § 10.06(g). However, where a respondent becomes eligible for release prior to the scheduled probable cause hearing, the court in which the sex offender management petition is pending must issue an order staying such release, in which case the probable cause hearing "shall commence no later than seventy-two hours from the date of the respondent's anticipated release." MHL § 10.06(h). MHL article 10 also provides that a trial on the matter must be held within sixty days from the date of the probable cause hearing. MHL § 10.07(a).

In this case, although the New York State Attorney General filed its petition in Oneida County Supreme Court on January 28, 2010, plaintiff's probable cause hearing did not take place until April 23, 2010. Defs.' Memo. of Law App. C (Dkt. No. 17-1) at 26-27. Under MHL § 10.06(h), that hearing

should have been held within seventy-two hours of the date of his release from penal confinement, February 2, 2010. Because it did not occur until more than two-and-a-half months after his scheduled release date, plaintiff alleges that his due process rights were violated. Complaint (Dkt. No. 1) at § 6, ¶ 6. Similarly, although his trial should have been held no more than sixty days after his probable cause hearing, MHL § 10.07(a), it did not occur until October 2011, nearly a year-and-a-half later, Defs.' Memo. of Law App. E (Dkt. No. 17-1) at 32.

Defendants argue that plaintiff waived the time frames prescribed in MHL article 10 by filing his notice of removal pursuant to MHL § 10.06(b). Defs.' Memo. of Law (Dkt. No. 17-1) at 8. In support of this position, defendants cite Justice Tormey's removal order, in which he observed that plaintiff was "advised that[,] by electing to change venue before the probable cause hearing is held[,] . . . he is waiving the application of the time frames for that hearing and subsequent trial, as set forth in [MHL] §10.06 and 10.07[.]" Defs.' Memo. of Law App. B (Dkt. No. 17-1) at 20-21. Neither defendants nor Justice Tormey's order, however, identify authority supporting the position that, by filing a notice of removal under MHL article 10, a respondent waives his right to have the statutorily prescribed time frames apply in the county to which the case is

18

transferred. A careful review of MHL article 10, moreover, reveals that none of

its provisions specifically state that, upon filing a request for removal pursuant

to MHL § 10.06(b), a respondent waives his right to the prescribed time frames.

*See generally* MHL Article 10. Defendants' memorandum of law and Justice

Tormey's removal order indicate only that plaintiff *did* waive the application of

the time frames; neither of those documents provides either (1) supporting

evidence that plaintiff voluntarily and knowingly consented to the waiver, or (2)

the authority determining that a respondent waives his right to statutorily

prescribed time frames when he files a motion for removal. In light of the

absence of either of these, and mindful of the court's duty to liberally construe a

*pro se* plaintiff's complaint, I find that it would be premature to dismiss plaintiff's

due process claim arising from the allegation that he was not timely afforded

the probable cause hearing and trial in this matter.[6]

---

[6]    I am aware of the provision in MHL article 10 instructing that "failure to act within the [time periods specified in the article] shall not invalidate later agency action[.]" MHL § 10.08(f). That provision, however, is not dispositive as to whether plaintiff's due process rights were violated by, for example, his eighty-day confinement between the date of his scheduled release from penal confinement and the date of his probable cause hearing.

## c. The Orange County Supreme Court's Dangerousness Finding

Plaintiff's complaint alleges that the Orange County Supreme Court, following a probable cause hearing, erred in "assum[ing] [plaintiff was] dangerous." Complaint (Dkt. No. 1) at § 6, ¶ 6. In support, plaintiff cites to a line of cases that have found MHL § 10.06(k), the provision governing a respondent's detention following a probable cause hearing, is facially unconstitutional. Complaint (Dkt. No. 1) at § 6 (citing *Mental Hygiene Leval Servs. v. Cuomo* ("*MHLS-II*"), 785 F. Supp. 2d 205 (S.D.N.Y. 2011), *vacated by Mental Hygiene Legal Servs. v. Schneiderman*, 472 F. App'x 45 (2d Cir. 2012); *MHLS-I*, 2007 WL 4115936; *State v. Enrique T.*, 929 N.Y.S.2d 376 (Sup. Ct. Bronx Cnty. 2011)). Despite the findings that MHL § 10.06(k) is facially unconstitutional, the cases cited by plaintiff suggest that, under MHL article 10, a respondent may be constitutionally detained following a probable cause hearing and before trial if the court presiding over the probable cause hearing makes a specific finding of dangerousness and that no lesser conditions than confinement would suffice to protect the public. *See MHLS-I*, 2007 WL 411596, at *15 (granting the plaintiff's motion for a preliminary injunction "insofar as [MHL § 10.06(k)] requires detention pending trial absent a specific, individualized finding of probable cause to believe that a person is sufficiently

20

dangerous to require confinement, and that lesser conditions of supervision will not suffice to protect the public during pendency of the proceedings"); *see also Enrique T.*, 929 N.Y.S.2d at 402.

Liberally construing plaintiff's complaint, it appears that he is alleging that his due process rights were violated because the Orange County Supreme Court, the court presiding over his probable cause hearing, failed to specifically find him dangerous. Complaint (Dkt. No. 1) at § 6, ¶ 6. This allegations is unfounded, and directly contradicted by a careful review of Justice Nicholas DeRosa's order. Defs.' Memo. of Law App. C (Dkt. No. 17-1) at 26. In that order, Justice De Rosa specifically "found that there is probable cause to believe that respondent is sufficiently dangerous to require confinement pending disposition of this matter and that lesser conditions of supervision will not suffice to protect the public during the pendency of the proceedings[.]" *Id*. This finding comports with the due process called for in the relevant case law. *MHLS-I*, 2007 WL 4115936, at *15; *Enrique T.*, 929 N.Y.S.2d at 402. Accordingly, I find that this allegation does not give rise to a cognizable due process claim under section 1983.

d.	Violation of the Permanent Injunction Issued by the
	Southern District of New York

On March 29, 2011, while the proceedings pursuant to MHL article 10

against plaintiff were pending in Orange County, District Judge Deborah A.

Batts, of the Southern District of New York, issued *MHLS-II*, in which she

permanently enjoined the New York State Attorney General from enforcing MHL

§ 10.06(k), based on her finding that the subsection is unconstitutional because

it "provides for automatic detention of all individuals subject to Article 10,

without a judicial proceeding to determine dangerousness." *MHLS-II*, 785 F.

Supp. 2d at 226. Liberally construed, plaintiff's complaint in this action alleges

that defendants denied him due process because they failed to abandon the

MHL article 10 proceeding against him following the issuance of *MHLS-II*.

Complaint (Dkt. No. 1) at § 6, ¶ 6.

Although the order in *MHLS-II* was vacated by the Second Circuit in June

2012, and thus plaintiff's assertion that defendants violated the permanent

injunction issued therein fails, plaintiff's complaint could be construed to allege

that defendants violated the preliminary injunction entered in *MHLS-I*, which

was affirmed by the Second Circuit in *Paterson*, 2009 WL 579445. *See Dorsey

v. Hogan*, 511 F. App'x 96, 100 (2d Cir. 2013) (remanding to the district court to

allow the plaintiff to file a second amended complaint that alleges a violation of

22

the preliminary injunction in *MHLS-I*). In *Dorsey*, the plaintiff's complaint alleged

a due process violation where he was forced to participate in a sex offender

treatment program while confined. *Dorsey*, 511. F. App'x at 100-01. The

Second Circuit found, however, that the plaintiff's complaint in that case "can

fairly be read to present a more general challenge to [the plaintiff's] confinement

as a sex offender." *Id.* at 101. In remanding to the district court, the court

explained that the plaintiff

> may have been confined at [CNYPC] in violation of a
> preliminary injunction entered by then-District Judge
> Lynch. In December 2007, two years before [the plaintiff]
> was first confined under [the SOMTA], Judge Lynch
> issued an order barring New York from enforcing [MHL]
> § 10.06(k), the provision under which [the plaintiff] was
> detained. . . . Judge Lynch found that the statute was
> likely unconstitutional in permitting such interim
> confinement absent a specific, individualized finding of
> probable cause to believe that the person is sufficiently
> dangerous to require confinement, and that lesser
> conditions of supervision will not suffice to protect the
> public during the pendency of the proceedings. Entry of
> the preliminary injunction was affirmed on appeal by a
> panel of this Court in March 2009, and the injunction
> appears to have remained in effect throughout plaintiff's
> confinement at [CNYPC].

*Id.* at 100 (citations, alterations, and quotation marks omitted).

In light of the Second Circuit's findings and holdings in *Dorsey*, I find that

plaintiff's allegation that the defendants violated the permanent injunction

23

issued in *MHLS-II* could be liberally construed to allege that they violated the preliminary injunction issued in *MHLS-I*, which is still in effect today, and plainly was in effect at the time of the MHL article 10 proceedings against plaintiff in state court.

This finding, however, does not end the inquiry. *MHLS-I* specifically instructs that the application of MHL § 10.06(k) is unconstitutional "absent a specific . . . finding of probable cause to believe that [the respondent] is sufficiently dangerous to require confinement, and that lesser conditions of supervision will not suffice to protect the public[.]" *MHLS-I*, 2007 WL 4115936, at *15. In this case, Justice DeRosa's order, issued after the probable cause hearing in April 2010, explicitly found "that there [was] probable cause to believe that respondent is sufficiently dangerous to require confinement pending disposition of th[e] matter and that lesser conditions of supervision w[ould] not suffice to protect the publifc during the pendency of the proceedings[.]" Defs.' Memo. of Law App. C (Dkt. No. 17-1) at 26. Accordingly, plaintiff's complaint does not allege sufficient facts to plausibly suggest that his due process rights were violated when defendants proceeded against him under MHL article 10 following the issuance of *MHLS-II*.

In summary, only the allegation that plaintiff's due process rights were

violated by the failure to conduct a probable cause hearing and trial in accordance with the time frames prescribed in MHL article 10 are sufficient to state a cognizable section 1983 claim. Accordingly, I recommend that plaintiff's due process claim survive defendants' motion solely with respect to that allegation.

### 4. Plaintiff's Equal Protection Claim

In their motion, defendants seek dismissal of plaintiff's equal protection claim. Defs.' Memo. of Law (Dkt. No. 17-1) at 9-10.

The equal protection clause of the Fourteenth Amendment directs state actors to treat similarly situated people alike. *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state a cognizable equal protection cause of action, a plaintiff must allege sufficient facts that plausibly suggest that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995).

In this case, plaintiff's complaint does not allege any facts that plausibly suggest he was treated differently than others similarly situated. Indeed, there are insufficient facts for the court to even infer a basis for this particular claim. In his complaint, plaintiff places heavy reliance upon the Supreme Court's

decision in *Foucha v. Louisiana*, 504 U.S. 71 (1992). *Foucha*, however, is readily distinguishable. In that case, the Supreme Court found fault with a Louisiana statute that treated convicted criminals found to be insane more favorably than those persons who have been acquitted of a criminal act on the basis of insanity, and required proof of dangerousness by clear and convincing evidence before confining an insane convicted criminal beyond the term of his criminal sentence, but permitted civil confinement of a defendant acquitted on the basis of insanity without requiring a similar showing. *Foucha,* 504 U.S. at 84-86. No such distinction has been cited by the plaintiff in this action. Accordingly, I recommend dismissal of plaintiff's equal protection claim.

     5.    <u>Personal Involvement</u>

In their motion, defendants also seek dismissal of plaintiff's claims against defendant Schniederman, arguing that plaintiff's complaint fails to plausibly allege that he was personally involved in any of the conduct giving rise to this action. Defs.' Memo. of Law (Dkt. No. 17-1) at 11-12.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d

Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

In this case, plaintiff's complaint does not disclose any actions taken against him directly by defendant Schneiderman. *See generally* Complaint (Dkt. No. 1). Instead, it appears that any claims asserted against him are based upon his position as the New York State Attorney General, and thus the supervisor of the two defendant Assistant Attorneys General who were directly involved in the MHL article 10 proceedings against the plaintiff. It is well-established, however, that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior*." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.

To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 554 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501. Because plaintiff does not allege any facts plausibly suggesting that one or more of these grounds of supervisory liability exist against defendant Schneiderman in this case, I recommend dismissal of plaintiff's claims against him.

### 6.    Prosecutorial Immunity

The three individual defendants in this case, consisting of the New York State Attorney General and two of his assistants, seek dismissal of plaintiff's damage claims against them on the additional ground that they are entitled to immunity from suit in their role as prosecutors. Defs.' Memo. of Law (Dkt. No.

17-1) at 10-11.

It is well-established that "prosecutors are entitled to absolute immunity for that conduct 'intimately associated with the judicial phase of the criminal process.'" *Hill v. City of New York*, 45 F.3d 653, 660-61 (2d Cir. 1995) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). "In determining whether absolute immunity obtains, [the court] appl[ies] a 'functional approach,' looking at the function being performed rather than to the office or identity of the defendant." *Hill*, 45 F.3d at 660 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)); *see also Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004) ("The appropriate inquiry . . . is not whether authorized acts are performed with a good or bad *motive*, but whether the *acts* at issue are beyond the prosecutor's authority."); *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (finding that prosecutorial immunity protects prosecutors from liability under section 1983 "for virtually all acts, regardless of motivation, associated with his function as an advocate").

Two years after *Imbler*, the Supreme Court extended prosecutorial immunity to government attorneys involved in administrative proceedings. *See Butz v. Economou*, 438 U.S. 478, 512-13 (1978) ("We think that adjudication within a federal administrative agency shares enough of the characteristics of

the judicial process that those who participate in such adjudication should also be immune from suit for damages."). The Second Circuit, in turn, has extended the same immunity to government attorneys prosecuting and defending civil actions. *See Barrett v. U.S.*, 798 F.2d 565, 572 (2d Cir. 1986) ("The controversial nature of the proceeding[s], the risk that a losing defendant will seek to retaliate by a suit attacking the propriety of the government attorney's conduct, and the existence of alternative safeguards against the attorney's misconduct . . . militate in favor of absolute immunity.").

In this case, defendants Schneiderman, Williams, and Conflitti are sued in their capacities as prosecutors. Defendants Williams and Schneiderman, the latter sued in his capacity as the New York State Attorney General, together initiated the MHL article 10 civil commitment proceedings against plaintiff in Oneida County, and defendants Conflitti and Schneiderman pursued those proceedings to completion in Orange County. The allegations against each of them are based on their conduct in advocating for the State of New York in their capacities as prosecutors. Accordingly, they are entitled to absolute immunity from suit for damages.

7.   Eleventh Amendment Immunity

Defendants seek dismissal of all claims against defendant Attorney General's Office, and any claim that may be construed as having been asserted against any of the individual defendants in their official capacities. Defs.' Memo. of Law (Dkt. No. 17-1) at 12-13.

The Eleventh Amendment protects a state against suits brought in federal court by "private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Cory v. White*, 457 U.S. 85, 90-91 (1982); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from the state as the real party in interest[7]. *See, e.g., Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even though it is

---

[7]      In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham Cnty.*, 547 U.S. 189, 193 (2006).

nominally asserted against an individual official." (quoting *Edelman*, 415 U.S. at 663)); *see also Richards v. State of New York App. Div., Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing, *inter alia*, *Cory v. White*, 457 U.S. 85, 89-91, (1982)). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."[8] *Ying Jing Gan*, 996 F.2d at 529; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

In the event that plaintiff's complaint asserts claims against the named-defendants in their official capacities, those claims are, in reality, brought against the State of New York, and are therefore subject to dismissal. *Daisernia*, 582 F. Supp. at 798-99. Similarly, as an agency of the State of New York, defendant Attorney General's Office is immune from suit, as well. *See Levy v. Cohen*, 439 F. App'x 30, 32 (2d Cir. 2011) (affirming district court's dismissal of the plaintiff's damage claims against the New York State Attorney General's Office "because. . . the Eleventh Amendment provides a state and its

---

[8]     By contrast, the Eleventh Amendment does not preclude lawsuits seeking to impose individual or personal liability on state officials under section 1983. *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991).

agencies with immunity from claims for damages in federal court"). Accordingly, because plaintiff's complaint requests only money damages and does not seek declaratory or injunctive relief, I recommend that all claims against defendant Attorney General's Office and any claims asserted against the individual defendants in their official capacities be dismissed with prejudice.

B.     Whether to Permit Amendment

In the event the recommendations set forth herein are adopted, the result would be dismissal of all of the defendants named in plaintiff's complaint. Generally, when a *pro se* plaintiff's complaint is dismissed for failure to state a claim, the plaintiff should be allowed to amend his complaint at least once. *Gomez v. USAA Federal Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999). However, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

In this instance, in light of the fact that I have construed plaintiff's complaint to allege sufficient facts to give rise to a due process claim, I recommend that plaintiff be afforded an opportunity to amend his complaint to name a defendant that may properly be sued for this alleged violation, if such an individual exists.

## C.     Plaintiff's Motion to Appoint Counsel

Also pending before the court is plaintiff's third motion to appoint *pro bono* counsel to represent him in this matter. Dkt. No. 21.

District courts are afforded broad, though not limitless, discretion in determining whether to appoint counsel to represent indigent civil litigants. 28 U.S.C. § 1915(e)(1); *see also Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986). In *Hodge*, the Second Circuit noted that, when exercising that discretion, the court should first determine whether the indigent's position seems likely to be of substance. *Hodge*, 802 F.2d at 60. "If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in th[e] case why appointment of counsel would be more likely to lead to a just determination." *Hodge*, 802 F.2d at 61-62; *see also Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994).

In this case, in light of my finding that plaintiff's allegations state a plausible due process claim, plaintiff likely satisfies the threshold inquiry of whether his claim may be of substance. *Hodge* 802 F.2d at 60. Given the

34

complex legal considerations implicated by plaintiff's claims, and the need to identify any potentially responsible, non-immune defendants to name in his due process cause of action, I find that appointing *pro bono* counsel in this case is appropriate.[9] Accordingly, I recommend that *pro bono* counsel be appointed to represent plaintiff in this case, in the event the recommendations related to the substance of plaintiff's claims contained in this report are accepted.

IV.    SUMMARY AND RECOMMENDATION

Although plaintiff's complaint alleges sufficient facts to give rise to a cognizable due process claim, it fails to name an appropriate, non-immune defendant. Accordingly, I find that plaintiff's complaint is subject to dismissal, but, in light of the legal issues presented by his due process claim, that he should be granted leave to file an amended complaint with the assistance of *pro bono* counsel.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 17) be GRANTED but that plaintiff be granted leave to file an amended complaint that

---

[9]    My position is also influenced by the Second Circuit's decision in *Dorsey*, where the court determined that the action should be remanded the action to allow the plaintiff to file a second amended complaint asserting a due process violation arising from allegations that he was unlawfully confined in the CNYPC for two years following the expiration of his penal incarceration, and that counsel be appointed to represent plaintiff on remand. *Dorsey*, 511 F. App'x at 101.

names an appropriate defendant; and it is further

RECOMMENDED that plaintiff's motion for appointment of counsel (Dkt. No. 21) be GRANTED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:    August 9, 2013
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge


Slip Copy, 2009 WL 579445 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2009 WL 579445 (C.A.2 (N.Y.)))**

Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,
Second Circuit.
MENTAL HYGIENE LEGAL SERVICES,
Plaintiff-Appellee,
v.
David A. PATERSON FN*, and Rew Cuomo, Diane Jones Ritter, and Brian Fischer, Defendants-Appellants.

> FN* Pursuant to Federal Rule of Appellate Procedure 43(c)((2), Governor David A. Paterson is automatically substituted for former Governor Eliot Spitzer as an appellant in this case.

No. 07-5548-cv.
March 4, 2009.

Appeal from the United States District Court for the Southern District of New York (Gerard E. Lynch, Judge).
Cecelia C. Chang (Barbara D. Underwood and Benjamin N. Gutman, on the brief), for Andrew M. Cuomo, New York, N.Y.

Sadie Zea Ishee (Dennis B. Feld, on the brief), for Mental Hygiene Legal Services, New York, N.Y.

Present REENA RAGGI, RALPH K. WINTER, PETER W. HALL, Circuit Judges.

## SUMMARY ORDER

**\*1** UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the order of the district court, entered on December 19, 2007, is AFFIRMED.

Defendants-appellants David A. Paterson, Andrew Cuomo, Diane Jones Ritter, and Brian Fischer appeal from an order of the United States District Court for the Southern District of New York (Lynch, *J.*), granting in part and denying in part plaintiff-appellee Mental Hygiene Legal Services's motion for a preliminary injunction. Plaintiff had filed a declaratory judgment action attacking the constitutionality of six procedural provisions of Article 10 of the New York Mental Hygiene Law (MHL), which establishes a regulatory regime for "Sex Offenders Requiring Civil Commitment or Supervision," and subsequently moved for preliminary injunctive relief. The district court granted the motion with respect to sections 10.06(k) and 10.07(d). It determined that plaintiff demonstrated a likelihood of success in challenging § 10.06(k), concluding that the provision permitted the pre-trial detention of a "sex offender requiring civil management" without an individualized finding that the person is sufficiently dangerous to warrant confinement and that lesser conditions of supervision will not suffice to protect the public. The court also enjoined defendants from committing, pursuant to section 10.07(d), any person charged with, but never convicted of, a sex offense because of his or her mental incapacity to stand trial, unless a court or jury has found that the person did commit the conduct constituting the sex offense beyond a reasonable doubt. The district court denied plaintiff's motion with respect to the four other challenged portions of Article 10.

District courts may grant preliminary injunctions when the moving party demonstrates (1) irreparable injury absent injunctive relief, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships decidedly tipped in the movant's favor. *Lusk v. Village* of Cold Spring, 475 F.3d 480, 485 (2d Cir.2007). However, when "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 579445 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2009 WL 579445 (C.A.2 (N.Y.)))**

or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Beal v. Stern,* 184 F.3d 117, 122 (2d Cir.1999) (internal quotation marks omitted). A district court has wide discretion in determining whether to grant a preliminary injunction, and this Court reviews the district court's determination only for abuse of that discretion. *Green Party of N .Y. State v. N.Y. State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir .2004). Such abuse occurs when the court applies an incorrect legal standard or makes clearly erroneous factual findings. *See Prayze FM v. F.C.C.,* 214 F.3d 245, 249 (2d Cir.2000). We identify neither error in this case.

**\*2** We agree with the district court that plaintiff has shown irreparable injury and, at least, a likelihood of prevailing on its constitutional claims with respect to sections 10.06(k) and 10.07(d). Our conclusion, like any ruling on a preliminary injunction, does not preclude a different resolution of plaintiff's facial challenge on a more fully developed record. *See id.* at 253 (declining to decide facial challenge on appeal of grant of preliminary injunction).

The district court's order is accordingly AFFIRMED.

C.A.2 (N.Y.),2009.
Mental Hygiene Legal Services v. Paterson
Slip Copy, 2009 WL 579445 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
**(Cite as: 2007 WL 4115936 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
MENTAL HYGIENE LEGAL SERVICE and
Shawn Short, Plaintiffs,
v.
Elliot SPITZER, Andrew Cuomo, Michael Hogan,
Diana Jones Ritter, and Brian Fischer, Defendants.

No. 07 Civ. 2935(GEL).
Nov. 16, 2007.

Sadie Zea Ishee, New York, NY, and Dennis Bruce
Feld, Mineola, NY, for plaintiff Mental Hygiene
Legal Service.

Hollie S. Levine, Binghamton, NY, for plaintiff
Shawn Short.

Edward J. Curtis, Jr., and Bruce B. McHale, Assistant
Attorneys General, New York, NY, for defendants.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

**\*1** On March 14, 2007, Governor Spitzer
signed the Sex Offender Management and Treatment
Act, which became effective on April 13,
2007, in part as Article 10 of the New York Mental
Hygiene Law ("MHL"), creating a new legal regime
for "Sex Offenders Requiring Civil Commitment
or Supervision." As part of the Act, the New
York Legislature found that "recidivistic sex offenders
pose a danger to society that should be addressed
through comprehensive programs of treatment
and management," MHL § 10.01(a), and that
some "sex offenders have mental abnormalities that
predispose them to engage in repeated sex offenses,"
MHL § 10.01(b). The Legislature concluded
that such offenders

should receive ... treatment while they are incar-

cerated as a result of the criminal process, and
should continue to receive treatment when that
incarceration comes to an end. In extreme cases,
confinement of the most dangerous offenders will
need to be extended by civil process in order to
provide them such treatment and to protect the
public from their recidivist conduct.

*Id.*

On April 12, 2007, Plaintiff Mental Hygiene
Legal Service ("MHLS") filed a declaratory judgment
action attacking the constitutionality of certain
provisions of the Act, and subsequently moved
for preliminary injunctive relief and a temporary restraining
order. Subsequently, Shawn Short, an individual
subject to various provisions of the law,
intervened in the matter and joined MHLS's motions.
Plaintiffs do not attack the substantive constitutionality
of the statutory provision for civil commitment.
Rather, their motion focuses narrowly on
particular procedural provisions of the Act, contending
that specific aspects of the regime it creates
fail to provide the requisite procedural safeguards
necessary to comport with the constitutional command
that persons may not be deprived of liberty
without due process of law. Plaintiffs also contend
that certain aspects of the statutory regime deny the
individuals subject to those provisions the equal
protection of laws guaranteed by the Constitution.
Together, the plaintiffs challenge:

(A) MHL § 10.06(f), which authorizes the New
York Attorney General to issue a "securing petition"
to detain certain individuals beyond the
completion of their term of imprisonment, in advance
of the probable cause hearing, without notice
or opportunity for review;

(B) MHL § 10.06(k), which mandates involuntary
civil detention pending the commitment trial,
based on a finding at the probable cause hearing
that the individual may have a mental abnormality,
without a finding of current dangerousness;

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

(C) MHL § 10.06(j)(iii), which forbids an individual indicted for a crime but found incompetent to stand trial to contest the commission of the acts that constituted the crime at the probable cause hearing;

(D) MHL § 10.07(d), which authorizes civil commitment for persons found incompetent to stand trial and never convicted of any offense based on a showing by clear and convincing evidence that they committed the sexual offense with which they were charged;

**\*2** (E) MHL § 10.07(c), which authorizes the factfinder at the commitment trial to make a retroactive determination by clear and convincing evidence that certain non-sex crimes were committed with a "sexual[ ] motivat [ion];"

(F) MHL § 10.05(e), which authorizes certain pre-hearing psychiatric examinations, in the absence of counsel, of individuals subject to the Act. FN1

> FN1. At oral argument, plaintiffs withdrew their application for preliminary injunctive relief with respect to a seventh provision, MHL § 33.13(c)(9)(vii), which permits the release of confidential clinical and medical records of certain individuals subject to the act under certain specified circumstances. (Tr. 5).

Oral argument was heard on September 14, 2007.

For the reasons discussed below, plaintiffs have demonstrated irreparable injury as well as a likelihood of success in demonstrating that § 10.06(k) is unconstitutional insofar as it permits civil detention pending trial without an individualized finding of current dangerousness and that § 10.07(d) is unconstitutional insofar as it allows detention of individuals after the commitment trial absent a finding beyond a reasonable doubt that such individuals committed the acts which constituted

the crime for which they had been charged. Defendants' motion to dismiss these portions of plaintiffs' complaint will therefore be denied. Plaintiffs have failed to make a showing sufficient for a preliminary injunction against the restrictions on contesting certain past events at the probable cause hearing as provided for in § 10.06(j)(iii). Defendants' motion to dismiss that portion of plaintiffs' facial attack against this provision will be granted. Both plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss regarding challenges to the securing petition procedures, as provided for in § 10.06(f), the retroactive determination of the "sexual motivation" of a past crime, as provided for in § 10.07(c), and the failure to appoint counsel in advance of certain pre-hearing psychiatric exams, as provided for in § 10.05(e), will be denied.

**DISCUSSION**

I. Article Ten of the MHL

Provisions of the Act are triggered when a "person who may be a detained sex offender is nearing an anticipated release" from confinement or parole. MHL § 10.05(b). FN2 A "[d]etained sex offender" is (for the most part) a person "in the care, custody, control, or supervision of an agency with jurisdiction," as a result of having been adjudicated to have committed certain sex offenses or certain designated felonies with a "sexual[ ] motivat[ion]." MHL § 10.03(g). FN3 As such a person nears release, a case review team ("CRT") of three individuals, at least two of whom must be mental health professionals meeting certain statutory requirements, MHL § 10.05(a), are to determine whether the person is a "sex offender requiring civil management." MHL § 10.06(a).

> FN2. "Release" is defined to include "release, conditional release or discharge from confinement, from supervision by the division of parole, or from an order of observation, commitment, recommitment or retention." MHL § 10.03(m).

> FN3. The complete definition of "detained sex offender" is:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

a person who is in the care, custody, control, or supervision of an agency with jurisdiction, with respect to a sex offense or designated felony, in that the person is either: (1) A person who stands convicted of a sex offense as defined in subdivision (p) of this section, and is currently serving a sentence for, or subject to supervision by the division of parole, whether on parole or on post-release supervision, for such offense or for a related offense; (2) A person charged with a sex offense who has been determined to be an incapacitated person with respect to that offense and has been committed pursuant to article seven hundred thirty of the criminal procedure law, but did engage in the conduct constituting such offense; (3) A person charged with a sex offense who has been found not responsible by reason of mental disease or defect for the commission of that offense; (4) A person who stands convicted of a designated felony that was sexually motivated and committed prior to the effective date of this article; (5) A person convicted of a sex offense who is, or was at any time after September first, two thousand five, a patient in a hospital operated by the office of mental health, and who was admitted directly to such facility pursuant to article nine of this title or section four hundred two of the correction law upon release or conditional release from a correctional facility, provided that the provisions of this article shall not be deemed to shorten or lengthen the time for which such person may be held pursuant to such article or section respectively; or (6) A person who has been determined to be a sex offender requiring civil management pursuant to this article.

MHL § 10.03(g).

As defined by the Act, a "[s]ex offender requiring civil management" is a "detained sex offender who suffers from a mental abnormality," who is either "a dangerous sex offender requiring confinement" or "a sex offender requiring strict and intensive supervision." MHL § 10.03(q). A "[d]angerous sex offender requiring confinement" is a "detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." MHL § 10 .03(e). A "[s]ex offender[ ] requiring strict and intensive supervision" is a "detained sex offender who suffers from a mental abnormality but is not a dangerous sex offender requiring confinement." MHL § 10.03(r). A mental abnormality is defined to be a "congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct." MHL § 10.03(i).

**\*3** If the CRT finds the offender to require civil management, then the Attorney General may file a "sex offender civil management petition" in New York State court. MHL § 10.06(a). Within 30 days after the petition is filed, the court "shall conduct a hearing to determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management." MHL § 10 .06(g). At the conclusion of the probable cause hearing as described in § 10.06(g), the court "shall determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management." MHL § 10.06(k). If the court so determines, it "shall order the respondent ... committed to a secure treatment facility ... [and] the respondent shall not be released pending the completion of [the] trial [contemplated in MHL § 10.07]." MHL § 10.06(k).

Under § 10.07, at the commitment trial, which

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

is supposed to begin within 60 days of the probable cause determination, the jury (or judge if the right to a jury trial is waived) determines by clear and convincing evidence "whether the respondent is a detained sex offender who suffers from a mental abnormality." MHL §§ 10.07(a), (d). If such a determination is made, then the judge "shall consider whether the respondent is a dangerous sex offender requiring confinement or a sex offender requiring strict and intensive supervision." MHL § 10.07(f). If at the commitment hearing the court finds:

> by clear and convincing evidence that the respondent has a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the respondent is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility, then the court shall find the respondent to be a dangerous sex offender requiring confinement.

MHL § 10.07(f). Upon such a finding, the respondent "shall be committed to a secure treatment facility ... until such time as he or she no longer requires confinement." *Id.* Once committed, the individual shall have a yearly psychiatric exam, and a right to be examined by an independent examiner. MHL § 10.09(b). In certain circumstances, the detained individual has a right to petition the court for an evidentiary hearing, and detention will continue only if the Attorney General can demonstrate by clear and convincing evidence that the respondent is still a dangerous sex offender requiring confinement. MHL § 10.09(h). While committed, sex offenders shall be kept in "secure treatment facilit[ies]," MHL § 10.06(k)(i), segregated from those who are not "sex offenders." MHL § 10.10(e). If the court grants a subsequent hearing based on the detainee's petition and finds that the detained individual suffers from a mental abnormality, but is no longer a dangerous sex offender, then the court will discharge the individual from custody but order a regimen of strict and intensive supervision and treatment. MHL § 10.09(h).

*4 If the judge does not find that the respondent is a dangerous sex offender requiring confinement, "then the court shall make a finding of disposition that the respondent is a sex offender requiring strict and intensive supervision, and the respondent shall be subject to a regimen of strict and intensive supervision and treatment." MHL § 10.07(f).FN4 In making such a finding, the court shall consider "the conditions that would be imposed upon the respondent if subject to a regimen of strict and intensive supervision, and all available information about the prospects for the respondent's possible reentry into the community." *Id.* An individual may petition every two years for modification or termination of the strict and intensive supervision. MHL § 10.11(f). Upon receipt of a petition for termination, the court may, in its discretion, hold a hearing where the Attorney General must show by clear and convincing evidence that the individual is still a sex offender in need of civil management. MHL § 10.11(h).

> FN4. The statute allows the mental abnormality issue to be relitigated after two years of strict and intensive supervision, MHL § 10.11(f), and if a court agrees to hear a petition for discharge by an individual adjudicated to be a dangerous sex offender requiring civil confinement. MHL § 10.09(h).

## II. Legal Standards

### A. Preliminary Injunction

To obtain a preliminary injunction the moving party must show irreparable injury and either (i) likelihood of success on the merits or (ii) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor. *Green Party of New York State v. New York State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir.2004); *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir.1995); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F .2d 70, 72 (2d Cir.1979) (per curi-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

am).

B. Procedural Due Process

Procedural due process claims are to be examined in "two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ... [and] the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989) (citations omitted). Whether a deprivation affects a liberty or property interest can be a difficult question. In this case, however, there is no question. Persons affected by Article 10 are threatened with deprivation not merely of *a* liberty interest, but of liberty *tout court,* as the Act contemplates that those found within its scope may be confined against their will.

If a protected liberty interest is implicated by state action, then the Court must determine what process is due. Due process is not a fixed concept, but flexible, and depends on the particular circumstances. *Zinermon v. Burch,* 494 U.S. 113, 127 (1990). The extent of process due is analyzed under the framework established by *Mathews v. Eldridge:*

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

**\*5** 424 U.S. 319, 335 (1976). When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard. *Hamdi v. Rumsfeld,* 542 U.S. 507, 533 (2004) (plurality opinion) (The "central meaning of procedural due process" is that parties "whose

rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.") (citations and internal quotation marks omitted); *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965); see also *United States v. James Daniel Good Real Property,* 510 U.S. 43, 53 (1993); *Wisconsin v. Constantineau,* 400 U.S. 433, 437 (1971).

Though the *Mathews v. Eldridge* analysis requires an evaluation of each challenged statutory provision or instance of government deprivation, certain general comments are appropriate. The personal interests implicated by Article 10 are fundamental human interests, including (i) liberty per se, which may be lost to involuntary commitment or strict probation-like conditions which must be complied with on pain of involuntary commitment;[FN5] (ii) involuntary psychiatric or behavior modification medication or other treatment;[FN6] and (iii) the lifelong stigma attached to the label of sex offender that may adversely affect an individual's ability to live and work.[FN7] An erroneous deprivation due to inadequate procedures in this context will likely lead to, at a minimum, substantial stigma and mandated strict supervision. The governmental interests involved are also serious. Individuals who are mentally ill and dangerous, and prone to the commission of sexual offenses, pose serious risks to our communities. New York thus has a strong interest in ensuring the safety of potential victims of such offenses.

> FN5. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno,* 481 U.S. 739, 755 (1987). "[A]n unchecked system of detention carries the potential to become a means for oppression and abuse." *Hamdi v. Rumsfeld,* 542 U.S. 507, 530 (2004) (plurality opinion). See also *Vitek v. Jones,* 445 U.S. 480,

492 (1980) (" '[A]mong the historic liberties' protected by the Due Process Clause is the 'right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.' "), quoting *Ingraham v. Wright,* 430 U.S. 651, 673 (1977). "[I]nvoluntary commitment to a mental hospital, like involuntary commitment of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law." *O'Connor v. Donaldson,* 422 U.S. 563, 580 (1975) (Burger, C.J., concurring), citing *Specht v. Patterson,* 386 U.S. 605, 608 (1967), and *In re Gault,* 387 U.S. 1, 12–13 (1967). *See also Vitek,* 445 U.S. at 491 ("[F]or the ordinary citizen, commitment to a mental hospital produces a massive curtailment of liberty ... [and] in consequence requires due process protection.") (citations and internal quotation marks omitted); *see also Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983).

FN6. One has a liberty interest against "[c]ompelled treatment in the form of mandatory behavior modification programs" absent adequate justification. *Vitek,* 445 U.S. at 492. *See also Mills v. Rogers,* 457 U.S. 291, 299 n. 16 (1975) (assuming without deciding "that involuntarily committed mental patients do retain liberty interests protected directly by the Constitution ... and that these interests are implicated by the involuntary administration of antipsychotic drugs") (citations omitted); *Project Release v. Prevost,* 722 F.2d 960, 979 (2d Cir.1983) ("Although *Mills* did not definitively resolve the question of whether a liberty interest in refusing antipsychotic medication exists as a federal constitutional matter, the case appears to indicate that there is such an interest."); *id.* ("[I]t appears that New York State recognizes the right" to refuse antipsychotic medica-

tion).

FN7. Due process is implicated not only when an individual's physical liberty is impaired, but also "[w]here a persons's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Wisconsin v. Constantineau,* 400 U.S. 433, 437 (1971). Harm to "reputation alone ... is [not] 'liberty' ... by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis,* 424 U.S. 693, 701 (1976). The Second Circuit has required some additional impediment beyond harm to reputation alone to establish a constitutional deprivation. *See, e.g., Valmonte v. Bane,* 18 F.3d 992, 999 (2d Cir.1994); *Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.1989). The liberty interests implicated by involuntary civil commitment based on mental illness include "adverse social consequences to the individual ... [and] [w]hether we label this phenomena 'stigma' or choose to call it something else ... we recognize that it can occur and that it can have a very significant impact on the individual." *Vitek,* 445 U.S. at 492, citing *Addington v. Texas,* 441 U.S. 418, 425–26 (1979); *Neal v. Shimoda,* 131 F.3d 818, 829 (9th Cir.1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender ."). *See also Doe v. Pataki,* 3 F.Supp.2d 456, 469 (S.D.N.Y.1998).

C. Involuntary Detention of Persons With Mental Illness

The Constitution does not guarantee an "absolute right in each person to be, at all times and in all circumstances, wholly free from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

safety to its members." *Kansas v. Hendricks,* 521 U.S. 346, 356–57 (1997) (citations and internal quotation marks omitted). Civil commitment is appropriate in certain circumstances, but it "must be justified on the basis of a legitimate state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding. Equally important, confinement must cease when those reasons no longer exist." *O'Connor,* 422 U.S. at 580 (Burger, C .J., concurring), citing *McNeil v. Director, Patuxent Inst.,* 407 U.S. 245, 249–50 (1972) and *Jackson v. Indiana,* 406 U.S. 715, 738 (1972). States have, in "certain narrow circumstances," provided for "forcible civil detainment of people who ... pose a danger to the public," and the Supreme Court has

> **\*6** consistently upheld ... involuntary commitment statutes when (1) the confinement takes place pursuant to proper procedures and evidentiary standards, (2) there is a finding of dangerousness either to one's self or others, and (3) proof of dangerousness is coupled ... with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'

*Kansas v. Crane,* 534 U.S. 407, 409–10 (2002), citing *Hendricks,* 521 U.S. at 357–58 (internal quotation marks omitted). "[E]ven if ... involuntary confinement [is] initially permissible [and founded upon a constitutionally adequate basis], it [can] not constitutionally continue after that basis no longer exist[s]." *O'Connor,* 422 U.S. at 575 (citation omitted); FN8 see also *Foucha v. Louisiana,* 504 U.S. 71, 78 (1992) ("[K]eeping [someone] against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness.").

> FN8. These constitutional concerns were reflected in the Kansas civil commitment statute at issue in *Hendricks* and *Crane,* where "[i]f, at any time, the confined person is adjudged 'safe at large,' he is statutorily entitled to immediate release." *Hendricks,* 521 U.S. at 364. The Kansas

statute "permit[s] immediate release upon a showing that the individual is no longer dangerous or mentally impaired." *Id.* at 368–69.

The substantive standards governing involuntary civil detention are well established: "A finding of 'mental illness' alone cannot justify a State's locking up a person against his will and keeping him indefinitely in simple custodial confinement." *O'Connor,* 422 U.S. at 575. "Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty." *Id.* (citations omitted). Involuntary civil confinement "may entail indefinite confinement, [which] could be a more intrusive exercise of state power than incarceration following a criminal conviction." *Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983). Though "involuntary civil commitment constitutes a significant deprivation that requires due process protection, ... the difference between civil and criminal confinement may nonetheless be reflected in different standards and procedures applicable in the context of each of the two systems—so long as due process is satisfied." *Id.* (citations and internal quotation marks omitted). In the case of civil confinement, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson,* 406 U.S. at 738. However, "due process does not tolerate the involuntary confinement of a nondangerous individual." *Project Release,* 722 F.2d at 972 (citations and internal quotation marks omitted).

III. The Challenged Provisions

Plaintiffs do not challenge New York's authority to involuntarily commit individuals who have in the past committed sexual crimes and are at present mentally ill and dangerous. Nor can they, because the Supreme Court has held that such detention is constitutionally authorized. See *Hendricks,* 521 U.S. at 356, 369–71 (holding that confinement of sex offenders based on proof of mental abnormality and a finding of dangerousness does not violate

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
**(Cite as: 2007 WL 4115936 (S.D.N.Y.))**

substantive due process, and rejecting claims that sexual offender detention provisions violate the Double Jeopardy Clause or constitute impermissible ex post facto lawmaking. Plaintiffs' challenges therefore leave untouched the central provisions of the new statutory scheme, which authorize detention based on a finding that an individual who (i) has committed a sex crime (or the acts which constitute the crime) and (ii) is mentally ill and dangerous may be involuntarily committed. Plaintiffs object, however, to some provisions of the statute that they claim permit an offender to be detained on an inadequate showing of these factors. Five of their six challenges to the statute relate to this basic concern. Their sixth challenge relates to the timing of the appointment of counsel.

A. MHL § 10.06(f)

**\*7** Article 10 authorizes detention both after the probable cause hearing and after the commitment hearing. However, Article 10 also authorizes detention of a potential sexual offender even *before* the probable cause hearing, and in advance of any judicial hearing, solely on the basis of an executive order of detention, and plaintiffs challenge the constitutionality of these pre-hearing detention provisions.

When an individual subject to the Act may be released from incarceration or parole before the CRT is able to make a determination as to whether the individual may be a sex offender in need of civil management, the Attorney General, if she "determines that the protection of public safety so requires," may file a "securing petition." MHL § 10.06(f).FN9 The filing of such a "securing petition" in and of itself requires that the individual shall be (or remain) detained and "there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management." *Id.*FN10

FN9. The statute incorporates certain timelines anticipating that the evaluation of the individual will be completed before an individual is scheduled for release. *See, e.g.,*

MHL § 10.05(b) (agencies shall give notice to the Attorney General and Commissioner of Mental Health 120 days prior to an individual's release); MHL § 10.05(g) (if the CRT determines that the individual is a sex offender requiring civil management, it shall give notice of this fact to the Attorney General and the respondent within 45 days of the Commissioner of Mental Health's receipt of the notice of the individual's release); MHL § 10.06(a) (Attorney General shall seek to file the sex offender civil management petition with the court within 30 days after receiving the case review team's finding). However, as certain of the provisions explicitly note, *see, e.g.,* MHL §§ 10.05(g), 10.06(a), and the statute more generally provides, these deadlines are almost always aspirational, and the failure to meet these deadlines "shall not invalidate later agency action except as explicitly provided by the provision in question." MHL § 10.08(f). Thus, Article 10 anticipates that some individuals may be scheduled for release before the CRT can complete its work and the normal judicial process is instituted.

FN10. The full text of the provision states:

Notwithstanding any other provision of this article, if it appears that the respondent may be released prior to the time the case review team makes a determination, and the attorney general determines that the protection of public safety so requires, the attorney general may file a securing petition at any time after receipt of written notice pursuant to subdivision (b) of section 10.05 of this article. In such circumstance, there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management. If the case review

team determines that the respondent is not a sex offender requiring civil management, the attorney general shall so advise the court and the securing petition shall be dismissed.

MHL § 10.06(f).

Plaintiffs contend that these provisions violate the most basic tenets of due process: notice to the individual and an opportunity to challenge the continued detention. (MHLS Mot. 5–7.) Defendants contend that plaintiffs' concerns are overblown, and that their criticisms take the statute out of context. (D.Opp.8–10.) They insist that the securing petition provision actually "protects rather than injures the respondent" because it ensures that a judge can only determine whether an individual has a "mental abnormality" with the benefit of technical clinical evidence provided by the CRT evaluation. (*Id.* at 8.) Defendants also suggest that "the securing provisions come into play only after notice" and only in situations where "the protection of public safety so requires." (*Id.* at 10.)

On these points, defendants' arguments are unpersuasive. It is true that some form of "notice" must be given in advance of a securing petition; however, it is not notice given *to* the individual subject to the petition, and it is not notice *regarding* the potential detention by securing petition. The statute anticipates that the agency that has jurisdiction over a person who may be a detained sex offender nearing release will give notice to the Attorney General and the Commissioner of Mental Health within 120 days before such a person's release. MHL § 10.05(b). The Attorney General is authorized to issue a securing petition "at any time after receipt of written notice" pursuant to § 10.05(b), regardless of whether the Commissioner of Mental Health has received such notice. MHL § 10.06(f). Whatever notice might in due course be given to a respondent about Article 10's potential applicability to him in advance of the filing of a securing petition,[FN11] the statute unquestionably does not require that anyone give notice to the re-

spondent, in advance of the detention, that he will be detained by a securing petition. Moreover, the statute gives an individual no opportunity to contest the petition, and thus his detention, in advance of its issuance. In addition, individuals subject to securing petitions would not necessarily have state-appointed counsel to assist them in determining how to respond to a securing petition. MHL § 10.06(c) (appointment of counsel is triggered by the filing of a sex offender civil management petition or the request for the attorney general for a court-ordered psychiatric examination, not the filing of a securing petition).

> FN11. *See, e.g.,* MHL § 10.05(e) ("If the person is referred to a case review team for evaluation, notice of referral shall be provided to the respondent.").

**\*8** Defendants also contend that any deprivation of liberty will be modest, because the statute requires a probable cause hearing to be held within 72 hours of the filing of the securing petition. (D. Opp. at 8.) However, this is not strictly accurate. Though the probable cause hearing is initially scheduled to be held within 72 hours of the filing of a securing petition, the probable cause hearing may be delayed due to (i) delay caused or consented to by the individual, or (ii) a showing by the Attorney General, to the satisfaction of the court, of "good cause why the hearing could not ... commence." MHL § 10.06(h). Moreover, the statute provides that in the event of the filing of a securing petition, "there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management." MHL § 10.06(f). Thus, the confinement occasioned by the securing petition could extend well beyond 72 hours.

The Second Circuit has upheld against constitutional challenge brief detentions of less than 72 hours in certain situations involving persons who may be mentally ill and dangerous to themselves or others. Project Release, 722 F.2d at 966, upheld a statutory provision authorizing involuntary deten-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion for 72 hours of a previously voluntary admittee to a mental hospital who gave notice of his desire to leave, so as to give the hospital administrator sufficient time to determine whether the individual should be converted from voluntary to involuntary commitment. *Charles W. v. Maul* authorized detention for less than 72 hours in a New York State psychiatric center of an individual adjudicated incompetent to stand trial on a misdemeanor charge, in order to "evaluate whether he presented a danger to himself or others warranting invocation of New York's civil commitment law." 214 F.3d 350, 353 (2d Cir.2000).

The situation surrounding the detentions authorized here appears different from those involved in Project Release or Maul. First, the nature of the dilemma faced by New York is different. Both Project Release and Maul involved situations where the release of the potentially dangerous or ill person was necessarily unpredictable. A hospital director does not know that a voluntary admittee wishes to leave until the admittee gives the director notice of those wishes. Similarly, when, or whether, a criminal defendant will be adjudicated incompetent to stand trial is also unpredictable, and the "state will not necessarily be prepared to undertake civil commitment proceedings immediately after criminal charges are dismissed." *Maul,* 214 F.3d at 359. In those situations, therefore, brief emergency detention periods are in some sense functionally necessary. Here, in contrast, the conclusion of a term of parole or imprisonment is generally a predictable event, and one for which, at least in the normal course of events, the CRT has at least 120 days in advance of the offender's release to prepare by conducting its investigation.

**\*9** Second, the procedures and deadlines involved in the 72–hour period of review here appear to be less rigorous than those at issue in Project Release and Maul. Under the regulatory scheme challenged in Project Release, upon written notice of the patient's desire to leave, the hospital director could continue that person's detention based on

"reasonable grounds for belief that the patient may be in need of involuntary care and treatment." 722 F.2d at 966, citing MHL § 9.13(b). During that period, the director "must have two physicians examine the patient and report their findings and conclusions separately to the director, who must then either release the patient or apply for a court order authorizing involuntary retention." *Id.,* citing N.Y. Comp.Codes R. & Regs. tit. 14, § 15.7 (1980). Upon application to a court, written notice is given to the patient and the patient's nearest known relative, and to a number of other parties (including Mental Health Information Service, an organization that provides information and assistance to patients and others interested in their welfare), any of whom can demand a judicial hearing to be held within three days of the court's receipt of such a demand. *Id.* The normal procedures for court authorization of detention of an involuntary patient then apply. *Id.,* citing MHL §§ 9.13(b), 9.33. In Maul, the government policy authorizing detention required evaluation within 72 hours of a finding of incompetency to stand trial before initiating civil confinement proceedings. 214 F.3d at 356.

Here, in contrast, the judicial review at the 72–hour stage may be no more than a determination that the Attorney General has shown "good cause" for delaying the CRT evaluation. The statute does not provide *any* absolute outer limit to the time that a CRT may spend in making its determination in the wake of a filed securing petition. There are no standards in the statute for what may constitute "good cause," no requirement that this "good cause" showing be established by any sort of hearing, and no requirement that petitioner participate in such a process. Furthermore, the "good cause" finding appears to relate to the existence of an excusable failure to complete the CRT evaluations, and is not necessarily a mechanism by which the judge may review the Attorney General's determination that the individual is sufficiently dangerous so as to require a securing petition. Though the detention may be based on an executive branch determination that an individual is dangerous, that determin-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

ation may be unreviewable by a court for a potentially indefinite period of time.

The securing petition thus may operate as a mechanism by which an executive branch official is empowered to order that an individual be held in custody beyond his sentence or judicial order of confinement on the mere say-so of the Attorney General. It may operate to authorize executive detention without notice to the individual being detained, without an opportunity to be heard, without advance judicial approval of the detention. There is no provision for immediate review by any court that the emergency action was justified and that the individual is in fact dangerous or may be dangerous, and no requirement that the court make an immediate decision as to whether an offender merits detention. Moreover, the detention could potentially last indefinitely, where "good cause" is shown why the CRT is unable to render a decision as to whether the individual may suffer a "mental abnormality" as defined by the statute.

***10** However, this is not a case in which any plaintiff is challenging his or her confinement pursuant to a securing petition. Rather, the plaintiffs here are challenging the provisions of § 10.06(f) as facially unconstitutional. Such plaintiffs bear a heavy burden. Facial invalidation of a statute is an extraordinary remedy and generally disfavored. *National Endowment for the Arts v. Finley,* 524 U.S. 569, 580 (1998) (Facial challenges to statutes are "generally disfavored," as facial invalidation is "strong medicine" that "has been employed by the Court sparingly and only as a last resort."), citing *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 223 (1990), and *Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973). "A facial challenge will only succeed if there is no set of circumstances under which the challenged practices would be constitutional." *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 347 (2d Cir.1998). Therefore, a court need only determine "whether there are 'any circumstances under which the [provisions] of the Act are permissible in order to uphold the Act.' " *Velazquez v. Leg-*

*al Services Corp.,* 164 F.3d 757, 763 (2d Cir.1999), quoting *Able v. United States,* 88 F.3d 1280, 1290 (2d Cir.1996). At least outside the special context of the First Amendment, plaintiffs challenging the facial constitutionality of a statute must demonstrate that the statute is invalid "in all applications." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.,* 462 F.3d 219, 228 (2d Cir.2006).

Although the analysis above suggests that under certain circumstances the broad authorization of confinement by direction of the Attorney General may operate unconstitutionally, whether by extending detention for too long a period or by permitting detention without a genuine emergency, the present record does not demonstrate that the statute cannot be administered or interpreted in a way to avoid these problems. To obtain a preliminary injunction, plaintiffs have the burden of demonstrating a likelihood of success in proving that "each time that [the] statute is enforced, it will necessarily yield an unconstitutional result." *Nat'l Abortion Fed'n v. Gonzales,* 437 F.3d 278, 293–94 (2d Cir.2006) (Walker, C.J., concurring).

There are situations, however, in which an executive official, with cause to believe that an individual is dangerous, can constitutionally detain such an individual in advance of a court hearing. See, e.g., *County of Riverside v. McLaughlin,* 500 U.S. 44, 56 (1991) (noting that probable cause hearing must follow within 48 hours of warrantless arrest); see also *Project Release,* 722 F .2d at 966; *Maul,* 214 F.3d at 353. The constitutionally of the detention depends, among other things, on (i) the reason for the detention, including existence of good or probable cause to detain the individual in the first place, and the nature of the exigency requiring action without prior notice and hearing, (ii) the nature of the detention, including the length of the detention pending the judicial hearing, and (iii) the nature and meaningfulness of the judicial review, when it actually comes. Thus, there exist situations in which an individual who may be a sexual offender may constitutionally be detained in ad-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

vance of a decision by an impartial decision maker that the individual is in fact dangerous. However, detention in advance of meaningful review by a judicial officer or other impartial factfinder is usually only appropriate for a matter of days. See, e.g., *County of Riverside,* 500 U.S. at 56; *Project Release,* 722 F.2d at 966; *Maul,* 214 F.3d at 353.

**\*11** Thus, while plaintiffs have raised serious and legitimate concerns about the potential operation of § 10.06(f), they have not established that they are likely to succeed in establishing the facial invalidity of this provision. It is not possible to conclude on the basis of the present record that the statute will necessarily function in an unconstitutional manner. In the first six months of the statute's operation, the parties agree, securing petitions have been used only twice.FN12

> FN12. The first securing petition was filed on the date the Act became effective. (Letter of Edward J. Curtis, Esq., to the Court, dated September 21, 2007, at 2.) The second securing petition was filed on July 11, 2007, and withdrawn in two days. (Letter of Edward J. Curtis, Esq., to the Court, dated September 26, 2007, at 1 .)

In these cases, it appears that the periods of detention without judicial review were brief, and the record is unclear as to the reasons, if any, why the CRT was unable to complete its review before the offender's scheduled release.

It is conceivable that the statute may be susceptible to constitutional application. If there are situations in which a potentially dangerous offender who may qualify as a mentally abnormal sex offender requiring confinement is unexpectedly scheduled for imminent release, and the detention is limited to a brief period before a judicial hearing, the resulting emergency may justify a short period of detention pending such a hearing. At this early stage of the proceedings, it is unclear whether such situations exist. A factual record detailing the circumstances under which the relevant authorities be-

come aware of the scheduled release of offenders, and how the CRTs operate, may reveal whether genuine emergency conditions warranting executive detention actually exist.

But plaintiffs have not established that it is likely that such conditions do not exist. And in any event, as a matter of equitable discretion, an injunction on these facts would be inappropriate. Since the statute was recently enacted, New York State courts have not yet had an opportunity to interpret these provisions. As a matter of equitable discretion, it is preferable to give the New York State courts the opportunity to determine the proper scope of a New York law before a federal court declares whether it offends the federal Constitution. New York courts may well interpret the securing petition as a mere emergency device, only to be utilized in compelling circumstances, and may narrowly interpret the exceptions to the provision of judicial review within 72 hours. Depending upon how New York courts interpret their own statute, there may be no need to reach any federal constitutional issue.

In short, this Court declines to issue a preliminary injunction against a provision that may rarely if ever be used, or if used, may be capable of being interpreted or applied in a manner that does not offend the due process clause. Because a fuller factual record is necessary for the Court to determine whether the statute may be capable of constitutional application, both plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss will be denied as they pertain to MHL § 10.06(f).

**B. MHL § 10.06(k)**

Once the Attorney General, based on the report of the CRT, determines that an individual may be a sex offender in need of civil management, he may file a "sex offender civil management petition" with a New York court. MHS § 10.06(a). Within 30 days of the filing of the sex offender management petition, the court must conduct a hearing without a jury to determine if there exists "probable cause to believe that the respondent is a sex offender requir-

ing civil management." MHL § 10.06(g). If, at the conclusion of the hearing, the court finds such probable cause, the judge is required to commit the individual to a secure treatment facility, where the individual shall be detained pending the civil commitment trial. MHL § 10.06(k). Detention may last more than 60 days.[FN13]

> FN13. The statute requires a trial to begin within 60 days of the probable cause hearing. MHL § 10.07(a). However, since the statute mandates detention through the completion of the trial, MHL § 10.06(k)(iii), the statute authorizes detention beyond 60 days. In the first case that went to trial, the time of detention extended to 80 days. (Tr. 53.) In complicated trials, detention may even be longer. Both the significant period of detention authorized, as well as the purpose of the detention itself, separate this case from other statutes which authorize very short periods of detention for the purpose of determining whether or not an individual is dangerous or is in need of confinement. See *Project Release,* 722 F.2d at 966 (72 hours); *Charles W. v. Maul,* 214 F.3d at 358–59 (2d Cir.2000) (less than 72 hours).

**\*12** Plaintiffs contend that these provisions are unconstitutional because they mandate the confinement of an individual pending the commitment trial without a finding that the individual detained is in fact dangerous, or even without probable cause to believe that the individual *might* be dangerous. An evaluation of this contention requires careful attention to the details of the regulatory scheme.

It is undisputed that when a proceeding may result in an adjudication of detention, a court may detain the defendant pending adjudication of the matter based on a finding of probable cause to believe the facts justifying ultimate detention exist, plus a finding that lesser conditions of supervision during pendency of the action will not be sufficient to guarantee the safety of the community. That is

the teaching of *United States v. Salerno,* 481 U.S. 739 (1987), which upholds a statute permitting pretrial detention of defendants in criminal cases on just such a showing. There is no reason why a similar standard should not apply in civil commitment proceedings: if there is probable cause to believe the respondent is likely to be adjudicated a dangerously mentally ill person or a sex offender requiring confinement as defined in the Act, the same need to guarantee the safety of the community that warrants detention of a criminal defendant while he is still presumed innocent warrants a similar detention pending trial of potentially dangerous persons who have not yet been found to require civil commitment.

Plaintiffs do not dispute this general principle. They argue, however, that unlike the pre-trial detention regime upheld in Salerno, the statute at issue here requires the detention pending trial of *all* respondents as to whom there is probable cause that they qualify as sex offenders requiring civil management, without an individualized judicial determination that they cannot safely be at liberty pending adjudication. They contend, in effect, that this is analogous to a statute that denied bail to *all* criminal defendants pending trial, based only on a finding of probable cause to believe they committed an offense that *might* lead to a prison sentence.

Defendants respond that the analogy fails, because a finding of dangerousness is implicit in the probable cause determination required by MHL § 10.06(k). They note that the required finding, is among other things, a finding of probable cause to believe that the respondent suffers from a mental abnormality which is defined to include only those mental abnormalities which "predispose [ ] [an individual] to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct." MHL § 10.03(i). Therefore, defendants contend, a degree of dangerousness sufficient to justify 60 days of detention pending a trial is embedded into the definition of mental abnormality itself.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

But that is not quite so. What is relevant to the pre-trial release decision is not merely a generalized notion that a person presents some degree of potential danger—if that were so, any person that there is probable cause to believe committed a crime of violence could be detained without more—but also a finding that the person is sufficiently dangerous that less intrusive conditions than detention cannot guarantee the safety of the community pending trial.

**\*13** Article 10 itself makes clear, however, that not all persons who have a mental abnormality sufficient to meet the definition of a "sex offender requiring civil management" require actual confinement. Under the statute, "sex offender requiring civil management" is a catch-all category that includes individuals subject to the act who are *not* individuals "likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." MHL §§ 10.03(e), (q), (r). At least some individuals who fit this broader category will *not* be subject to detention, but only to parole—or probation-like conditions of supervision while at liberty in the community, even *after* a jury finding that they have been *proven,* by clear and convincing evidence, to be sex offenders in need of civil management.

The Act is not simply a mechanism to extend the confinement of individuals currently incarcerated; it can also operate to extend parole-like conditions to persons who are currently on parole. In certain situations, New York apparently believes that strict and intensive supervision of (and medication and therapy for) a respondent, under conditions resembling parole supervision, is adequate to protect the community. Defendants do not contest that persons across a broad spectrum of treatment needs and threat levels may be classified as "sex offenders requiring civil management." That there is probable cause to believe that an individual requires some kind of civil management, and may be dangerous *if not treated,* does not necessarily mean that such a person will be dangerous *if released,* and

would therefore require detention.[FN14]

> [FN14]. The presence of a mental abnormality combined with the commission of a past crime may be sufficient to institute proceedings against an individual, and surely the commission of past sexually violent crimes is relevant to a psychiatrist's or judge's determination of whether an individual is at present violent. *Hendricks,* 521 U.S. at 357 ("[P]revious instances of violent behavior are an important indicator of future violent tendencies.") (citations and internal quotation marks omitted). However, it is current dangerousness, not past crimes, which ultimately justifies civil detention in these situations. *See, e.g., id.* (the act held constitutional in *Hendricks* "unambiguously requires a finding of dangerousness either to one's self or to others as a prerequisite to involuntary confinement").

Nevertheless, the Act requires the detention, pending trial, on a mere finding of probable cause to believe that the respondent suffers from a "mental abnormality," of those for whom detention is not a necessary or intended remedy, even if such abnormality is proven at trial. Mandatory detention pending trial is triggered by a court finding of probable cause to believe that a person is a "sex offender requiring civil management," not by a finding of probable cause to believe that such a person is dangerous or requires secure confinement. Under the Act, then, a person may be detained for 60 days or more based on a determination that there is probable cause to believe that he may have committed a sexual felony and may have a mental abnormality.[FN15] Comparing a federal sex offender statute's definition of "sexually dangerous" demonstrates how Article 10's definition of "mentally abnormal" does not incorporate a finding of dangerousness. The comparable federal sex offender statute defines a "sexually dangerous" individual to be one who "suffers from a serious mental illness, abnormality,

or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation *if released."* 18 U.S.C. § 4247(a)(6) (italics added). Likewise, by provision of Article 10, a "dangerous sex offender requiring confinement" is a person who suffers from a mental abnormality such that "the person is likely to be a danger to others and to commit sex offenses *if not confined to a secure treatment facility."* MHL § 10.03(e) (italics added). Both incorporate a finding that the individual would likely be sexually violent *if released.* In critical contrast, Article 10's definition of mental abnormality includes those individuals whose tendencies may be controlled by remedies that fall short of confinement, such as medicine, treatment, or some other form of supervision.

> FN15. Article 730 defendants, a subset of the larger category of "detained sex offender," MHL § 10.03(g)(2), may have only been indicted for a crime before a court found them incompetent to stand trial. N.Y.Crim. Proc. Law ("CPL") § 730.50(1). Article 10 requires that only those 730 defendants that "did engage in the conduct constituting" the offense be subject to Article 10. However, such a determination is presumed at the probable cause stage, MHL § 10.06(j)(iii), and only needs to be proved by clear and convincing evidence at the trial stage, MHL § 10.07(d).

**\*14** The intervenor's situation illustrates the point.[FN16] He alleges that in the Article 10 proceeding against him, New York seeks only an order, in effect, of continued parole. (Intervenor Complaint ¶¶ 4, 21, 26.) Such parole-like community treatment is apparently all New York contends is required, and all the State asks the Court to impose if a jury finds that he indeed requires any treatment at all. Such treatment without detention, indeed, is all that was imposed on the intervenor before institution of proceedings under the Act.

> FN16. At this stage of the proceedings, the Court makes, and can make, no findings on the facts of the intervenor's case. Rather, the Court assumes the truth of the intervenor's allegations for the purposes of this discussion. The point is not whether these facts are indeed true as to the intervenor, but simply that what he contends are the facts of his case illustrate the conceded structure of the statute. Indeed, the Court has been advised that since the briefing in this case, the intervenor has been detained on a charge of parole violation.

Nevertheless, under § 10.06(k), upon a finding of probable cause to believe that the intervenor may have a mental abnormality as defined by the statute, a person in the intervenor's situation must be automatically detained pending trial. Such detention is potentially catastrophic. Not only will the intervenor lose his liberty, but he will likely lose his job and his house, and default on loans. (*Id.* ¶ 33.) He will thus, by mandatory operation of the statute, be deprived of more liberty *before* he is adjudicated in need of treatment, based on a mere showing of probable cause to believe treatment is required, than New York seeks to impose *after* he is shown by clear and convincing evidence to need treatment. This is perverse, and at oral argument the State was unable to give any rational explanation of how this furthers any legitimate government interest.[FN17] Nor can it—there is no convincing reason that an individual should be detained for a substantial period of time pending a trial to determine whether a person does or does not need outpatient treatment.

> FN17. *See* (Tr. at 54–59); (*id.* at 59, "It is a difficult thing to justify. I have explained why I believe it's there, and that's about all I can offer.").

The Supreme Court has never held that an individual can be detained for a substantial period of time based on mental incapacity alone. See, e.g., *O'Connor,* 422 U.S. at 575 ("A finding of 'mental illness' alone cannot justify a State's locking up a person against his will and keeping him indefinitely

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

in simple custodial confinement."). Those civil commitment statutes that the Supreme Court has upheld require a specific "finding of dangerousness either to one's self or to others" that "links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior." *Crane,* 534 U.S. at 410, citing *Hendricks,* 521 U.S. at 357–58. Due process "does not tolerate the involuntary confinement of the non-dangerous individual." Project Release, 722 F.2d at 972 (citations and internal quotation marks omitted).

In practice, the automatic detention provisions operate less as a precise tool to determine who is dangerous enough to be committed pending trial, and more as a hammer to coerce individuals to enter into plea arrangements with the State, and thereby accept both designation as a sex offender and intensive ongoing treatment in order to avoid spending what may be more than 60 days in involuntary confinement. A respondent as to whom post-trial detention is not sought will have an overwhelming incentive to agree to an adjudication that he is a sex offender in need of treatment, and to accept continuation of community supervision, rather than contest the State's case, in order to avoid a potentially lengthy period of detention pending trial, even if he believes he may avoid any adverse consequence by going to trial.

**\*15** Detention will of course be warranted in some cases; however, it should be triggered, as the Legislature notes, "[i]n extreme cases" and only for "the most dangerous offenders." MHL § 10.01(b). FN18 In contrast, § 10.06(k) extends automatic detention to all individuals who may receive treatment subject to Article 10, without a judicial proceeding to determine dangerousness, and with no rational basis for determining whether the particular individual would pose a danger to the community if released. New York may not automatically detain any individual who may be subject to the statute for a significant period of time without proving that there

is at least probable cause to believe that he is dangerous. FN19

> **FN18.** In other portions of the brief, defendants note that the "array of protections, evaluations, judicial determinations and necessary findings which are built into the legislative scheme provide ample constitutional protections, at both the probable cause and trial stages." (D.Mot.12–13.) However, at no point previous to the mandatory detention does any person at any level make any determination that an individual is so dangerous as to necessitate detention.

> **FN19.** Defendants argue that in order to mount a successful facial challenge to a statute, plaintiffs must establish that there is no set of circumstances under which the statute would be valid. (D. Opp. 29, quoting *Salerno,* 481 U.S. at 745.) However, MHL § 10.06(k) can never be constitutional, because individuals subject to these provisions, and faced with a substantial period of detention, are entitled to an individualized determination that they are in fact dangerous. The question is not whether *detention pending trial* will ever be valid—plaintiffs concede it sometimes will be—but whether *mandatory* detention pending trial, without the showing of dangerousness necessary to justify such detention, is on its face invalid.

Plaintiffs have thus demonstrated a likelihood of success on the merits with respect to the unconstitutionality of MHL § 10.06(k). Plaintiffs have also demonstrated irreparable injury. When a complaint alleges denial of a constitutional right, irreparable harm is presumed. *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984). Unjustified confinement to a mental institution is a "massive curtailment of liberty." *Vitek,* 445 U.S. at 491. Being coerced into accepting a designation of "mentally abnormal sex offender" is also highly stigmatic. See

*Vitek,* 445 U.S. at 492; *Neal v. Shimoda,* 131 F.3d 818, 829 (9th Cir.1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender ."). The harm to respondent either in being involuntarily committed without a finding of dangerousness or in being coerced to accept a designation of sex offender without an opportunity to contest the Attorney General's petition is both grave and irreparable.

This dispute must be resolved with urgency because respondents in the civil commitment proceedings are entitled to contest the State's case against them. However, if they know that they will be detained pending trial, where the pre-trial consequences are more severe than the post-trial consequences even were they to be adjudicated at the commitment trial to be a sex offender in need of civil management, then there is overwhelming and enormous pressure for an individual to accept the designation of sex offender and related treatment rather than face the 60 days of involuntary confinement. This statutory provision raises serious due process concerns with respect to all individuals who may be subject to its terms, not only because it does not require a finding of dangerousness before a period of substantial involuntary commitment, but also because it functions as a club to coerce waivers of very serious and important rights.

Plaintiffs have demonstrated a likelihood of proceeding on the merits as well as irreparable injury. Section 10.06(k) is inherently coercive, and plaintiffs' motion for a preliminary injunction will be granted insofar as the section requires detention pending trial absent a specific, individualized finding of probable cause to believe that a person is sufficiently dangerous to require confinement, and that lesser conditions of supervision will not suffice to protect the public during pendency of the proceedings.

C. MHL § 10.06(j)(iii)

*16 Plaintiffs also challenge a provision of the Act that forbids a class of individuals known as

Article 730 defendants from contesting at the probable cause hearing the facts that form the basis of the criminal charges against them. Article 730 defendants are individuals who have been charged with a crime and found incompetent to stand trial pursuant to Article 730 of the New York Criminal Procedure Law, N.Y.Crim. Proc. Law ("CPL") §§ 730.10 –70. FN20 MHL § 10.03(g)(2). Although these individuals have never been found guilty of a crime, nevertheless a respondent's commission of a sex offense shall be "deemed established" and shall not be re-litigated at the probable cause hearing where it "appears that ... the respondent was indicted for such offense by a grand jury but found to be incompetent to stand trial for such offense." MHL § 10.06(j)(iii).

FN20. Article 730 authorizes criminal courts to order psychiatric investigations of criminal defendants under certain circumstances and when the court "is of the opinion that the defendant may be an incapacitated person." CPL § 730.30(1). Upon the receipt of an examination order, two qualified psychiatric examiners must examine the defendant to determine his capacity. CPL § 730.20(1). If the examiners are not of the same opinion regarding the capacity of the defendant, a third psychiatric examiner must examine the defendant. CPL § 730.20(5). When the examiners are not unanimous in their opinion that the defendant is a dangerous incapacitated person, the court must conduct a hearing to make that determination. CPL § 730.30(4). Where the examiners are unanimous, the court may *sua sponte* conduct a capacity hearing, and must do so on motion by the defendant or the district attorney. CPL § 730.30(3). If the court concludes that the defendant is not incapacitated, the criminal action against him will proceed. CPL § 730.50(1). If the court is satisfied that the defendant lacks the capacity to assist in his defense, or if no party objects to the unan-

imous conclusion of the psychiatrists that the defendant is incapacitated, the court must issue either an order of observation or an order of commitment. CPL § 730.50(1). In the case of those charged with non-felony offenses, upon the order of observation or commitment the court must dismiss the criminal indictment with prejudice. CPL § 730.50(1). In the case of those charged with felony offenses, the criminal action may proceed against the defendant if the defendant regains capacity. CPL §§ 730.50(2)-(3). A defendant charged with a felony but found unable to stand trial cannot be detained in the aggregate for longer than two-thirds of the authorized maximum term of imprisonment for the highest class felony charged in the indictment. CPL § 730.50(3).

Plaintiffs attack these procedures, pointing out that Article 730 defendants may be detained pending an Article 10 trial without any finding that they committed the underlying offense charged, while all other persons to whom the Act applies have been found to have committed all of the elements of the offense charged. (MHLS Mot. 16 .) Plaintiffs claim that this provision violates both due process and equal protection.

Plaintiffs' due process argument is founded on the concern that an individual may be detained following the probable cause hearing pending the commitment trial based on insufficient evidence that he in fact committed a crime and is in fact dangerous. Defendants argue that indictment by a grand jury demonstrates the existence of "legally sufficient evidence" to establish that a person committed such an offense. (D. Mot. 20, citing CPL §§ 190.65(1)(a)-(b) & 70.10(1)-(2)). Plaintiffs rightly point out that neither an indictment nor a finding of incompetence establishes guilt. However, detention pending criminal trial does not require a finding that the defendant in fact committed the crime charged, but only probable cause to believe that the

individual committed an offense (and is dangerous or a flight risk). See, e.g., *Salerno,* 481 U.S. at 749, 755; *Bell v. Wolfish,* 441 U.S. 520, 534 (1979). In criminal cases, moreover, an indictment by a grand jury is sufficient to establish probable cause. CPL § 190.65(1); *U.S. v. Beyer,* 426 F.2d 773, 774 (2d Cir.1970). If an indictment is sufficient to conclusively establish probable cause that the person committed the offense at issue in the criminal proceeding, then surely it is sufficient to perform the same function in a civil commitment proceeding. Article 730 defendants, like other persons subject to the Act, will have the opportunity to contest the State's case against them at the commitment trial. So long as they are detained pending trial based on an individualized finding of dangerousness and mental abnormality (see discussion above regarding MHL § 10.06(k)), due process requires no more than a probable cause finding with respect to the underlying alleged offense.

**\*17** Plaintiffs' contention that this provision violates equal protection is also unpersuasive. Unlike others subject to the Act who have been convicted of crimes, individuals who lack capacity to assist in their own defense may not constitutionally be tried; and definitive findings about whether such a defendant in fact committed the charged crime are thus precluded. See, e.g., *Cooper v. Oklahoma,* 517 U.S. 348, 354 (1996) ("A defendant may not be put on trial unless he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.") (citations and internal quotation marks omitted). New York has not had the opportunity to try Article 730 defendants in advance of the Article 10 proceedings. Their inability to stand trial, however, should not prevent Article 730 defendants from being committed pursuant to an otherwise constitutional sexual offender commitment scheme. Persons who are unable to stand trial may still have committed violent sexual crimes, be mentally ill, and pose a serious danger to the community. New York has a strong interest in detaining and treating such indi-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

viduals. New York also has a strong interest in preventing the probable cause hearing, intended as an efficient screening mechanism, from turning into the first of two trials. That some persons subject to the Article 10 proceedings have been found guilty of crimes while others have not does not deny equal protection to either group.

Plaintiffs have not demonstrated a likelihood of success on the merits in their claims that MHL § 10.06(j)(iii) is facially unconstitutional, and subject to the other provisions of this opinion, plaintiffs' motion for preliminary injunction with respect to this provision is denied. Moreover, defendants' motion to dismiss the complaint will be granted as it pertains to plaintiffs' attack of MHL § 10.06(j)(iii), because as a matter of law, the probable cause established by an indictment is a sufficient showing of potential guilt to warrant pretrial detention where an individualized showing of mental abnormality and dangerousness have been made.

### D. MHL § 10.07(d)

The statute predicates detention after the commitment trial on findings that an individual is (i) a sex offender who is (ii) mentally ill and (iii) dangerous. The vast majority of persons subject to the Act have been found by a jury beyond a reasonable doubt to have committed at least one crime.[FN21] For two groups, however, the Act authorizes detention following the commitment trial of individuals who have not been convicted of any crime. The first group consists of those persons who, at a criminal trial, had been found by a jury beyond a reasonable doubt to have committed the conduct constituting the offense charged, but were also found to be not guilty by virtue of some mental disease or defect. MHL § 10.03(g)(3); see also NYPL § 40.15. The second group consists of Article 730 defendants, those persons charged with sex offenses but determined by a court to have been so incapacitated as to have been unable to help prepare their own defense, and therefore unable to stand trial. MHL § 10.03(g)(2). For such defendants, the statute permits post-trial detention where the Attorney General can "prov[e] by clear and convincing evidence [at the commitment trial] that respondent did engage in the conduct constituting [the sex] offense" for which the Article 730 defendant was indicted. MHL § 10.07(d). Therefore, of all individuals subject to the Act, only the Article 730 defendants face a designation of "sex offender," and potentially involuntary detention, without having been found beyond a reasonable doubt to have committed the acts which constitute *any* crime, sexual or otherwise.

> FN21. In most cases, that crime will have been determined by a jury, beyond a reasonable doubt, to have been sexual in nature. There are certain circumstances in which that is not the case, as discussed in Part III E of this Opinion, below.

**\*18** Plaintiffs attack the provisions relating to the post-trial detention of these Article 730 defendants, claiming that the procedures violate due process. Defendants, relying on *Addington v. Texas,* 441 U.S. 418 (1979), insist that the procedures set forth in the statute are adequate, because that necessary to support involuntary civil commitment need only be found by clear and convincing evidence. (D.Opp.21–22.)

Defendants' argument is not without force. As a general matter, plaintiffs concede that an individual may be civilly committed based on a finding, by clear and convincing evidence, that an individual is mentally ill and dangerous. (See Tr. at 35, 36–38.) Plaintiffs concede this, as they must, because the Supreme Court's opinion in Addington supports exactly that proposition, holding that an individual can be indefinitely civilly committed upon a showing by clear and convincing evidence that an individual is mentally ill and would be a danger if released. 441 U.S. at 420, 433. See also *Hollis v. Smith,* 571 F.2d 685, 692, 695 (2d Cir.1978). Indeed, Article 730 defendants who may be detained under Article 10 may have been committed pursuant to just such a civil commitment scheme,[FN22] and presumably the legislature could, if it chose,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

permit lengthier commitment for such individuals than is currently permitted by Article 730.[FN23]

> FN22. *See* MHL § 10.03(g)(2) (Article 730 defendants must have been charged for committing a sex offense.); MHL § 10.03(p) (All sex offenses are felonies.); CPL § 730.50(1) (If the court determines that defendant is an incapacitated person it must adjudicate defendant an incapacitated person, and "[w]hen the indictment charges a felony ... it must issue an order of commitment ... for care and treatment in an appropriate institution for a period not to exceed one year from the date of such order."); CPL § 730.50(2) (upon the conclusion of a period of confinement pursuant to Article 730, when the State believes that the defendant continues to be incapacitated, it can apply for an order of retention, and if the court adjudicates the defendant an incapacitated person, it must issue an order of retention for a period not to exceed one year); CPL § 730.60(6) (If an Article 730 defendant is about to be released and the court determines that the defendant is a danger to himself or others, then "the court shall issue an order to the commissioner authorizing retention of the committed person in the status existing at the time notice was given hereunder, for a specified period, not to exceed six months.").

> FN23. *See* CPL § 730.50(3) (The civil detention for a defendant charged with a felony but found unable to stand trial "must not exceed two-thirds of the authorized maximum term of imprisonment for the highest class felony charged in the indictment.").

But Article 10 is not a mere civil commitment statute that may apply to any citizen. Rather, it applies only to those who have committed a sexual offense (or at least, the conduct constituting such an offense). The Article 10 respondent is labeled not merely a person in need of treatment, but a "sex offender," a label premised on the conclusion that the accused committed a crime (or at least, the conduct constituting a crime). Application of the stigma associated with a finding of criminality elevates the statute beyond the ordinary civil standards of proof, and requires proof beyond a reasonable doubt, regardless of the "civil" label attached to the statute.

*In re Winship,* 397 U.S. 358 (1970), is instructive. In Winship, the Supreme Court held that when a juvenile is "charged with an act which would constitute a crime if committed by an adult," that act must be proved beyond a reasonable doubt. *Id.* at 359. New York defined juvenile delinquents as persons older than seven but younger than 16 who "do[ ] any act which, if done by an adult, would constitute a crime." *Id.* at 359, citing N.Y. Fam. Ct. Act § 712. The Court rejected the argument that a lesser standard of proof was required because "delinquency status is not made a crime [and therefore] the proceedings are not criminal," *id.* at 365, concluding that "civil labels and good intentions do not themselves obviate the need for criminal due process safeguards" and that a "proceeding where the issue is whether the child will be found to be 'delinquent' and subject to the loss of his liberty for years is comparable in seriousness to a felony prosecution." *Id.* at 365–66, citing *In re Gault,* 387 U.S. 1, 36 (1967) (internal quotation marks omitted). The Court noted that though a different label was used, the individual was still subject to the "stigma of a finding that he violated a criminal law" and the "possibility of institutional confinement on proof insufficient to convict him were he an adult." *Id.* at 367.

**\*19** Although Winship establishes that a civil label is not always dispositive of the requisite standard of proof, the Supreme Court has made clear that a legislature's declaration of the civil nature of confinement may be overcome only where there is "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

as to negate [the State's] intention" to deem it civil. *Hendricks,* 521 U.S. at 361, citing *United States v. Ward,* 448 U.S. 242, 248–49 (1980). Here, plaintiffs have met that high burden. The situation presented here is indistinguishable from that addressed in Winship. In neither case can the State use a particular label to obviate the need for appropriate procedural protections in determining whether an individual in fact committed acts that constitute a crime, where such a determination not only triggers the possibility of long-term detention, but also labels the person an "offender." Just as with a juvenile adjudication, the statute combines the severe deprivation of liberty attendant on detention and rehabilitative treatment with a stigmatic label. The statute subjects an Article 730 defendant found to have committed a sex offense both to the "stigma of a finding that he violated a criminal law" and to the "possibility of institutional confinement on proof insufficient to convict him were he an adult" competent to stand trial. Winship, 397 U.S. at 367. The consequences of the adjudication are significant. Article 730 defendants who are confined pursuant to the Act will be confined in secure treatment facilities, segregated alongside dangerous sexual criminals found to suffer from mental abnormalities. MHL §§ 10.06(k), 10.07(c). And the prerequisite for that confinement is a conclusion that they too have committed sexual offenses.

Article 10 is a civil statute, and provides civil, not criminal, remedies for individuals who are mentally ill and dangerous. Those remedies, however, are predicated on criminal conduct. The statute applies only to *criminals* or to individuals who would be criminals if they had been sane when they committed the acts which constituted the crime and had been competent to stand trial. The title of Article 10 is *"Sex Offenders* Requiring Civil Commitment or Supervision." (Emphasis added.) The statute refers to those subject to its provisions as "sex offenders" and "recidivist sex offenders." See, e.g., MHL §§ 10.01(a), (g). Individuals subject to the Act are termed "sex offender[s] requiring civil management." MHL § 10.03(q). The instrument that the

Attorney General must file to instigate commitment proceedings is a "sex offender civil management petition." MHL § 10.06(a). Both the terms "offender" and "recidivist" have clear criminal implications. Black's defines an "offender" as "[a] person who has committed a crime," and a "recidivist" as "one who has been convicted of multiple criminal offenses, usually similar in nature." Black's Law Dictionary (8th ed.2004). The procedures involved as well as the terminology used impart an aspect of moral condemnation, normally reserved for criminal judgments, upon those found guilty at the Article 10 trial.[FN24]

> **FN24.** On these matters, the current statute stands in contrast to Kansas's sexual offender civil commitment statute upheld in *Hendricks.* 521 U.S. at 352. The Kansas statute applied to "sexually violent predator [s]," defined as those persons who "ha[ve] been convicted of or charged with a sexually violent offense and who suffer[ ] from a mental abnormality or personality disorder which makes [them] likely to engage in the predatory acts of sexual violence." *Id.* citing Kan. Stat. Ann. § 59–29a02(a) (1994). Though "predator" is not a gentle term, neither is it necessarily a criminal term. Furthermore, the Kansas statute applied not only to those who had been convicted of crimes, but also to those charged with committing crimes, and therefore did not purport to restrict itself to individuals who have committed criminal offenses. In any event, the Kansas statute only authorizes detention based on proof beyond a reasonable doubt that the individual was in fact a sexually violent predator. *Hendricks,* 521 U.S. at 352–53.

**\*20** Under the *Mathews v. Eldridge* standard, the severity of these consequences, normally resulting only from criminal conviction, argues for the imposition of the highest burden of proof. The second Eldridge factor, the risk of erroneous adju-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

dication, points in the same direction, as the risk is particularly high in the case of Article 730 defendants. The reason these defendants have not been put on trial for the acts that form the basis of the criminal charges against them is that they were found by a court to have been incompetent to participate in their own defense. To have put them on trial on the criminal charge would have violated due process. *Cooper,* 517 U.S. at 354 ("A defendant may not be put on trial unless he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.' "), quoting *Dusky v. United States,* 362 U.S. 402, 402 (1960). Even at a criminal trial, with a standard of proof beyond a reasonable doubt and all the other attendant protections of the criminal process, the risk of an erroneous conviction is too great when the defendant lacks the ability to assist his attorney in defending the case.

Every other category of "offender" to whom the law applies has been found guilty of conduct constituting a crime beyond a reasonable doubt, at a criminal trial at which the defendant was fully able to participate in his defense. To *reduce* the burden of proving guilt for Article 730 defendants perversely heightens the risk of erroneous conviction. The unique circumstances of these defendants, who were adjudicated to have been unable to participate in their own defense, suggest a need for stronger, not reduced, procedural protections against erroneous conviction.

The standard of proof "represents an attempt to instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Winship,* 397 U.S. at 370. A weakened standard of proof represents, by definition, the tolerance of a greater likelihood of error. When combined with the inherently greater risk of error implicated in trying a defendant who is unable to defend himself due to incompetence, the risk of erroneous adjudication of guilt becomes too great to

permit the imposition of the stigma of the "sex offender" label and the attendant long-term deprivation of liberty.

The third Eldridge factor, the importance of the governmental interest at stake, does not suggest a more lenient standard of proof. Without question, the government interest involved here is of the highest order, involving the protection of the public safety against serious imposition. It is precisely that interest that permits the State, in effect, to put the incompetent on trial at all: given the importance of protecting potential victims against repeat sexual offenders, the difficulties that prevent a criminal trial of the incompetent cannot preclude the State from taking preventive steps to provide necessary treatment.[FN25] But the requirement of proof beyond a reasonable doubt that the respondent *is* an offender is not an obstacle to the statutory scheme. Indeed, a finding of criminal conduct beyond a reasonable doubt is prerequisite to "civil management" proceedings for every category of person subject to the scheme *other than* Article 730 defendants. There is no plausible reason to suggest that the governmental interest supporting Article 10 commitments would be undermined if the same requirement is imposed with respect to the category of defendants least able to defend themselves.

> FN25. Plaintiffs do not argue, and the Court does not hold, that individuals who were found either incompetent to stand trial or not guilty by virtue of insanity may not be detained pursuant to the Act because they have not been convicted of a crime. The statute is drafted to deal with individuals who are mentally ill, and it would be strange to prevent a state from dealing with mentally ill and dangerous individuals who have been adjudicated to have committed violent sexual acts via the civil remedies that this Act imposes. Even though *Winship* required certain procedural protections in the context of juvenile adjudications, it did not completely transform

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

all aspects of the juvenile delinquency system into a criminal system. *See, e.g., Winship*, 397 U.S. at 359 n. 1 (The opinion does not "rest[ ] ... on the assumption that all juvenile proceedings are criminal prosecutions, hence subject to constitutional limitations ... [W]e are not here concerned with ... the pre-judicial stages of the juvenile process, nor do we direct our attention to post-adjudicative or dispositional process.") (citations and internal quotation marks omitted). So too here, requiring that New York must prove beyond a reasonable doubt that the Article 730 defendant committed the acts that constitute a crime that may have been sexual does not transform all aspects of Article 10, at least with respect to Article 730 defendants, into criminal proceedings.

**\*21** Due process therefore requires that when an individual is subject to the stigma of being labeled a "sexual offender" and of a finding that he violated a criminal law triggering the possibility of institutional confinement, proof that he in fact committed the acts that form the basis for being labeled an "offender" must be made beyond a reasonable doubt.[FN26] Plaintiffs have demonstrated a likelihood of success in prevailing on their claim that the "clear and convincing" burden of proof does not afford the protections that due process requires in determining that Article 730 defendants are in fact "offenders" subject to the Act. Therefore, plaintiff's motion for a preliminary injunction will be granted with respect to this portion of the statute.

> FN26. Plaintiffs do not argue that due process requires any other procedures to ensure that Article 730 defendants are dealt with fairly, and the Court expresses no view on any such issue.

**E. MHL § 10.07(c)**

The same constitutional difficulty that undermines § 10.07(d) affects § 10.07(c), albeit in a different way that presents a closer issue.

Eligibility for extended supervision under Article 10 is premised on the fact that an individual is not only an offender, but specifically a *sexual* offender. A sexual offender may be one who has committed either a crime that by definition includes a sexual element (for example, rape or sexual abuse) or a crime not necessarily sexual by definition (for example, kidnapping) in a sexual manner or with a sexual motive.[FN27] The Act thus recognizes that crimes that are not sexual in their essential nature may still constitute sexual offenses. New York's criminal code did not previously recognize such a category of "as-applied" sexual crimes, and the Act amends the code to create a new crime: the commission of any one of a set of serious felonies "for the purpose, in whole or substantial part, of his or her own direct sexual gratification." NYPL § 130.91. That crime will be, by definition, a sexual offense. For those individuals subject to Article 10 by reason of a crime committed after the enactment of Article 10, that crime must be one of a defined set of sexual crimes, including a "sexually motivated felony" as defined by NYPL § 130.91. MHL § 10.03(p); NYPL §§ 130.00–130.91. In such cases, the "sexual motivation" will be an element of a crime that will have been charged, submitted to the jury, and proved beyond a reasonable doubt in the underlying criminal case, before an offender will be subject to the extended supervision provisions of the Act.

> FN27. The provisions of Article 10 apply to individuals who have committed certain specialized crimes that are inherently sex-based offenses, such as rape and sexual abuse. MHL § 10.03(p); NYPL §§ 130.00–130.90. The provisions also apply to individuals who have committed certain "designated felon[ies]," MHL § 10.03(f), crimes not necessarily sexual in nature, in a way that demonstrates a "sexual [ ] motivat[ion]." MHL § 10.03(g)(4); NYPL § 130.91.
>
> However, for those individuals sought to be de-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

tained based on a crime committed before the enactment of Article 10, that crime need not have been proven before a criminal jury to have been inherently sexual or committed with a sexual motivation. The Act authorizes the detention of such individuals if they have committed any one of a set of serious "designated felonies" with a "sexual motivation." For most of these individuals, it would have been impossible for the sexual motivation determination to have been made at the underlying trial.[FN28] Therefore, for those who have committed the crime that forms the basis of their potential detention before the enactment of Article 10, the statute allows the "sexual motivation" determination to be made not at an underlying criminal trial, but at the civil commitment trial, at which the determination is to be made on the basis of clear and convincing evidence. MHL §§ 10.03(g)(4), 10.03(p)(4), 10.07(d).

> FN28. Some persons subject to Article 10 have been charged with, and convicted of, a designated felony before Article 10 was enacted or proposed. For such offenders, it would obviously have been impossible to have put the "sexual motivation" issue to the jury at the underlying criminal trial. For an offender who committed his allegedly sexual crime before the enactment of the Act, but who has been or will be charged with (and convicted of) his crime after the enactment of the Act, New York could perhaps put the issue of "sexual motivation" before the jury in the underlying criminal trial, so as to determine his eligibility for the detention provisions of Article 10. However, unlike those who committed their crimes after the Act's enactment, those who committed their crimes before its enactment cannot be found guilty of, and punished for, a crime that did not exist at the time that they committed the allegedly criminal acts. U.S. Const. art. 1, § 9. cl. 3. Moreover, such a procedure could be at best unwieldy and at worst preju-

dicial to defendants. In any event, New York apparently has not attempted to provide a procedure for putting the issue before the underlying criminal jury in such cases.

*22 Plaintiffs contend the "sexual motivation" determination is in fact an element of a crime, and that due process therefore requires that it be proved beyond a reasonable doubt. Defendants insist that due process requires only a "clear and convincing" standard of proof for civil commitment proceedings, relying on Addington for support. 441 U.S. at 432 (concluding that "the reasonable-doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment").

Plaintiffs argue, however, that a retroactive determination that a pre-existing crime was committed with a sexual motive is essentially a criminal finding that necessitates a heightened standard of proof. They point out that in Addington, the Supreme Court rested its acceptance of the lesser standard of proof on the inherent uncertainties of the diagnostic and predictive findings of "mental illness" and "future dangerousness," which are not the sort of historical facts for which the standard of proof beyond a reasonable doubt was designed. The nature of a psychiatric diagnosis at issue in Addington raised a "serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous" because the "subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." 441 U.S. at 429–30 (citations omitted). See also, Hollis v. Smith 571 F.2d 685, 692, 695 (2d Cir.1978) (making determinations about a person's character and prospects for future conduct "beyond a reasonable doubt would either prevent the application of [commitment statutes predicated on such findings] except in the most extreme cases or invite hypocrisy on the part of judges or juries"); Id. (The

"ultimate issue" is "not as in a criminal case whether an alleged act was committed or event occurred, but the much more subjective issue of the individual's mental and emotional character. Such a subjective judgment cannot ordinarily attain the same 'state of certitude' demanded in criminal cases."); *United States v. Comstock,* No. 5:06–HC–2195BR, —— F.Supp.2d ——, ——, 2007 WL 2588815 at *26 (E.D.N.C. Sep. 7, 2007).

In contrast, a determination of "sexual motivation," as Article 10 itself makes clear, is capable of being made by a jury beyond a reasonable doubt. "The state of a man's mind," as Lord Justice Bowen famously remarked, "is as much a fact as the state of his digestion." *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716–17 (1983), quoting *Edgington v. Fitzmaurice,* 29 Ch. Div. 459, 483 (1885). See also *Arave v. Creech,* 507 U.S. 463, 473 (1993) ("The law has long recognized that a defendant's state of mind is not a 'subjective' matter, but a fact to be inferred from the surrounding circumstances.") (citations omitted). Unlike the findings at issue in Addington that an individual is both mentally ill and dangerous, a determination that an individual committed a crime with a sexual motivation is a factual determination, normally based on inferences from the facts and circumstances, that can be made beyond a reasonable doubt, as similar findings of purpose and intent are made every day in criminal trials.

**\*23** Of course, the Supreme Court in Addington articulated other reasons besides the difficulty of making findings regarding mental illness and dangerousness beyond a reasonable doubt for holding the clear and convincing burden of proof standard acceptable for civil commitment proceedings. The most fundamental reason for the clear and convincing standard is that, unlike criminal commitment, "[i]n a civil commitment state power is not exercised in a punitive sense." *Addington* 441 U.S. at 428. Furthermore, the standard of proof beyond a reasonable doubt "historically has been reserved for criminal cases," and the calculation of interests rel-

evant to civil commitment is different such that it "cannot be said ... that it is much better for a mentally ill person to 'go free' than for a mentally normal person to be committed." *Id.* at 428–29. Although Article 10, like the traditional civil commitment regime discussed in Addington, is intended to be therapeutic, protective, and regulatory rather than punitive, the sexual offender provisions of the Act differ crucially from other civil commitment regimes, in that they are reserved for persons who have already been brought into the criminal justice system, and either found guilty of sexual crimes, or determined in the commitment trial to have engaged in conduct constituting such crimes. A determination that one may need treatment is fundamentally different from a determination that one committed a crime, or that one is a sexual offender.

Applying the *Mathews v. Eldridge* standard to these offenders presents issues broadly similar to those discussed above in relation to Article 730 defendants, but with significant differences. First, with respect to the importance of the individual interests involved, the ultimate stakes remain of the highest level, since the respondent's personal liberty is at risk in these proceedings. As noted above, however, in the discussion regarding MHL § 10.07(d), the Constitution permits deprivation of liberty in the form of civil commitment on a showing of mental illness and dangerousness by clear and convincing evidence, without any finding of criminality at all. Such findings are to be made in the course of the detention hearing contemplated by Article 10 in any event. What is at stake in the determination of whether a respondent committed a crime with a sexual motivation is not whether such an offender can be detained, but whether the respondent can be detained pursuant to this sexual offender regime.

This, of course, is no small matter, not only because it is intertwined with the ultimate detention decision, but also because there is, as noted above, a significant stigma associated with the declaration that a person is a "sex offender." In this regard,

however, individuals covered by MHL § 10.07(c) differ importantly from the Article 730 defendants covered by MHL § 10.07(d). The persons covered by § 10.07(c) have already been found, beyond a reasonable doubt, to have committed a serious felony, while the incompetent defendants covered by § 10.07(d), although accused of crimes, have never been tried or found guilty, and continue to be presumed innocent of any crime. To designate the latter "sex offenders" requires that persons who have never been convicted of a crime nevertheless be declared functionally guilty of serious felonies—which in turn will subject them to a scheme of extended detention or other supervision not imposed on any other person who has not been found beyond a reasonable doubt to have committed the conduct constituting such a felony. The defendants covered by MHL § 10.07(c), in contrast, have already been formally condemned as felons based on proof beyond a reasonable doubt. The further determination that their crimes had a sexual motivation is surely a serious matter that must be weighed carefully in the Eldridge balance. But the interest in question is not quite as strong as the interest of Article 730 defendants in avoiding a declaration of criminal guilt.

**\*24** The risk that an offender will erroneously be found a sexual offender if the clear and convincing standard is applied is also less great for this group of respondents. Unquestionably, the lessening of the burden of proof from "beyond a reasonable doubt" to "clear and convincing evidence" makes it easier for the finding to be made, and thus increases the chance of an erroneous finding of guilt (while, of course, reducing the risk that a respondent will erroneously be found *not* to have acted from a sexual motive). But because defendants covered by MHL § 10.07(c) are competent to assist in their defense, they are far better able to make use of the assistance of counsel and the other procedural rights accruing to respondents at trial, to defend against erroneous accusations, and to raise doubts in the mind of jurors about the accuracy of the State's charges.

Moreover, the narrowness of the issue presented reduces the chance of erroneous condemnation. Since the Article 730 defendants have never been found guilty of any crime, all of the elements of the underlying offense would be in play at an Article 10 trial. The respondent would thus have the full panoply of criminal defenses, including mistaken identity, alibi, and challenges to the witnesses' or victim's version of events available. Because of the respondent's incompetence, a lawyer representing the respondent would have little or no understanding of her client's version of the events, and thus would be enormously hampered in investigating the facts, selecting a defense, and challenging what may be a fundamentally mistaken understanding of the case. In the case of a defendant who has been found guilty of a non-sexual serious felony, however, there is no chance of error about the perpetrator's identity, or about whether the basic underlying crime was in fact committed: those facts have already been found by a jury beyond a reasonable doubt. In many cases, the sexual aspect of the case may be apparent, or, conversely, clearly absent. As compared with the cases covered by § 10.07(d), there will thus be fewer § 10.07(c) cases in which the burden of proof will likely make a difference, and in those, the respondent will be able to mount a defense. The extent to which the reduction of the burden of proof increases the risk of error is thus less in the case of § 10.07(c) than in the case of § 10.07(d).[FN29]

> FN29. Plaintiffs argue that evidence that an individual has, at the present time, a sexual abnormality, another element at issue in the Article 10 trial, is "all but guaranteed" to taint the determination as to whether that individual has, in the past, committed crimes with a sexual motivation. (MHLS Mot. 9–10.) The argument has a certain air of unreality about it: it is far more likely that the evidence that the crime of conviction had a sexual aspect is what triggered the inquiry into the defendant's mental abnormality in the first place.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

In any event, as in all trials, the jurors will be properly instructed about the different issues they will be required to decide, the relevance or irrelevance of different pieces of evidence to each of those issues, and the need to follow any necessary limiting instructions, and it will be presumed that the jurors will follow those instructions.

Finally, as is the case with the Article 730 defendants, while the interest of the State in the Article 10 scheme as a whole is extremely strong, the State's interest in the reduced burden of proof is more attenuated. For all sexual offenders who engage in criminal activity after the effective date of the Act, the sexual nature of their offense will have to be proven beyond a reasonable doubt, because such offenders will not be eligible for extended detention or treatment under Article 10 unless they are convicted beyond a reasonable doubt either of an offense that is sexual in its nature, or of the new crime created by the Act and codified at NYPL § 130.91. This makes it difficult for defendants to argue either that the retroactive finding of sexual motivation is not a finding of the element of a criminal offense, or that requiring such a finding to be make beyond a reasonable doubt will cripple, or even hamper, accomplishment of the State's salutary purposes in enacting Article 10.

**\*25** Defendants argue that the State could constitutionally justify civil detention based on a finding by clear and convincing evidence, at the underlying criminal trial, that the individual committed the crime with a sexual motivation, and that the Legislature did not provide for such a lesser standard at the underlying criminal trial simply in order to avoid confusing the jury with multiple standards of proof.[FN30] That argument is unpersuasive.

> FN30. Counsel for defendants contended at oral argument that the State required a heightened standard of proof for the "sexual motivation element" at the underlying criminal trial not as a constitutional necessity, but as a matter of legislative "genero[sity]." (See Tr. 40 ("I think what the legislature wanted to do was avoid confusing the juries or other triers of fact about what standard of proof they are supposed to employ. I mean, it was generous to those individuals who were charged after, but it makes sense in light of that.").)

First, the commission of the new crime—"sexually motivated felony"—also triggers a sentencing scheme, NYPL § 70.80, requiring certain mandatory minimum sentences that differ from the mandatory minimum sentences applicable to the commission of the underlying felonies without a sexual motivation.[FN31] It is thus not clear that New York could constitutionally reduce the burden of proving this element at the underlying criminal trial.[FN32]

> FN31. Pursuant to NYPL § 70.80(4)(a), a person who has committed a felony sex offense as criminalized by NYPL § 130.91 is subject to certain mandatory minimums to which they would not otherwise be subject. See NYPL §§ 70.80, 130.92(3). Whereas the standard mandatory minimum for those who have committed a class B through class E felony is one year, NYPL §§ 70.00(2), 70.00(3), for those who committed a class B felony with a sexual motivation, the minimum term of imprisonment is five years, NYPL § 70.80(4)(a)(i), for those who committed a class C felony with a sexual motivation, the minimum term of imprisonment is three and a half years and the maximum term of imprisonment is 15 years, NYPL § 70.80(4)(a)(ii), for those who committed a class D felony with a sexual motivation, the minimum term of imprisonment is two years, NYPL § 70.80(4)(a) (iii), and for those who committed a class E felony with a sexual motivation, the minimum term of imprisonment is one and a half years, NYPL § 70.80(4)(a)(iv). Even higher mandatory

minimums apply if the individual who committed the sexually motivated felony is a "predicate felony sex offender" as defined by NYPL § 70.80(c). *See* NYPL §§ 70.80(4), (5).

FN32. A heightened mandatory minimum sentence with no corresponding increase in the maximum sentence may not offend the Supreme Court's recent jurisprudence holding that subjecting a defendant to enhanced sentencing based on an additional offense element requires a jury finding of that element beyond a reasonable doubt. *See Harris v. United States,* 536 U.S. 545, 557 (2002) (finding that facts affecting mandatory minimums need not be proved beyond a reasonable doubt); *McMillan v. Pennsylvania,* 477 U.S. 79, 91 (1986) (same); *cf. Apprendi v. New Jersey,* 530 U.S. 466 (2000); *Blakely v. Washington,* 542 U.S. 296 (2004); *United States v. Booker,* 543 U.S. 220 (2005). It is not clear, however, that a majority of the Supreme Court continues to accept the validity of *Harris* and *McMillan. See, e.g., Harris,* 536 U.S. at 569 (Breyer, J., concurring in part and concurring in the judgment) ("I cannot easily distinguish *Apprendi* ... from this case in terms of logic."); *id.* at 572 (Thomas, J., joined by Stevens, Souter, and Ginsburg, JJ., dissenting) ( *"McMillan* ... conflicts with the Court's later decision in *Apprendi."* ). However, NYPL § 130.91 is nonetheless a different crime from the commission of the underlying felony without a sexual motivation, and a crime for which the consequences are potentially more severe for a portion of those convicted.

Second, the prospective statutory scheme makes even clearer that the function of the "sexual motivation" element is not to decide who is in need of extended treatment, but to define a category of

*convicted criminals* who are then eligible for *assessment* for such treatment. The function of the finding of sexual motivation is to define the kind of crime that the offender committed, not to determine whether he requires treatment. The clear and convincing standard of proof applies under Addington to factual assessments relating to the latter question, not the former. Thus, contrary to the State's argument, when the criminal jury under Article 10's prospective scheme is assessing the offender's motivation, it is not making an assessment of his need for extended treatment beyond expiration of his criminal sentence. That is a decision that will be made at a later date and by another jury—possibly many years later—based on a finding of mental abnormality and dangerousness as of that time. The Article 10 jury's finding about the nature of the offense is a retrospective, historical finding about the nature of the offender's conduct that triggers such an assessment, not an aspect of the assessment itself.

Finally, even accepting arguendo defendants' premise that the State could have provided prospectively for a trial finding of sexual motivation by clear and convincing evidence (for example, by foregoing any sentencing consequences other than eligibility for civil commitment under Article 10), the fact is that it did not. The issue in this case is not the constitutionality of hypothetical statutes that the Legislature might have passed affecting future sexual offenders. Rather, the inquiry under *Mathews v. Eldridge* is whether the procedural protections provided by the actual legislation with respect to past offenders are adequate, given a balancing of factors including the strength of the governmental interest in the existing scheme. Thus, regardless of the reasons why New York elected to require proof beyond a reasonable doubt of sexual motivation on a prospective basis, the fact that it did—and that it says it did so in order to simplify trial procedure by avoiding multiple standards of proof—undermines any claim that requiring proof beyond a reasonable doubt will interfere with the accomplishment of the statute's purposes. FN33

FN33. Alternatively, counsel argues that the reduced standard of proof was necessary because the gap in time between the crime committed with the alleged sexual motivation and the commitment hearing makes proving the "sexual motivation" element "quite a burden," and thus provides adequate justification for easing the State's burden of proof. (Tr. 40.) But the burden of defending oneself against such a charge also becomes more difficult with time. Thus, to the extent that the difficulty of accurately determining the offender's motivation retrospectively is a factor in the decision, that suggests an increased risk of error (a factor arguing for stronger procedural protections) as much as it suggests greater difficulty in accomplishing the State's purposes.

**\*26** The balancing standard of *Mathews v. Eldridge* necessarily involves the Court in weighing factors that the Legislature presumably considered in enacting the statute. Caution is therefore appropriate in evaluating the statutory scheme, and deference to the Legislature's conclusions is appropriate to the judicial role. Moreover, precedent is sparse and conflicting. The case of juvenile delinquency adjudications addressed in *Winship* appears to be the only case in which the Supreme Court has mandated proof beyond a reasonable doubt in proceedings denominated civil, and Addington's holding that those found to be dangerous and mentally ill by clear and convincing evidence may be civilly committed stands as a counter-example supporting the State's conclusion. The case of persons already found guilty beyond a reasonable doubt of a serious felony is less clearly analogous to Winship, moreover, than that of the mentally incompetent Article 730 defendants, who have never been found guilty of any crime and whose ability to defend themselves is by definition seriously impaired. Thus, while the prospective statutory scheme appears to demonstrate that the State could accomplish its goals with respect to past offenders even if

a higher burden of proof were imposed, the other factors in the Eldridge balance do not point as strongly in favor of enhanced procedural protection.

Arguably, the case of offenders convicted of serious but non-sexual felonies gravitates closer to Addington. A state may civilly commit an individual based on clear and convincing evidence that he or she is mentally ill and dangerous. It therefore appears somewhat anomalous to hold that a state may not civilly commit or subject to an extended treatment regime an individual who has already been convicted of a serious crime based on clear and convincing evidence that he is mentally abnormal and dangerous, along with the additional finding that his previous crime was committed with a sexual motivation. Unquestionably, in the civil proceeding contemplated by Article 10, evidence that the respondent's past criminal acts were committed with a sexual motivation would be admissible in any event to prove the existence of a mental abnormality or a present danger to others such that an individual merits detention. Rather than subject all criminal defendants to screening for possible proceedings under Article 10, New York has chosen to limit eligibility for extended detention to those whose crimes involved a sexual motivation. It is hardly clear that, in the absence of explicit guidance to the contrary, this Court should prevent a state from focusing on those types of individuals who, in the State's judgment, most likely require commitment.

With respect to these defendants, therefore, the question of constitutionality is more closely balanced than with respect to the Article 730 defendants discussed above. On the current record, plaintiffs have not demonstrated a likelihood of success on the merits, and therefore their motion for a preliminary injunction will be denied. It is also not clear, however, on the face of the complaint, that Winship or Addington forecloses relief. A fuller record with respect to the types of cases that are subject to MHL § 10.07(c) may well affect the proper understanding of the Eldridge factors. At

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

this stage of the case, the parties are unable to address how many offenders are subject to § 10.07(c), the length of time typically separating a criminal conviction from proceedings under Article 10, or the nature of the evidence that may be available to retrospectively assess the motivations of offenders, among other factors that may bear on the balancing of the Eldridge factors. Whether retrospective re-characterization of a crime in a civil proceeding requires the same procedural protections as are required for classifying an incompetent defendant as a criminal is an issue sufficiently complicated, with sufficiently broad ramifications, that the Court cannot simply find the statute constitutional on a motion to dismiss based solely on the pleadings. Accordingly, defendants' motion to dismiss that portion of the complaint that refers to MHL § 10.07(c) will also be denied.[FN34]

> [FN34]. Plaintiffs' equal protection argument adds nothing to the analysis. Essentially, plaintiffs argue that it is irrational to distinguish the standard of proof applicable to prospective offenders from that applicable to past offenders. However, the two categories of offenders are distinct, and present distinct problems. Going forward, New York has decided that the proper way to address the problem of sexually-motivated felons is to create a new category of crime, something that the State plainly is constitutionally forbidden from doing retrospectively by the Ex Post Facto Clause of the Constitution. U.S. Const. art. 1, § 9. cl. 3. But New York does have an interest in addressing the potential present and future need for extended treatment or detention of individuals whose crimes were committed in the past. The choice to deal with future offenders primarily through the creation of a new criminal prohibition does not foreclose New York from dealing otherwise with past offenders who are presently mentally abnormal and dangerous. The question is whether the pro-

cedures adopted to deal with such past offenders are consistent with due process in their own right. Any difference between those procedures and the procedures put in place with respect to future offenders is thus a rational product of the different situations of past and future offenders, and not of any irrational bias against or greater hostility toward past as opposed to future sex offenders.

### F. MHL § 10.05(e)

**\*27** Article 10 provides for a right to legal counsel, with the appointment of counsel at state expense for those who cannot afford it, upon the Attorney General's initiation of a formal action against a respondent. MHL § 10.06(c). Therefore, a respondent is guaranteed state-funded counsel for all judicial hearings pursuant to the Act. Plaintiffs contend, however, that counsel is also required before the Attorney General files any formal action before a court, when an individual who is being investigated by a CRT is asked to submit to a psychiatric exam. This psychiatric exam may affect both the CRT's recommendation to the Attorney General and the Attorney General's case for confinement at the probable cause hearing and commitment trial.

Article 10 provides for three potential psychiatric examinations before the commitment trial. First, during the investigational stage, before institution of any judicial proceeding, the CRT may request that an offender submit to a psychiatric examination in connection with the CRT's investigation to determine "whether the respondent is a sex offender in need of civil management." MHL § 10.05(e). While the offender apparently may decline to participate in the interview, such a declination may be used against him. At the commitment trial, the jury "may hear evidence of the degree to which the respondent cooperated with the psychiatric examination" and, upon request and if it so finds, the court can "instruct the jury" that "respondent refused to submit to a psychiatric examination." MHL § 10.07(c). If the CRT finds that the respondent is

such a sex offender, it must notify both the respondent and the Attorney General in writing. MHL § 10.05(g). This notification must include a written report from a psychiatric examiner that includes a finding as to whether the individual has a mental abnormality. *Id.* This determination necessarily occurs in advance of the filing of a civil management petition, and triggers the formal court process, including the probable cause hearing and the commitment hearing. MHL §§ 10.06(a); 10.06(g); 10.07(a). An individual is not entitled to counsel when asked by the CRT to submit to a psychiatric evaluation, MHL § 10.08(g), and the statute provides no notice to the respondent of the potential consequences of the examination.^FN35

> FN35. As was clarified at oral argument:
>
> The Court: "Now, what kind of advice of rights, if any, does [a respondent asked to participate in a CRT-requested psychiatric examination] get ... When an individual gets told, we would like you to see Dr. So-and-so in connection with this process ... Then the doctor shows up. What is this person supposed to do? How is he supposed to make a decision as to do I go through [with] this, what does this mean, what are my rights? He is basically on his own to make that call?"
>
> Counsel for Defendants: "I think he is pretty much on his own to make that call."
>
> (Tr. 76–77.)

Second, upon receipt of the CRT report (but still before the filing of a sex offender civil management petition), the Attorney General may petition the court to order the respondent to submit to an evaluation by a psychiatric examiner. MHL § 10.06(d). If the court grants relief, the interview will be conducted by a psychiatric examiner of the Attorney General's choosing. *Id.* An individual is

entitled to counsel upon the Attorney General's filing of such a petition. MHL § 10.06(c).

Third, after the filing of a sex offender civil management petition but prior to the commitment trial, the individual against whom the petition was filed may ask the court to order that he be evaluated by a psychiatric examiner of his own choosing. MHL § 10.06(e). If so ordered, and if the respondent cannot afford to pay a psychiatric examiner, the court "shall appoint an examiner of the respondent's choice to be paid within the limits prescribed by law." *Id.* Following the examination, the examiner shall report his findings in writing to the respondent or his counsel, the Attorney General, and the court. *Id.* If unable to afford one, a respondent is entitled to counsel upon the filing of a civil management petition, MHL § 10.06(c), and therefore will have the assistance of counsel in petitioning the court for a respondent-requested psychiatric exam.

**\*28** The Second Circuit has suggested that involuntary commitment proceedings trigger a right to counsel. *Project Release,* 722 F.2d at 976. However, it has also declined to extend that guarantee to pre-hearing psychiatric interviews held pursuant to the civil commitment provisions of Article 9 of New York's Mental Hygiene Law. *Id.* ("[W]e [are not] prepared to require that legal counsel be guaranteed at pre-hearing psychiatric interviews" under Article 9.); cf. *Ughetto v. Acrish,* 518 N.Y.S.2d 398, 405 (1987) (holding that the New York legislature intended that "in the absence of any showing that counsel's presence would interfere with the psychiatric examination, counsel should be permitted to observe either directly or indirectly these [Article 9] prehearing psychiatric examinations"). In evaluating Article 9 of the Mental Hygiene Law, the Second Circuit found it constitutionally sufficient that commitment procedures specifically provided a right to counsel, at state expense, in all judicial proceedings. *Project Release,* 722 F.2d at 976. Article 10, like Article 9, provides a right to counsel, at state expense, in all judicial proceedings.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
**(Cite as: 2007 WL 4115936 (S.D.N.Y.))**

Plaintiffs contend that the interests implicated here are different from those at issue in Project Release. They note that the civil commitment as a mentally abnormal sex offender under Article 10 engenders greater stigma than a psychiatric commitment under Article 9. Furthermore, individuals are presumptively committed to a "secure treatment facility" under Article 10 in contrast to a non-secure hospital under Article 9. Also, Article 10 requires a court order for release of a detained individual, and does not permit release based solely on the clinical judgment of his treating doctors. Article 9 allows release based on the clinical judgment of the treating physicians without a court order. Plaintiffs argue that these greater intrusions on the detainees' liberty warrant greater protections against the erroneous deprivation. Plaintiffs also argue that not only is the CRT-prompted psychiatric interview functionally mandatory, but operates as a critical stage of the commitment hearing,[FN36] which, especially in view of the diminished capacity of many individuals subject to the provisions, merits the appointment of counsel. Plaintiffs do not contend that counsel should be permitted to intervene in the examination. Rather, they argue only that due process requires a passive observational role for counsel in the CRT psychiatric hearing only so as to ensure that the psychiatric report and testimony based on the interview is accurate. (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 4.)

FN36. *See, e.g.,* MHL § 10.08(g) (relevant written reports of psychiatric examiners are admissible in any hearing or trial pursuant to Article 10); MHL § 10.07(c) (jury may hear evidence of the "degree to which the respondent cooperated with the psychiatric examination" and if the respondent "refused to submit to a psychiatric examination").

Though there are differences between the two civil commitment provisions, it is unlikely that these differences are sufficiently significant to require a different constitutional mandate. First, and as a general proposition, the Second Circuit, like courts in other jurisdictions, has been reluctant to extend the right to counsel to psychiatric examinations. See, e.g., *Project Release,* 722 F.2d at 976; *Hollis v. Smith,* 571 F.2d 685, 692 (2d Cir.1978); *United States v. Baird,* 414 F.2d 700, 711 (2d Cir.1969);* see also *Tippett v. Maryland,* 436 F.2d 1153, 1158 (4th Cir.1971); *United States ex rel. Wax v. Pate,* 409 F.2d 498 (7th Cir.1969); *United States v. Albright,* 388 F.2d 719, 726–27 (4th Cir.1968); *State v. Whitlaw,* 45 N.J. 3, 210 A.2d 763 (1965). Second, the specific statute at issue here provides that any one against whom a civil management petition has been filed has the option, with the assistance of appointed counsel if he cannot afford his own, to petition the Court for his own examiner, also paid for by the State, to examine the individual and potentially rebut any distortions or inaccuracies in the report or testimony of the CRT-prompted or Attorney General-petitioned psychiatric examiner. MHL § 10.06(e). Practically speaking, the most effective counter to an improperly-conducted psychiatric examination is not the presence of counsel, but a more professional examination by another psychiatrist. Based on both the statutory structure as well as the presence of cases from this Circuit suggesting otherwise, plaintiffs are unable to demonstrate a likelihood of success on the merits with respect to this constitutional claim. The chances of succeeding on this point appear slim, and therefore their motion for a preliminary injunction will be denied.

**\*29** It does not follow, however, that defendants' motion to dismiss must be granted. First, because plaintiffs seek relief different from that sought in *Project Release*[FN37] and because of the differences between the consequences of Article 9 and Article 10 proceedings set forth above, it cannot be said that Project Release absolutely forecloses the position advanced by plaintiffs. Second, the evaluation of plaintiffs' arguments requires a more detailed understanding of how the psychiatric examination provisions of Article 9 and Article 10

operate. Plaintiffs argue, for example, that these proceedings function as a critical stage in the proceeding, and the strength of such an argument depends on factual allegations whose accuracy cannot be assessed on a motion to dismiss .[FN38] Plaintiffs are entitled to develop their record, and it will be more appropriate to adjudicate the merits of this argument on summary judgment or at trial. Therefore, both plaintiffs' motion for preliminary injunctive relief and defendants' motion to dismiss the complaint will be denied.

FN37. Plaintiffs here seek only an observational role for counsel, and not a participatory role. (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 3 n. 2.) In *Project Release,* the plaintiffs contended that individuals had a statutory "right to have [someone] present as counsel at discussions between [themselves] and hospital staff." 722 F.2d at 969, citing *Project Release v. Prevost,* 551 F.Supp. 1298, 1303 n. 2 (S.D.N.Y.1982). The Second Circuit "found no error in this determination." 722 F.2d at 969. It is not clear from either the opinion of the district court or the Second Circuit the exact role that plaintiffs sought for the counsel at such discussions, though being present "as counsel" normally implies an active role. It is precisely because an active counsel may interfere in the course of a hospital discussion or psychiatric examination that courts are often reluctant to grant such a right to counsel. *See, e.g., Hollis,* 571 F.2d at 692 (" 'It is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is upon the cooperation of his patient, than the presence of a lawyer objecting to the psychiatrist's questions and advising his client not to answer this question and that.' "), quoting *Tippett,* 436 F.2d at 1158.

FN38. Plaintiff MHLS filed suit before the effective date of the Act, and "did not fully

appreciate, until seeing SOMTA in operation, how critical the psychiatric exams under MHL 10.05(e) would prove" to the position of individuals subject to the Act. (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 2.) Plaintiffs claim that "[i]n practice, nearly all psychiatric exams so far conducted under Article 10 have been arranged by the case review team, rather than the attorney general, and accordingly, counsel has not been involved." (*Id.*) Upon the filing of an Article 10 petition, the psychiatric examiner who conducted the CRT evaluation "is ordinarily called as the State's primary or sole witness at the probable cause hearing" and that the State "may even enter the examiner's report without calling the examiner to testify." (*Id.*) Plaintiffs also note that in addition to the fact that the individuals being interviewed may be of impaired capacity, there exists an "emotional tension" inherent in a psychiatric interview that may determine the interviewee's eligibility for post-sentence civil commitment. They liken this to the context of criminal line-ups. (*Id.* at 3 n. 2, citing *United States v. Wade,* 388 U.S. 218, 230–31 (1967) (discussing how "emotional tension" may interfere with a suspect's ability to accurately observe and report on line-up procedures).)

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for a preliminary injunction is granted with respect to the challenged portion of MHL §§ 10.06(k) and 10.07(d), and denied in all other respects, and defendants' motion to dismiss is granted with respect to plaintiffs' challenge to MHL § 10.0(j)(iii), and denied in all other respects.

Plaintiffs are directed to submit a proposed form of order consistent with this opinion after consultation with defendants.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
**(Cite as: 2007 WL 4115936 (S.D.N.Y.))**

SO ORDERED.

S.D.N.Y.,2007.
Mental Hygiene Legal Service v. Spitzer
Not Reported in F.Supp.2d, 2007 WL 4115936
(S.D.N.Y.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
**(Cite as: 2008 WL 974409 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Faris ABDUL-MATIYN, Plaintiff,
v.
Governor George PATAKI, Governor; Allen, Correction Officer; Rowe, Correction Officer; Valezquez, Correction Officer; Benbow, Correction Officer; Johnson, Sullivan Correctional Facility Senior Parole Officer; John Doe, 1, Sullivan Correctional Facility Audiologist; John Doe 2, Sullivan Correctional Facility Counselor; Walsh, Sullivan Correctional Facility Superintendent; John Doe 3, Sullivan Correctional Facility Psychiatrist; John Doe # 4, Cnypc Psychiatrist; Elizabeth Farnum, Doctor; Debroize, Doctor; Forshee, Doctor; Pete Hanmer, Cnypc Primary Therapist; Tom Murphy; Jeff Nowicki; Sharon Barboza, Director Cnypc Sotp Program; Sawyer, Director, Cnypc; Cnypc Medical Staff; Michelle Payne, Former Cnypc Program Rehabilitation Counselor; Steve Capolo; and Linda Becker, Defendants.

No. 9:06-CV-1503 (DNH)(DRH).
April 8, 2008.

Faris Abdul-Matiyn, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General State of New York, Gerald J. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants Johnson, Walsh, Farnum, Debroize, Forshee, Hanmer, Murphy, Nowicki, Barboza, Sawyer, CNYPC Medical Staff, Capolo, and Becker.

Kloss, Stenger, Kroll & Lotempio, David W. Kloss, Esq., of Counsel, Buffalo, NY, for Defendants Allen, Rowe, Valezquez, and Benbow.

### DECISION and ORDER
DAVID N. HURD, District Judge.

*1 Plaintiff, Faris Abdul-Matiyn, brought this civil rights action pursuant to 42 U.S.C. § 1983. By a voluminous Report-Recommendation dated February 19, 2008, the Honorable David R. Homer, United States Magistrate Judge, addressed the numerous issues in this matter with the recommendations that:

1. The motion of Walsh and Johnson to sever be denied;

2. The motion of Walsh and Johnson to dismiss be granted as to plaintiff's conspiracy claim against defendant Johnson for failure to intervene, and denied in all other respect;

3. The state defendants' motion to dismiss be granted in all respects as to defendant Sawyer; granted in all respects as to plaintiff's claim for denial of access to the courts, and denied in all other respects;

4. The City defendants' motion to dismiss be denied in all respects;

5. The motion of defendant CNYPC Medical Staff to dismiss be granted; and

6. The complaint be dismissed without prejudice as to defendants George Pataki, Michelle Payne, and John Does I-IV.

No objections to the Report-Recommendation have been filed.

Based upon a careful review of the entire file and the recommendations of Magistrate Judge Homer, the Report-Recommendation is accepted and adopted in its entirety. *See* 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that:

1. Defendant Walsh and Johnson's motion to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

sever is DENIED;

2. Defendant Walsh and Johnson's motion to dismiss is GRANTED with regard to plaintiff's conspiracy claim against defendant Johnson for failure to intervene, and DENIED in all other respects;

3. The state defendants' motion to dismiss is GRANTED in all respects with regard to defendant Sawyer, GRANTED in all respects with regard to plaintiff's claim for denial of access to the courts, and DENIED in all other respects;

4. The City defendants' motion to dismiss is DENIED in all respects;

5. The motion of defendant CNYPC Medical Staff to dismiss is GRANTED; and

6. The complaint is DISMISSED without prejudice with regard to defendants George Pataki, Michelle Payne, and John Does I-IV.

7. The Clerk is directed to enter judgment accordingly, and the remaining defendants are instructed to file and serve answers with regard to the remaining claims on or before April 29, 2008.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**
FN1

> FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Faris Abdul-Matiyn ("Abdul-Matiyn"), formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, FN2 twelve DOCS employees FN3 ("State defendants"), four New York City Corrections Officers

("City defendants"), and the Central New York Psychiatric Center ("CNYPC") Medical Staff ("CNYPC defendants"), violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments. Compl. (Docket No. 1). Presently pending are a motion to sever defendants Walsh and Johnson pursuant to Fed.R.Civ.P. 21 or, in the alternative, to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (Docket No. 17) and motions to dismiss from the State defendants (Docket Nos. 44, 47), FN4 the City defendants (Docket No. 46), and defendant CNYPC Medical Staff defendants (Docket No. 55) pursuant to Fed.R.Civ.P. 12(b)(6). Abdul-Matiyn opposes all motions. Docket Nos. 45, 48, 62. For the following reasons, it is recommended that (1) the motion of Walsh and Johnson to sever be denied and their motion to dismiss be granted in part and denied in part, (2) the State defendants' motion be granted in part and denied in part, (3) the City defendants' motion be denied, and (4) the motion of the CNYPC Medical Staff be granted.

> FN2. Abdul-Matiyn initially named twenty-six defendants. Compl. By an order entered January 26, 2007, the Court *sua sponte* dismissed three of the defendants. Docket No. 8. Defendants Pataki and Payne have not been served or otherwise appeared in this action. Likewise, defendants John Does I-IV have neither been served nor further identified. More than 120 days have elapsed since the complaint was filed. Accordingly, it is recommended that the complaint be dismissed without prejudice as to these six defendants pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

> FN3. Two of the State defendants, Walsh and Johnson, are employed by Sullivan Correctional Facility and, while represented by the same attorney as the other State defendants, have filed separate motions.

> FN4. The State defendants initially moved

to dismiss which was later discovered to contain an error in the electronic scanning of the documents. Docket No. 47. By an order dated May 29, 2007 (Docket No. 44, Pt. 1), that motion was stricken from the record and replaced by Docket No. 47. Docket No. 49.

## I. Background

**\*2** The facts are presented in the light most favorable to Abdul-Matiyn as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

Abdul-Matiyn "was released from Woodburn [Correctional Facility], after ... serv[ing] sixteen years and eight months ...." Compl. at 13. Abdul-Matiyn thereafter "attended [and completed] sex therapy, alternative[s] to violence, [and] psychological programs ...." *Id.* However, on May 5, 2005, Abdul-Matiyn was arrested and detained at Rikers Island due to a parole violation. *Id.*

Upon his arrival at Rikers Island, Abdul-Matiyn complained of " arthritis, back problems (pains), a history of heart problems, a history of blackouts ..," and kidney and bladder stones. *Id* . On July 6, 2005, Abdul-Matiyn requested a sick call because he was "having severe back pains, that were making it almost impossible for him to walk ... [and] a tightness in his chest and strong chest pains." *Id.* at 7. Abdul-Matiyn alleges that he was sent back to his cell, and despite his continued complaints, crippling pain, and pleas to go to the hospital, defendants Allen and Benbow ignored his requests. *Id.* at 7-8. Defendant Valezquez replaced Allen and "[Abdul-Matiyn] and the inmates informed [her] that [AbdulMatiyn] was having chest and back pains ... [so she] called the hospital and she was told to send [him] right down." *Id.* at 8. Benbow approached Valezquez to inquire where AbdulMatiyn was going and when Valezquez informed her that he was going to the hospital, Benbow allegedly referred to Abdul-Matiyn by a racial epithet and called the hospital, instructing them to put Abdul-Matiyn "on the burn". *Id.*

Defendant Rowe met Abdul-Matiyn upon his arrival at the hospital. *Id.* She informed him that he was "on the burn" and "[d]espite [Abdul-Matiyn's] persistent complaints of chest and back pains ..," Rowe did not let him see a doctor until over three and one-half hours later. *Id.* at 9. Abdul-Matiyn's chest pains had subsided, but he was still suffering from back pain and was prescribed methocarbamol. *Id.* Abdul-Matiyn contends that the physician informed him that due to the hospital's faulty equipment, the methocarbarnol was the only treatment available and that any persisting pain would have to be managed with Abdul-Matiyn's ability to use his mind to control the discomfort. *Id.*

Additionally, Abdul-Matiyn alleges that on another occasion where he was rushed to the clinic "due to severe pains [in his] chest, back and belly ..,", he encountered Rowe, who stated that "they had something special in store for [Abdul-Matiyn]" and refused to provide Abdul-Matiyn with immediate medical treatment. *Id.* at 12. Abdul-Matiyn also contends that some of Rowe's saliva landed on his face and in his mouth while Rowe was speaking to him and attributed this exchange of bodily fluids to his contraction of Hepatitis B. *Id.* at 15.

**\*3** Abdul-Matiyn was supposed to be released from Rikers Island on May 5, 2006. *Id.* at 14. However, at the beginning of April, Abdul-Matiyn was summoned to meetings with the Sullivan Correctional Facility's mental health department. *Id.* at 16.FN5 The mental health workers "stated that Albany told them to interview [Abdul-Matiyn] and to send Albany an evaluation;" however, despite Abdul-Matiyn's repeated requests, they would not tell him why Albany required an evaluation. *Id.* During the interview, Abdul-Matiyn was asked questions concerning his religion and alleged involvement with terrorists and terrorist organizations. *Id.* Additionally, Abdul-Matiyn contends that the mental health department was misconstruing prior conversations he had with them FN6 about his religious beliefs, "distort[ing] and misinterpret[ing his statements] to have it appear that [he] was seeing and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

hearing things that were not there." *Id.*

> FN5. At some point Abdul-Matiyn was transferred to Sullivan Correctional Facility for housing, but the exact date is not reflected in the record.

> FN6. Abdul-Matiyn states that he sporadically suffered from depression which caused trouble sleeping. Compl. at 16. When this occurred, he would "go to mental health and speak with someone and [ ] get something to help him sleep." *Id.*

After the evaluation interview, Abdul-Matiyn was seen by defendant Johnson. *Id.* at 17. Johnson asked Abdul-Matiyn to complete additional paperwork, allegedly because AbdulMatiyn's initial paperwork had been "messed up." *Id.* Abdul-Matiyn "asked if anything came up that would interfere with his release ...." and Johnson responded "no unless something else comes up unexpectedly ...." *Id.* Abdul-Matiyn continually asked correctional facility staff if there were new developments occurring in his case that would preclude his release; however, "[e]ach defendant expressed ... that they had no knowledge of anything that would prevent [him] from going home." *Id.*

On May 5, 2005, Abdul-Matiyn was met by Johnson and informed that he was "suppose[d] to have been examined by mental health the last two weeks before he was to be released [and] ... he had to be transferred to Marcy Psychiatric [Correctional Facility] to be evaluated." *Id.* at 18. Abdul-Matiyn alleges that he was told that his evaluation would be "three days to a week and no more than two weeks ...." *Id.* Abdul-Matiyn was then strip-searched, shackled, and transported to CNYPC. *Id.* Abdul-Matiyn later alleged that Walsh authored and signed an application for involuntary commitment and that this information was readily known by other defendants. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶¶ 11, 13-14.

Upon arrival at CNYPC, defendant Murphy al-

legedly told Abdul-Matiyn that he would "be [t]here a lot longer than [two weeks because he was] one of the filthy animals [defendants] have to clean off our streets." Compl. at 19. "All of [Abdul-Matiyn's] property was taken from him," including religious texts and other items. *Id.* Additionally, Murphy informed Abdul-Matiyn that he would "be [t]here for the rest of [his] life." *Id.* Abdul-Matiyn continually asked what authority granted defendants the ability to keep him confined against his will, but defendants did not give him an answer. *Id.*

**\*4** Additionally, Abdul-Matiyn underwent a psychological evaluation upon arrival. *Id.* According to the psychologist, "she didn't see anything mentally wrong with [Abdul-Matiyn] ... and that she could not give [him] any answers to his legal questions except that Governor Pataki instructed them to lock up everyone convicted of a sexual offense by any means possible, and keep them locked up forever." *Id.*

While Abdul-Matiyn resided at CNYPC, the CNYPC defendants, "especially ... Hanmer, .. Murphy, .. Nowicki and ... Payne told [him] he had no constitutional rights ... to be allowed to practice his religion, have access to the courts or be told why he was [t]here at CNYPC." *Id.* at 20. Additionally, defendant Capolo allegedly refused Abdul-Matiyn's requests to pray, "tell[ing Abdul-Matiyn] that he was too busy to allow [Abdul-Matiyn] the opportunity to pray and [that he] would have to find another time after Capolo got off work to pray." *Id.* at 27. Abdul-Matiyn also contends that Payne "would taunt [him] everyday by making sarcastic statements about [Abdul-Matiyn] and his religion to groups of people whenever he was present." *Id.* Furthermore, although CNYPC provided kosher meals to Jewish residents and defendant Becker "told [Abdul-Matiyn] that they would consider obtaining a contract for halal meals FN7 ...," none were purchased and Abdul-Matiyn was denied his special religious diet. *Id.* at 20.

> FN7. "Halal" foods are those prepared in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
**(Cite as: 2008 WL 974409 (N.D.N.Y.))**

accordance with Islamic religious law. *See, e.g.,* Cyril Glasse, *The Concise Encyclopedia of Islam* 133, 144, 148 (1989).

Abdul-Matiyn also contends that while he was at CNYPC, he was "forcefully strip searched, on a few occasions and threatened with the threat of being injected with drugs if he refused to be striped [sic] searched or ... participate in the programs [t]here at CNYPC, even if his refusal [wa]s due to his religion or if he w[as] physically ill." *Id.* at 23. AbdulMatiyn also alleges that Payne threatened him with the punishment of the "side room", where patients were allegedly "unmercifully beat, kick[ed] and stomp[ed] ...." *Id.* at 28. Moreover, Abdul-Matiyn contends that his "room ha[d] not been clean in over six months and the times [he] ha[d] tried to clean his room with a wet towel; he was threatened with punishment ...." *Id.* at 23. Abdul-Matiyn also complains that his confinement was discriminatory because "defendants ... came to the determination that they would imprison males convicted of sexual offenses ... [since] defendants are targeting only males convicted of sexual offenses and not females who commit the same or similar offenses." *Id.* at 25. This action followed.

## II. Discussion

In his complaint, Abdul-Matiyn alleges that his First Amendment rights were violated because the CNYPC defendants failed to provide him with halal meals, did not allow him to pray, and impeded his access to the courts. Abdul-Matiyn also claims that he was unlawfully strip-searched and shackled on multiple occasions. Additionally, Abdul-Matiyn asserts Eighth Amendment violations for deliberate indifference to a serious medical need [FN8] and, liberally construing Abdul-Matiyn's complaint, failure to protect. Moreover, AbdulMatiyn contends that his due process rights were violated by his civil confinement and the conspiracy between Walsh and Johnson to have him civilly confined, as well as claiming that his equal protection rights were violated by CNYPC's discriminatory procedures confining only male sex offenders. Walsh and Johnson

move to sever and, in the alternative, dismiss based upon the failure to (1) abide by the pleading requirements, (2) allege the personal involvement of Walsh, and (3) state a claim with respect to Johnson. The State defendants move to dismiss based upon (1) Abdul-Matiyn's failure to comply with pleading requirements, (2) failure to allege the personal involvement of Sawyer, (3) the submission of a conclusory complaint with respect to the First and Fourteenth Amendment claims, and (4) the fact that verbal harassment alleged on the part of Capolo is not actionable under § 1983. The City defendants move to dismiss based upon the failure to (1) comply with pleading requirements, (2) allege personal involvement, (3) exhaust administrative remedies, [FN9] and (4) allege a serious medical need. The CNYPC defendants move to dismiss based upon Eleventh Amendment immunity.

> FN8. Abdul-Matiyn asserts multiple claims of serious medical conditions including *inter alia* back and chest pain, hearing loss, bladder and kidney stones, Hepatitis B, and arthritis. Compl. at 5,11, 12-13, 14. Because only the City defendants asserted an argument controverting Abdul-Matiyn's serious medical need, only the ailments directly pertaining to their involvement with his treatment will be discussed. Docket No. 46. These claims primarily concern the complaints of Abdul-Matiyn's chest and back pain. Compl. at 7-9.

> FN9. "[F]ailure to exhaust is an affirmative defense ...." *Jones v. Block,* 127 S.Ct. 910, 921 (2007); *see also Paese v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 445 (2d Cir.2006). Thus, the City defendants' assertion of this affirmative defense in a motion to dismiss is premature but may be revisited at the summary judgment stage. *See Jones,* 127 S.Ct. at 921-22 (holding that an inmate is not required to plead exhaustion in the complaint). Accordingly, the City defendants' motion on this ground should

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

be denied.

### A. Legal Standard

**\*5** Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the nonmovant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, "a 'complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Gilfus v. Adessa,* No. 5:04-CV-1368 (HGM/DEP), 2006 WL 2827132, at \*3 (N.D.N.Y.2006) (citing *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted)). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest..... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations,.. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted).

### B. Failure to Comply with Pleading Requirements

"Under the Federal Rules, a 'short and plain' complaint is sufficient as long as it puts the defendant on notice of the claims against it." *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (*quoting* Fed.R.Civ.P. 8(a)). Additionally, the Federal Rules state that "[a]ll averments of claim ... shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances...." Fed.R.Civ.P. 10(b). However, "[a]t base, the Rules command us never to exalt form over substance." *Phillips,* 408 F.3d at 128 (*citing* Fed.R.Civ.P. 8(f)).

The majority of defendants cite Abdul-Matiyn's failure to number his complaint in paragraphs as a basis for dismissal. However, the Court has been "willing to overlook harmless violations of Rule 10(b) ..." where the spirit of the rule, "to facilitate [ ] the clear presentations of the matters set forth, so that allegations might easily be referenced in subsequent pleadings," is not offended. *Id.* (citations and internal quotations omitted). Thus, "where the absence of numbering or succinct paragraphs does not interfere with one's ability to understand the claims or otherwise prejudice the adverse party, the pleading should be accepted." *Id.* (citations omitted).

**\*6** In this case, it is clear that all defendants were able to reference easily the allegations in the complaint as each set forth multiple reasons to dismiss the complaint other than the failure to comply with Rule 10(b). Moreover, defendants were not clearly prejudiced as each motion and memorandum of law is extensively researched, cogently written, and, when viewed together, refute most of the bases upon which Abdul-Matiyn asserts constitutional violations.

Therefore, the motions of Walsh and Johnson, the State defendants, and the City defendants on this ground should be denied.

### C. Personal Involvement

Certain defendants contend that Abdul-Matiyn has failed to establish their personal involvement. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> (1)[T]he defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

### 1. Walsh

Walsh contends that "[o]ther than being named in the caption and identified as a party, [he] is never referred to in the complaint." Docket No. 17, Pt. 2 at 4. However, construing all of Abdul-Matiyn's submissions liberally, he alleges that "Walsh ... without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment .... " Docket No. 48 at ¶ 11. As discussed *infra* in subsection II(E)(2)(I), Abdul-Matiyn's involuntary civil confinement may constitute a due process violation. Thus, Walsh's alleged actions of authoring and signing the allegedly false

report which served as the basis of Abdul-Matiyn's confinement may constitute direct participation in an alleged constitutional violation.

Accordingly, Walsh's motion to dismiss on this ground should be denied.

### 2. Benbow, Allen, Rowe, and Valezquez

The City defendants contend that there are no allegations that they were personally involved in the alleged deliberate indifference to Abdul-Matiyn's medical treatment because they were not personally involved with providing his medical care. However, defendants need not physically administer the care to be subject to Eighth Amendment liability.

**\*7** As discussed *infra* in subsection II(E)(1), construing all facts in the light most favorable to Abdul-Matiyn, the City defendants exhibited deliberate indifference to his medical treatment. Although the City defendants were not responsible for the actual medical care, they were responsible for seeing that Abdul-Matiyn received adequate treatment once they were aware of his serious medical need. Crediting Abdul-Matiyn's allegations, each City defendant ignored this responsibility by denying Abdul-Matiyn with medical treatment or severely delaying it. Therefore, the complaint suffices to allege that each was directly involved in the alleged deliberate indifference.

Thus, City the City defendants' motion on this ground should be denied.

### 3. Sawyer

The State defendants argue that "[o]ther than being named in the caption and identified as a party, Sawyer is never referred to in the complaint." Docket No. 47, Pt. 2 at 4. Reading all of Abdul-Matiyn's submissions together, he alleges that "superiors [are] liable for their [employees'] actions ... and Sawyer is responsible for the training for those employed at CNYPC and liable for their actions and inactions." Docket No. 48 at ¶ 22. Abdul-Matiyn continues by alleging negligent hiring and retention and vicarious liability. *Id.* at ¶¶ 23-26.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
**(Cite as: 2008 WL 974409 (N.D.N.Y.))**

Sawyer cannot be held liable solely because he held a supervisory position over other defendants. Abdul-Matiyn does not specifically contend that Sawyer was directly involved or had knowledge of the alleged constitutional violations; however, even when reading the complaint in the light most favorable to Abdul-Matiyn, any liberally construed allegations of direct involvement and knowledge would still lack any factual basis. Additionally, although Abdul-Matiyn contends that there was negligent supervision, there is no fact asserted beyond his conclusory allegations that Sawyer created a hiring or retention policy which allowed constitutional violations to continue or was grossly negligent in managing the other named defendants.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

**D. Severance**

In the event of misjoinder of parties, "[a]ny claim against a party may be severed and proceed separately." Fed.R.Civ.P. 21. "While the decision whether to grant a severance motion is committed to the sound discretion of the trial court, the federal courts view severance as a procedural device to be employed only in exceptional circumstances." *Baergas v. City of New York,* No. 04-CV-2944 (BSJ/HBP), 2005 WL 2105550 at *3 (S.D.N.Y. Sept. 01, 2005) (citations and internal quotations omitted). The factors considered "when determining whether severance is appropriate [are]:

(1) whether the claims arise out of the same transaction or occurrence, whether the claims present common questions of fact or law, (3) whether severance would serve judicial economy, (4) prejudice to the parties caused by severance, and (5) whether the claims involve different witnesses and evidence."

**\*8** *Id.* at *3-4 (citations omitted).

In this case, it is clear that severance is not warranted. The actions of Walsh and Johnson are the basis of Abdul-Matiyn's due process claim. Liberally reading all submissions, Abdul-Matiyn alleges that Walsh, "without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment" and signed it, leading to Abdul-Matiyn's involuntary civil confinement, potentially in violation of the Fourteenth Amendment. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶ 11. Additionally, Abdul-Matiyn contends that Johnson participated in the conspiracy to involuntarily confine him "by concealing what was taking place, and giving [him] misleading information concerning the situation." *Id.* at ¶ 13. Thus, the subsequent claims of involuntary confinement asserted against the CNYPC defendants directly relate to, and intertwine with, the allegations against Walsh and Johnson. Additionally, the same set of facts relating to who signed the papers and ordered that he be confined would be determined in both cases. Among other things, this would result in defendants calling duplicate witnesses. Thus, severing the litigation would not serve the interests of judicial economy and may lead to inconsistent findings in liability and damages which would prejudice all defendants.

Therefore, Walsh and Johnson's motion to sever should be denied.

**E. Failure to State a Claim**

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19 (1981).

**1. Eighth Amendment**

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amend-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is two-fold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

**\*9** " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, 16 and (3) the existence of chronic and substantial pain ." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access

to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id* . at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04-CV1089 (GLS/RFT), 2006 WL 681223, at \*4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v.. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at \*14 (S.D.N.Y. Sept. 17, 2002). Courts have also failed to recognize chest pains as a serious medical condition. *See McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) (holding that keeping plaintiff "waiting for twenty-five minutes and then sen[ding] him back to his cell without treating his chest pains does not amount to a constitutional deprivation.").

However, considering Abdul-Matiyn's claims together and reading all allegations in a light most favorable to him, it appears that he has alleged a serious medical condition. Abdul-Matiyn contends he had a history of back pain and that the back pain he was experiencing on July 6, 2005 was so severe that it was "making it almost impossible to walk ...." Compl. at 7. This pain began at 11:30 a.m. and was not addressed until after 3 p.m. *Id.* at 7-9. Additionally, the back pain was accompanied by severe chest pain. *Id.* at 7. This pain lasted far longer than that addressed in *McCoy.* Additionally, the combination "had [Abdul-Matiyn] twisted over in a bending position ... [causing him to] cry[ ]." *Id.* Crediting Abdul-Matiun's allegations, this combina-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion of factors present a condition which a reasonable person or physician would deem worthy of treatment. Additionally, the pain appears to have been of sufficient severity. Thus, Abdul-Matiyn's chest and back pain constituted a serious medical condition.

**\*10** Construing the allegations in the light most favorable to Abdul-Matiyn also leads to the conclusion that the City defendants were deliberately indifferent to his need for medical treatment. Abdul-Matiyn alleges that Allen and Benbow refused to respond to his repeated requests to go to the clinic for his severe and crippling chest pains. Compl. at 7. Additionally, even though Valezquez called the clinic on Abdul-Matiyn's behalf, it is alleged that Valezquez stood idly by while Benbow told the clinic that Abdul-Matiyn was to be placed "on the burn." *Id.* at 8. Additionally, upon arrival at the clinic, Rowe refused to let Abdul-Matiyn see a physician for an extended period of time. Compl. at 9. If proven, these actions could constituted intentional delay and denial of medical services during a serious medical need.

Therefore, the City defendants' motion to dismiss on this ground should be denied.

### 2. Fourteenth Amendment
### I. Due Process

Abdul-Matiyn contends that the State defendants violated his due process rights when he was involuntarily, civilly confined at CNYPC without being given any justification from the State defendants. The State defendants contend that Abdul-Matiyn's claims are conclusory.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). "Prisoners enjoy the right not to be deprived of life, liberty or property without due process of law, but their rights are to be balanced with, and often tempered by, the needs of their special institutional setting." *Malik v. Tan-*

*ner,* 697 F. Supp 1294, 1301 (S.D.N.Y.1988) (citing *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974)). "Involuntary confinement, including civil commitment, constitutes a significant deprivation of liberty requiring due process." *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (*citing Addington v. Texas,* 441 U.S. 418, 425 (1979)). However, the Supreme Court has "permitt[ed] involuntary confinement based upon a determination that the person currently both suffers from a 'mental abnormality' or 'personality disorder' and is likely to pose a future danger to the public." *Kansas v. Hendricks,* 521 U.S. 346, 371 (1997). "In the case of civil confinement, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for ... commit[ment] ... [and is in]tolera [nt of] the involuntary confinement of a nondangerous individual." *Mental Hygiene Legal Serv. v. Spitzer,* No. 07-CV-2935 (GEL), 2007 WL 4115936, at \*6 (S.D.N.Y. Nov. 16, 2007) (citations and internal quotations omitted).

In this case, viewing all facts in the light most favorable to Abdul-Matiyn, it appears that his due process rights were violated. Abdul-Matiyn continually inquired why he was being interviewed, if the results of those discussions would interfere with his release date, and, upon his arrival at CNYPC, under what authority and with what proof he was being detained. All of these unanswered inquiries directly reflect upon the due process, or lack thereof, afforded to Abdul-Matiyn.

**\*11** Additionally, construing the allegations in the light most favorable to Abdul-Matiyn, he was not a danger to the community as he had undergone multiple courses during his release and devoted his time and energy to his religion and assisting those less fortunate in the community. Compl. at 13-14. Moreover, Abdul-Matiyn had no suicidal ideations or mental illness but was merely a devout and spiritual Muslim. *Id.* at 16. Therefore, AbdulMatiyn has alleged adequate facts to present a basis for recovery.

Thus, the State defendants' motion to dismiss on this ground should be denied.

### ii. Equal Protection[FN10]

[FN10]. Liberally construing Abdul-Matiyn's complaint, there is a second allegation of discrimination. Abdul-Matiyn claims that defendants did not target those convicted of homicide, a crime specifically mentioned in the Mental Hygiene laws, for confinement while they did target sex offenders, a crime allegedly "never considered by the framers ... as a mental illness ...." Compl. at 25. However, Abdul-Matiyn's conclusory allegations do not compare similarly situated individuals; thus, any such contention does not implicate Fourteenth Amendment protection.

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Myers v. Barrett,* No. 95-CV-1534, 1997 WL 151770, at *3 (N.D.N.Y. Mar. 28, 1997) (Pooler, J.). "To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197 (1976).

In this case, Abdul-Matiyn alleges that male sex offenders were civilly confined in CNYPC while similarly situated female sex offenders were not. Compl. at 25. Construing all allegations in the light most favorable to Abdul-Matiyn, it appears that he has asserted a sex-based, discriminatory policy. The State defendants merely claim that Ab-

dul-Matiyn has stated a conclusory allegation; however, at this stage these facts, without any proffer of substantial relation to an important government objective, are suffice to allege a potential basis for relief.

Therefore, the State defendants' motion to dismiss on this ground should be denied.

### 3. First Amendment
### I. Free Exercise of Religion

Abdul-Matiyn alleges that his First Amendment rights were violated when the State defendants failed to provide him with his religious meals and refused to let him pray. The State defendants contend that Abdul-Matiyn's claims are conclusory.

"The First Amendment ... guarantees the right to the free exercise of religion." *Johnson v. Guiffere,* No. 04-CV-57 (DNH), 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) (citing *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns ...." *Johnson,* 2007 WL 3046703, at * 4.

### a. Failure to Provide Halal Meals

**\*12** The Free Exercise Clause extends "into other aspects of prison life including, pertinently, that of an inmate's diet ...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples ...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden [s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

held religious beliefs.... [T]he burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision ... [and i]n the event such a[n] interest is articulated, its reasonableness is then subject to analysis under ... *Turner* ....

*Johnson,* 2007 WL 3046703 at * 4-5 (citations omitted).

In this case, Abdul-Matiyn has articulated a First Amendment violation as the State defendants did not provide him with his halal meals during his confinement in CNYPC. There is no dispute at this stage that Abdul-Matiyn held genuine religious beliefs. The State defendants at this stage assert only that Abdul-Matiyn's claim was conclusory. Therefore, the State defendants' motion must be denied because the allegations of the complaint suffice to state a claim.

Therefore, the State defendants' motion on this ground should be denied.

**b. Refusal to Allow Prayer**

"A determination of whether the refusal to permit attendance at a religious service [vioolates the First Amendment] hinges upon the balancing of an inmate's First Amendment free exercise right[ ] against institutional needs of ... operating prison facilities ...." *Johnson,* 2007 WL 3046703, at *4. "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (citations omitted).

In this case, Abdul-Matiyn appears to have asserted a First Amendment violation when the State defendants removed his religious texts and refused to permit him to pray. Compl. at 19. Abdul-Matiyn specifically references defendant Capolo, alleging that "he refuse[d] to allow [Abdul-Matiyn] to go and perform his prayers ...." *Id.* at 27. The State defendants contend that Capolo's oral refusals consti-

tuted nothing more than verbal harassment, which "alone, unaccompanied by an injury natter how inappropriate, unprofessional, or reprehensible .., does not constitute the violation of any federally protected right and therefore is not actionable under 42 U. S.C. § 1983." *Murray,* 2007 WL 956941, at *8.

However, the State defendants are incorrect in asserting that Capolo's alleged oral denials amounted only to verbal harassment and were insufficient to state a First Amendment violation. Capolo's alleged continuous refusals to provide Abdul-Matiyn with his religious texts or permit him time and space to pray were at least arguably unreasonable in light of the fact that at this stage, the State defendants have not proffered a legitimate penological interest which justified denial of the provision of a book and time for prayer. Thus, Abdul-Matiyn has alleged here a violation with a potential basis for relief.

**\*13** Therefore, the State defendants motion on this ground should be denied.

**ii. Access to Courts**

Abdul-Matiyn contends that while confined, he was denied access to a law library and was thus denied his First Amendment right of access to the courts. The State defendants assert that Abdul-Matiyn alleges only a conclusory claim here.

The Supreme Court has held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries ...." *Bounds v. Smith,* 430 U.S. 817, 828 (1977); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996). This right is not unlimited and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis,* 518 U.S. at 531. "[I]n order to fulfill the actual injury requirement ... on a law library claim where there is a lack of access to the courts, the inmate

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

must be pursuing [*inter alia* ] ... a civil rights claim pursuant to § 1983 to vindicate basic constitutional rights." *Linares v. Mahunik,* No. 05-CV-625 (GLS/RFT), 2006 WL 2595200, at *7 (N.D.N.Y. Sept. 11, 2006) (citations and internal quotations omitted). Thus, "to prove an actual injury, a plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials." *Id.* (citations omitted).

In this case, Abdul-Matiyn enjoyed the right to a law library. Construing his allegations in the light most favorable to Abdul-Matiyn, this right was violated when the State defendants denied him access to one. Compl. at 20. However, Abdul-Matiyn does not allege that he suffered any injury due to this alleged deprivation. even when viewing all of Abdul-Matiyn's submissions together, he makes only that his lack of access to a law library precluded him from "drafting papers for court." Docket No. 48 at § 47. Additionally, Abdul-Matiyn claims that this preclusion from drafting papers provided defendants with their grounds for dismissal based on non-compliance with pleading requirements. *Id.*

However, this conclusory allegation is insufficient to provide a basis for relief. AbdulMatiyn alleges no case then pending which was adversely affected in any way. In this case, defendants' motions to dismiss based on the failure to comply with the pleading requirements were rejected. Moreover, Abdul-Matiyn gives no other indication of what drafts he intended to submit to the Court.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

### 4. Conspiracy

Johnson assert that Abdul-Matiyn has failed to state a cause of action against him. Abdul-Matiyn contends that Johnson participated in the conspiracy to have him civilly detained and that he has a right "to be free from conspiracies to deprive him of his constitutional rights." Docket No. 48 at ¶¶ 13-14.

**\*14** "Section 1985 prohibits conspiracies to in-

terfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828-29 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal,* 490 F.3d at 176 (citations omitted).

Here, Abdul-Matiyn alleges that Johnson joined with others to deprive Abdul-Matiyn of his rights. Liberally construing those allegations, the concert of actions by Johnson and others could support a claim of agreement among Johnson and other defendants and acts in furtherance of the conspiracy. This suffices to support a claim for conspiracy against Johnson and Johnson's motion on this ground should be denied.

However, liberally construing Abdul-Matiyn's claims, he has asserted an action for negligent failure to prevent the deprivation of his rights. If Johnson "ha [d] knowledge that any of the wrongs ... mentioned in section 1985 ... [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do ... [he] shall be liable to the party injured." 42 U.S.C. § 1986. However, "[a] claim under section 1986 ... lies only if there is a viable conspiracy claim under section 1985." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994).

Therefore, Johnson's motion to dismiss on this

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

ground should be granted in part and denied in part.

### F. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100.

"[T]he Central New York Psychiatric Center[,] ... [as an institution, is an] arm[ ] of the state for Eleventh Amendment purposes and ... therefore, [is] absolutely immune from [P]laintiff's claims for monetary damages in this lawsuit." *Murray v. Pataki,* No. 03-CV-1263 (LEK/RFT), 2007 WL 956941, at *12 (N.D.N.Y. Mar. 29, 2007) (citations omitted). Therefore, the motion of defendant CNYPC Medical Staff on this ground should be granted.

### III. Conclusion

**\*15** For the reasons stated above, it is hereby **RECOMMENDED** that:

A. The motion of Walsh and Johnson to sever (Docket No. 17) be **DENIED;**

B. The motion of Walsh and Johnson to dismiss (Docket No. 17) be:

1. **GRANTED** as to Abdul-Matiyan's conspiracy claim against defendant Johnson for failure to intervene; and

2. **DENIED** in all other respects;

C. The State defendants' motion to dismiss (Docket Nos. 44, 47) be:

1. **GRANTED** in all respects as to defendant Sawyer;

2. **GRANTED** in all respects as to Abdul-Matiyan's claim for denial of access to the courts; and

3. **DENIED** in all other respects;

D. The City defendants motion to dismiss (Docket No. 46) be **DENIED** in all respects;

E. The motion of defendant CNYPC Medical Staff to dismiss (Docket No. 55) be **GRANTED;** and

F. The complaint be **DISMISSED** without prejudice as to defendants George Pataki, Michelle Payne, and John Does I-IV.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.
Abdul-Matiyn v. Pataki
Slip Copy, 2008 WL 974409 (N.D.N.Y.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.