IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

───────────────────────────────

WALTER T. ROACHE,

                  Plaintiff,      Civil Action No.
                                    9:12-CV-1034 (LEK/DEP)

     v.

BRIAN FISCHER, *et al.*,

                  Defendants.

───────────────────────────────

APPEARANCES:                 OF COUNSEL:

FOR PLAINTIFF:

FELT EVANS LLP              JAY G. WILLIAMS, III, ESQ.[1]
4-6 North Park Row
Clinton, NY 13323

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN    CATHY Y. SHEEHAN, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

---

[1]    Attorney Williams was appointed to represent the plaintiff in this matter, *pro bono*, on October 10, 2013. The court wishes to extend its thanks to counsel for his efforts on behalf of the plaintiff.

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Walter Roache, a resident of the Central New York Psychiatric Center ("CNYPC"), has commenced this action, pursuant to 42 U.S.C. § 1983, alleging that the defendants violated his civil rights. Plaintiff contends that his due process rights under the Fifth and Fourteenth Amendments were infringed when he was involuntary committed to the CNYPC beyond the conclusion of his penal confinement, for the purpose of undergoing sex offender treatment.

In response to plaintiff's amended complaint, which is the currently operative pleading, defendants moved seeking its dismissal on several grounds, including for failure to state a claim upon which relief may be granted based on the failure to allege facts plausibly suggesting that the four individual defendants were personally involved in the alleged violations. For the reasons set forth below, I recommend that defendants' motion be granted.

I.     BACKGROUND[2]

Plaintiff is a former New York State prison inmate currently being held in the CNYPC. [Dkt. No. 37 at 3]. At the times relevant to his claims in this action, plaintiff was confined in both the Oneida Correctional Facility ("Oneida"), located in Marcy, New York, and later in the CNYPC, which is also located in Marcy, New York. *Id.* at 3.

Plaintiff was incarcerated for a crime, the nature of which resulted in his being identified as a sex offender, and served a sentence for his offense that was to extend through his projected release date of February 2, 2010. [Dkt. No. 37 at 2-3]. At the time of his scheduled release from penal confinement, plaintiff was an inmate at Oneida. *Id.* at 3. Plaintiff was not released on February 2, 2010, as scheduled, however, and instead

---

[2]     In light of the procedural posture of this case, the court has accepted as true the allegations set forth in plaintiff's amended complaint for purposes of the pending motion. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964). Mindful that an amended pleading supersedes an earlier one in its entirety, N.D.N.Y. L.R.7.1(a)(4), I have not considered the allegations set forth in plaintiff's original complaint in my analysis of the pending motion. I have, however, taken judicial notice of, and thus considered, the various state court orders submitted by the parties in connection with both the pending motion to dismiss, as well as the defendants' earlier motion to dismiss plaintiff's original complaint. [Dkt. No. 17-1 at 19-34]; [Dkt. No. 19 at 22-29]; [Dkt. No. 47-2 at 14-18]; *see* Fed. R. Evid. 201(b); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d. Cir. 1995) (holding that, on a motion to dismiss, a court "may consider all papers and exhibits appended to the complaint , as well as any matters of which judicial notice may be taken"); *see also Hill v. Gourd*, 63 F. Supp. 2d 254, 256 (E.D.N.Y. 1999) (finding that it could take judicial notice of court orders and documents related to the plaintiff's related state case and parole hearings).

was held pending proceedings pursuant to Article 10 of the Mental Health Hygiene Law ("MHL Article 10") to determine whether he required sex offender treatment.[3] *Id.* Plaintiff alleges that he remained imprisoned at Oneida beyond February 2, 2010, "with no legal Order," pending a probable cause hearing under MHL Article 10. *Id.* at 3. Plaintiff contends that this detention was without legal authority and in violation of his due process rights under the Fifth and Fourteenth Amendments. *Id.*

Following a transfer of the matter pursuant to an order issued by Supreme Court Justice James C. Tormey on January 29, 2010, Dkt. No. 17-1 at 20-24, a hearing was held on April 23, 2010, in Orange County Supreme Court, to determine whether there was probable cause to believe plaintiff was a sex offender requiring civil management. Dkt. No. 37 at 3. A jury trial was subsequently convened, resulting in a determination that plaintiff was a sex offender requiring civil management, and an order was subsequently issued by Supreme Court Justice Nicholas DeRosa, on October 26, 2011, directing that plaintiff be held in custody of the New York Office of Mental Health ("OMH"). Dkt. No. 17-1 at 29-30. Plaintiff continues to be confined in the CNYPC pursuant to MHL Article 10, and alleges that he was held at Oneida, and is being held at the CNYPC, "in

---

[3]     The relevant provisions of MHL Article 10 are described below in Part III.B. of this report.

violation of his custodial rights under the Fifth and Fourteenth Amendments to the Constitution." *See generally* Dkt. No. 37.

II.    PROCEDURAL HISTORY

        Plaintiff commenced this action on or about June 26, 2012, with the filing of his original complaint and an accompanying application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Following the court's acceptance of the complaint and granting of plaintiff's request to proceed IFP, the originally named defendants, who included the New York State Attorney General's Office, the New York State Attorney General, and two assistant attorneys general, filed a motion to dismiss in lieu of an answer. Dkt. Nos. 6, 17. On August 9, 2013, I issued a report recommending (1) dismissal of all of plaintiff's claims against the named defendants, (2) that plaintiff be granted leave to amend his complaint to name a non-immune defendant, and (3) that plaintiff be appointed *pro bono* counsel for purposes of amending his complaint. Dkt. No. 25. Senior District Judge Lawrence E. Kahn adopted that report on September 30, 2013. Dkt. No. 31. The court thereafter appointed counsel on October 10, 2013. Dkt. No. 32.

        On March 24, 2014, plaintiff's appointed counsel filed an amended complaint in the action. Dkt. No. 37. As defendants, plaintiff's amended complaint names (1) Brian Fischer, the Commissioner of the New York

State Department of Corrections and Community Supervision ("DOCCS"); (2) Susan Connelly, the Superintendent at Oneida; (3) Michael Hogan, the Commissioner of Forensic Service and Mental Health; and (4) Donald Sawyer, the Executive Director of the CNYPC. Dkt. No. 37 at 2. Plaintiff alleges that these individuals caused him to be held at their respective facilities in violation of his rights and knew or should have known there was no legal basis for holding him. *See generally* Dkt. No. 37.

The newly named defendants responded to plaintiff's amended complaint by filing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 47. In their motion, defendants contend that (1) plaintiff's amended complaint fails to allege facts plausibly suggesting the personal involvement of any of the individual defendants; (2) plaintiff's claims are barred by the statute of limitations; (3) all defendants are immune from suit based on the Eleventh Amendment to the extent they are sued for damages in their official capacities; and (4) defendants are entitled to qualified immunity. *See generally* Dkt. No. 47-2.

With the filing of plaintiff's response in opposition to the motion, Dkt. No. 49, and defendants' reply, Dkt. No. 53, the defendants' motion is now fully briefed and has been referred to me for the issuance of a report and

recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

   A.    Dismissal Standard

   A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

   In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences

in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The tenet that a court must accept as true all of the allegations contained in a complaint does not apply, however, to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

B.  MHL Article 10 Generally

In 2007, the New York State legislature enacted MHL Article 10, known as the Sex Offender Management and Treatment Act ("SOMTA"), creating a statutory scheme prescribing the procedures to be followed with

respect to convicted sex offenders who might require civil commitment or supervision following completion of their prison terms. MHL Article 10; *Mental Hygiene Legal Servs. V. Spitzer* ("*MHLS-I*"), No. 07-CV-2935, 2007 WL 4115936 (S.D.N.Y. Nov. 16, 2007), *aff'd by Mental Hygiene Legal Servs. v. Paterson*, No. 07-5548, 2009 WL 579445 (2d Cir. Mar. 4, 2009); *State ex rel. Harkavy v. Consilvio*, 8 N.Y.3d 645, 651 (2007). MHL Article 10 provides an elaborate mechanism for review of a detained sex offender's case prior to his release from prison to determine whether further confinement under the SOMTA is necessary. *See generally* MHL Article 10. The specific provisions of MHL Article 10 that are relevant to this action are highlighted below.

When a "detained sex offender," also referred to as the "respondent," nears release from confinement or parole, a case review team, comprised of three individuals, at least two of whom must be mental health professionals, determines whether that person is "a sex offender requiring civil management." MHL §§ 10.05(e), 10.06(a). Upon a determination that the respondent is a sex offender requiring civil management, the case review team provides notice of that finding to the respondent and the Attorney General. MHL § 10.05(g). The Attorney General may then file a sex offender management petition in the supreme

or county court of the county where the respondent is located. MHL §
10.06(a). Within ten days of the filing of that petition, the respondent has
the right to file a notice of removal of the proceeding to the county of the
underlying criminal sex offense charges. MHL § 10.06(b). The Attorney
General may respond by moving for retention of venue for good cause. *Id.*

Within thirty days of the filing of the Attorney General's sex offender
management petition, the court before which the petition is pending must
conduct a hearing to determine whether there is probable cause to believe
that the respondent is a sex offender requiring civil management. MHL §
10.06(g). If, however, the respondent is not at liberty at the time the
petition is filed by the Attorney General but becomes eligible for release
prior to the probable cause hearing, "the court shall order the stay of such
release pending the probable cause hearing," and the probable cause
hearing "shall commence no later than seventy-two hours from the date of
the respondent's anticipated release date." MHL § 10.06(h).

Assuming the court presiding over the petition finds probable cause
to believe that the respondent is a sex offender in need of civil
management, MHL Article 10 instructs that (1) the presiding court issue an
order directing that the respondent be committed to a secure treatment
facility, (2) the court set a trial date, and (3) the respondent "shall not be

released" pending trial. MHL § 10.06(k). A jury trial must take place within sixty days of the probable cause hearing to determine whether the respondent is a detained sex offender who suffers from a mental abnormality.[4] MHL § 10.07(a). Upon a jury's finding that the respondent suffers from a mental abnormality under MHL article 10, the "court shall consider whether the respondent is a dangerous sex offender requiring strict and intensive supervision."[5] MHL § 10.07(f). The time frame for determining whether the respondent is a dangerous sex offender requiring confinement is not prescribed by MHL Article 10.

---

[4]     "Mental abnormality" is defined as follows:

> [A] congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct. MHL § 10.03(i).

MHL § 10.03(e).

[5]     The term "dangerous sex offender requiring confinement" is defined by MHL Article 10 to mean a person who is a detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility.

C.    Personal Involvement

In their motion, defendants seek dismissal of plaintiff's claims based on the ground that the amended complaint does not alleged sufficient facts plausibly suggesting that they were personally involved in any of the conduct giving rise to plaintiff's claims. Dkt. No. 47-2 at 7-8.

"Personal Involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffit v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). To prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

Plaintiff's amended complaint has failed to plausibly allege any actions taken against him directly by the named defendants. *See generally* [Dkt. No. 37](). Plaintiff merely contends, both in the amended complaint and in his response to the pending motion, that each defendant "knew or should have known" that he was being improperly held in violation of MHL Article 10. *Id.* at 3-5; *see also* [Dkt. No. 49 at 4]() ("It is Plaintiff's contention that each Defendant knew that the Plaintiff was held beyond his release date in the facility in which he or she had authority."). None of plaintiff's submissions, however, disclose any facts to substantiate these assertions. It is well settled that such conclusory allegations cannot defeat a motion to dismiss. *See, e.g., Castillo v. Comm'r N.Y. State Dep't of Corr. Servs.*, No. 06-CV-8580, 2008 WL 4501881, at *2 (W.D.N.Y. Sept. 30, 2008) ("Although plaintiff does allege that the defendants . . . 'have adopted policies, practices and procedures which Defendants knew or should have reasonably known would be ineffective in delivering medical treatment and care,' such conclusory allegations are insufficient to sustain a [section] 1983 claim.").

It appears that plaintiff has asserted claims against the four new defendants based upon their supervisory positions as the DOCCS Commissioner, the Superintendent of Oneida, the Commissioner of

Forensic Service and Mental Health, and the Executive Director of the

CNYPC. It is well-established, however, that an individual cannot be liable

for damages under section 1983 solely by virtue of being a supervisor

"and [liability] cannot rest on *respondeat superior*." *Richardson v. Goord*,

347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. To establish

responsibility on the part of a supervisory official for a civil rights violation,

a plaintiff must demonstrate that the individual (1) directly participated in

the challenged conduct; (2) after learning of the violation through a report

or appeal, failed to remedy the wrong; (3) created or allowed to continue a

policy or custom under which unconstitutional practices occurred; (4) was

grossly negligent in managing the subordinates who caused the unlawful

event; or (5) failed to act on information indicating that unconstitutional

acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007),

*rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 554 (2009);

*see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865,

873 (2d Cir. 1995); *Wright*, 21 F.3d at 501. A careful review of the

amended complaint fails to reveal that any of these potential bases for

liability apply in this case.

To reiterate, the only allegation in the amended complaint that

concerns the individual defendants is that they "knew or should have

known there was no legal basis for holding [p]laintiff[.]" Dkt. No. 37 at 4, 5. An allegation of this nature is not sufficient to implicate the supervisory defendants in the constitutional violations alleged. I therefore recommend dismissal of plaintiff's amended complaint based on its failure to allege the personal involvement of the named defendants.

### D. Statute of Limitations

As an alternative basis for dismissal, defendants argue that, because plaintiff's amended complaint does not "relate back" to the date of his original complaint, his claims against the newly added defendants are barred by the statute of limitations. Dkt. No. 47-2 at 7.

The applicable limitations period for a section 1983 action is derived from the general or residual statute of limitations for personal injury actions under the laws of the forum state. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989); *accord*, *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002). Accordingly, in New York, the statute of limitations for a section 1983 action is three years. N.Y. C.P.L.R. § 214(5); *see also Connolly v. McCall*, 254 F.3d 36, 40-41 (2d Cir. 2001) ("[The plaintiff's] federal constitutional claims, brought pursuant to 42 U.S.C. § 1983, are governed by New York's three-year statute of limitations for personal injury actions[.]"); *accord*, *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1138, 1156 (2d Cir.

1995). "While state law supplies the statute of limitations for claims under [section] 1983, federal law determines when a federal claim accrues." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994); *accord, Connolly*, 254 F.3d at 41. A claim arising under section 1983 accrues "when the plaintiff knows or has reason to know of the harm that he seeks to redress." *Connolly*, 254 F.3d at 41 (quotation marks omitted).

Here, plaintiff knew or had reason to know of the harm he sought to redress on February 2, 2010, when he was allegedly held beyond his release date by prison officials. Dkt. No. 37 at 3. Thus, his claim accrued on that date. Plaintiff's initial complaint, filed June 26, 2012, was therefore timely. Dkt. No. 1. Plaintiff's amended complaint, filed on March 24, 2014, however, was submitted more than three years after February 2, 2010. Dkt. No. 37. Defendants' statute of limitations defense therefore hinges on whether plaintiff's claims against the four newly added defendants is deemed to relate back to the initial complaint under Rule 15(c) of the Federal Rule of Civil Procedure, in which case the claims against them would be considered timely.[6]

---

[6] Rule 15(c) provides, in pertinent part, as follows:

> An amendment to a pleading relates back to the date of the original pleading when. . .

An amended complaint naming a new party relates back to the original pleading where it asserts a claim that arose out of the same conduct, transaction, or occurrence set out in the initial complaint, and, within the relevant period provided by Rule 4(m) for serving the summons and complaint, the party to be added "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." *Lewis v. City of N.Y.*, No.12-CV-2836, 2013 WL 6816615, at *4 (E.D.N.Y. Dec. 24, 2013) (quotation marks omitted). The relevant question under the second inquiry is "'not whether the plaintiff knew or should have known the identity of the proper defendant, but whether the proper defendant knew or should have known that it would have been named as a defendant but for an error.'" *Morales v. Cnty. of Suffolk*, 952 F. Supp. 2d 433, 437 (E.D.N.Y. 2013)

---

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

    (i) received such notice of the action that it will not be prejudiced in defending on the merits; and

    (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C).

(quoting *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 548 (2010)) (alterations omitted).

There is no dispute that plaintiff's amended complaint naming the four new defendants arose from the same conduct, transaction, or occurrence as his original complaint. Both the original complaint and the amended complaint allege that plaintiff was not released on February 2, 2010, and instead was held for a probable cause hearing pursuant to MHL Article 10 beyond his date of confinement without legal authority, in violation of the Fifth and Fourteenth Amendments. *Compare* Dkt. No. 1 *with* Dkt. No. 37.

The next question is whether, within 120 days of the date of the original complaint – that is, the relevant period for service of the summons and complaint under Rule 4(m) – the defendants named in the amended complaint received notice of the action such that they would not be prejudiced on the merits by their inclusion as defendants. *Lewis*, 2013 WL 6816615, at *4. Although actual notice is preferred, a court may impute constructive notice of a lawsuit to newly added defendant government officials through their attorney where the attorney also represented the original defendants sued, "so long as there is some showing that the attorneys knew that the additional defendants would be added to the

existing suit." *Id.* at *5 (quotation marks omitted). Generally, courts have imputed knowledge to the new defendants where "the attorneys had 'clear knowledge of the identity of the unidentified defendant, within the limitations period, such that it would be logical to assume that a reasonable attorney would either (1) inform his client of the prospective lawsuit or (2) takes steps to begin preparing a defense.'" *Id.* (quoting *Velez v. Fogarty*, No. 06-CV-13186, 2008 WL 5062601, at *18 (S.D.N.Y. Nov. 20, 2008)).

In this case, defendants' attorney, Cathy Sheehan, was also the attorney of record for the defendants named in the original complaint. There has been no showing, however, and plaintiff's amended complaint fails to allege, that Attorney Sheehan was aware that the new defendants would or could be added to the existing suit, and thus had reason to inform them of the prospective lawsuit, or to take steps to begin preparing their defense.

In any event, even assuming the defendants named in the amended complaint were on constructive notice, through their attorney, that suit would be brought against them, plaintiff's amended complaint fails the next prong of a relation-back analysis, which examines whether they knew or should have known that the action would have been brought against them

but for a mistake concerning the proper party's identity. *Lewis*, 2013 WL 6816615, at *4. In response to the motion to dismiss, plaintiff contends that "[a]t this stage of the litigation, it is too premature to make any determination as to the amount of knowledge Plaintiff had regarding the Defendants' identities and the actions of each." Dkt. No. 49 at 6. This argument, however, misapprehends the relevant inquiry. As noted above, it is the defendants' knowledge and notice, not the plaintiff's that is relevant. *See Morales*, 952 F. Supp. 2d at 437 ("The Supreme Court [has] made clear that 'the question under Rule 15(c)(1)(C)(ii) is not whether the plaintiff knew or should have known the identity of the proper defendant, but whether the proper defendant knew or should have known that it would have been named as a defendant but for an error.'" (quoting *Krupski*, 560 U.S. at 548) (alterations omitted)).

In this case, there is nothing before the court, including plaintiff's response to the motion to dismiss and his amended complaint, to support a conclusion that the four new defendants knew or should have known, within 120 days of the filing of the original complaint, that the action would have been brought against them but for a mistake concerning the proper parties' identities. *See Callicutt v. Scalise*, No. 11-CV-1282, 2013 WL 432913, at *5 (N.D.N.Y. Feb. 4, 2013) (Kahn, J.) ("Even granting Plaintiff's

submissions the generous reading that they are owed, the Court finds no basis to conclude that Defendants had actual knowledge of Plaintiff's claims against them.").

For all of these reasons, I find that, although plaintiff's amended complaint arises from the same transaction or occurrence as the original complaint, it does not otherwise relate back. Accordingly, I find plaintiff's amended complaint naming defendants Fischer, Connelly, Hogan, and Sawyer is time-barred, and recommend its dismissal on this additional basis.

### E.    Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F. Supp. 986, 1003 (E.D.N.Y.1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of

action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In the court's report and recommendation addressing the original defendants' motion to dismiss, the court granted plaintiff a first opportunity to amend his complaint with the assistance of *pro bono* counsel, appointed for the purpose of assisting plaintiff in identifying a viable defendant. *See* Dkt. No. 25 at 34-35 ("Given the complex legal considerations implicated by plaintiff's claims, and the need to identify any potentially responsible, non-immune defendants to name in his due process cause of action, I find that appointing *pro bono* counsel in this case is appropriate."). As discussed above, plaintiff's amended complaint fares no better than his original complaint with respect to naming potentially responsible and non-

immune individuals as defendants. Because plaintiff has already been afforded an opportunity to amend, with the assistance of counsel, I find no reason to believe that providing plaintiff a second opportunity to amend would have a different result.

In arriving at this conclusion, I have considered plaintiff's most recent communication to the court (notwithstanding my admonishment that plaintiff should not contact the court directly while he is represented by counsel), in which, liberally construed, he seeks permission to further amend his complaint and sets forth a proposed second amended complaint. Dkt. Nos. 54, 54-1. In the proposed second amended complaint, plaintiff seeks to name, as defendants, the individuals named in his original complaint, all of whom the court earlier determined to be entitled to immunity from suit, and the individuals named in his first amended complaint, all of whom, as is discussed above, were not personally involved in the allegations giving rise to this action. Dkt. No. 54-1 at 1. In addition, plaintiff's proposed second amended complaint fails to allege any additional facts that would change my conclusion regarding whether the defendants named in his amended complaint were personally involved in the alleged constitutional violations. *See generally* Dkt. No. 54-1. Accordingly, because I find that any amendment that might be offered

by plaintiff would be futile, I recommend against granting him leave to amend.

IV.     SUMMARY AND RECOMMENDATION

Plaintiff, through counsel, has submitted an amended complaint in which he seeks redress for alleged due process violations by the named defendants. The amended complaint, however, fails to allege the requisite personal involvement of each of the named defendants. Moreover, because there is no basis for the court to conclude that his amended complaint relates back to his original complaint, his claims against the four newly-added defendants are time-barred.[7]

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss ([Dkt. No. 47](#)) be GRANTED, and that plaintiff's amended complaint ([Dkt. No. 37](#)) be DISMISSED in its entirety.

---

[7]     Because I am recommending dismissal of the amended complaint based on defendants' arguments regarding personal involvement and statute of limitations, I have not addressed their alternative argument regarding immunity. I note, however, that they have advanced a defense of qualified immunity that appears compelling based on the fact that plaintiff's continued confinement following his scheduled release date was pursuant to authorizations from Supreme Court Justice Tormey on January 29, 2010, and later Supreme Court Justice DeRosa on April 23, 2010. [Dkt. No. 17-1 at 20-24](#), 26-27.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge


Dated:      February 9, 2015
            Syracuse, New York

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,
v.
Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln
Work-Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe # 1,
Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.
No. Civ.A. 95CV1641RSPDS.

Sept. 22, 1997.

Kenneth Brown, State Court Institute-Greene,
Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman
Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M.
Dvorin, Assistant Attorney General, Carl N. Lundberg,
Chief Legal Counsel, South Carolina Department of
Probation, Columbia, SC, for defendants Bishop, Magee,
Barton, McMahan, and Stanford, Carl N. Lundberg, of
Counsel.

DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Daniel
Scanlon, Jr., duly filed on April 17, 1997. Following ten
days from the service thereof, the Clerk has sent me the
entire file, including any and all objections filed by the
parties herein.

Plaintiff Kenneth Brown commenced this Section

1983 civil rights action on November 17, 1995. On
February 12, 1996, Magistrate Judge Scanlon ordered
Brown to submit an amended complaint alleging the
specific acts committed by the individuals named as
defendants which Brown claimed violated his
constitutional rights. Brown filed an amended complaint
on March 21, 1996. In his amended complaint, Brown
alleged that defendants violated his rights under the Eighth
and Fourteenth Amendments by failing to process properly
his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact he
had never violated the conditions of his parole. For a more
complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams
made a motion to dismiss for failure to state a claim
pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No.
14, at 2. On August 19, 1996, defendants Bishop, Magee,
Barton, and McMahan made a motion to dismiss the
complaint against them or, in the alternative, for summary
judgment. Dkt. No. 20. On October 17, 1996, defendants
Herman, Stewart, and Stanford made a motion to dismiss
for failure to state a claim. Dkt. No 34. On April 17, 1996,
Magistrate Judge Scanlon recommended that all
defendants' motions to dismiss be granted and that the
complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave
to file a second amended complaint and a copy of his
proposed amended complaint. Dkt. No. 53. I turn first to
the last motion filed, Brown's motion for leave to amend
his complaint a second time.

Brown seeks to file a second amended complaint
"setting forth in detail the personal involvement of each
defendant and how their acts of commission and omission
served to deprive plaintiff of Constitutionally secured
rights." Dkt. No. 53. The district court has discretion
whether to grant leave to amend. Ruffolo v. Oppenheimer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

*& Co.,* 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss-the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

**\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to

allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly-Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[FN1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

> FN1. I note, however, that the report-recommendation would survive even *de novo* review.

### CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

### ORDER and REPORT-RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.

### BACKGROUND

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1-2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5-7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8-10.

In February, 1993, plaintiff was arrested on robbery

charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11-14; Exs. C-J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15-17; Exs. F-I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

### DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See* LaBounty v. Adler, 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dismiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their]] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

*7 Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.
E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart

and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

N.D.N.Y.,1997.

Brown v. Peters
Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2013 WL 432913 (N.D.N.Y.)
**(Cite as: 2013 WL 432913 (N.D.N.Y.))**

---

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Devon CALLICUTT, Plaintiff,
v.
Anthony SCALISE, Albany County Police Depart-
ment Officer, et al., Defendants.

No. 1:11–CV–1282 (LEK/RFT).
Feb. 4, 2013.

Devon Callicutt, Pine City, NY, pro se.

John Joseph Reilly, City of Albany Corporation
Counsel, Albany, NY, for Defendants.

***MEMORANDUM–DECISION and ORDER***
LAWRENCE E. KAHN, District Judge.
**I. INTRODUCTION**
    **\*1** On October 26, 2011, *pro se* Plaintiff Devon
Callicutt ("Plaintiff") filed a civil rights Complaint
against six unnamed John Doe Defendants pursuant
to 42 U.S.C. § 1983. Dkt. No. 1 ("Complaint").
Plaintiff filed an Amended Complaint on May 9,
2012, naming as Defendants Albany County Police
Officers Anthony Scalise, Brian Masters, Brian
Hogan, Thomas Mahar, Paul Forkeutis, and a single
John Doe officer (collectively, "Defendants"). Dkt.
No. 9 ("Amended Complaint"). Presently before the
Court is Defendants' Motion to dismiss Plaintiff's
Amended Complaint, brought pursuant to Rules
12(b)(2) and 12(b)(6) of the Federal Rules of Civil
Procedure. Dkt. No. 15 ("Motion").

**II. BACKGROUND**

**A. Procedural History**

    On December 5, 2011, upon an initial screen-
ing of the Complaint by the Honorable Randolph F.
Treece, United States Magistrate Judge, Plaintiff
was granted thirty days in which to file an amended

complaint and was warned that, if he did not, Judge
Treece would recommend that the Complaint be
dismissed. Dkt. No. 5 ("December Order").
Plaintiff did not file an amended complaint within
the allotted time. *See* Dkt. Therefore, on April 27,
2012, Judge Treece issued another Order granting
Plaintiff an additional thirty days, but stating that if
Plaintiff did not file an amended complaint, Judge
Treece would recommend that the Court dismiss
the Complaint for failure to prosecute. Dkt. No. 8
("April Order"). In compliance with the April Or-
der, Plaintiff filed his Amended Complaint on May
9, 2012. On May 15, 2012, Summonses were issued
as to all named Defendants. Dkt. No. 11.

    On June 20, 2012, Defendants filed their Mo-
tion to dismiss the Amended Complaint. Defend-
ants argue that Plaintiff's claims are barred by the
applicable statute of limitations and that Plaintiff
has failed to obtain personal jurisdiction over
Plaintiffs. *See* Dkt. No. 17 ("Defendants' Memor-
andum of Law"). Plaintiff subsequently filed a Re-
sponse, and Defendants in turn filed a Reply.FN1
Dkt. Nos. 22 ("Response"), 23 ("Reply").

    FN1. In lieu of a memorandum of law, De-
    fendants filed as their Reply an
    "Affirmation of Eric P. Sugar in Reply to
    Plaintiff's Response to Defendants' Motion
    to Dismiss." While the affidavit properly
    contains some factual and procedural state-
    ments, it violates Local Rule 7.1(a)(2),
    which provides that "[a]n affidavit must
    not contain legal arguments but must con-
    tain factual and procedural background
    that is relevant to the motion the affidavit
    supports." Therefore, the Court declines to
    consider any such improper argumentation
    contained in the Reply. *See Oneida Indian
    Nation v. Cnty. of Oneida,* 802 F.Supp.2d
    395, 425 n. 24 (N.D.N.Y.2011) (refusing,
    under Local Rule 7.1(a)(2), to consider the
    legal arguments contained in affidavits
    submitted to the court).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 432913 (N.D.N.Y.)
**(Cite as: 2013 WL 432913 (N.D.N.Y.))**

**B. Factual Allegations**

Plaintiff's claims stem from a November 30, 2008 encounter with Defendants. Am. Compl. ¶ 11. On that date, Defendants were pursuing Plaintiff on foot, when he attempted to climb an eight-foot-tall fence. *Id.* While Plaintiff was perched atop the fence, Defendant Scalise pushed Plaintiff over. *Id.* Plaintiff fell backwards and landed on his back, causing the firearm he was carrying to discharge. *Id.* ¶ 13. Once in the backyard,[FN2] Plaintiff threw away his weapon, surrendered himself to Defendants, and was arrested. *Id.* ¶¶ 12–14. During the arrest, Plaintiff offered no resistance. *Id.* ¶ 12.

> FN2. Plaintiff does not specify what building "the backyard" was associated with or whether he had been trying to climb over the fence to reach "the backyard."

Once he had been handcuffed, however, Plaintiff was set upon by Defendants. *Id.* After handcuffing Plaintiff, Defendant Masters acted as though he were preparing to walk Plaintiff out of the yard, but then threw Plaintiff to the ground. *Id.* ¶ 15. Defendant Masters proceeded to hold Plaintiff's head to the ground, and Defendant Hogan held Plaintiff's legs. *Id.* ¶ 16. While the other two officers kept Plaintiff subdued, Defendant Mahar punched Plaintiff in the face "a couple of times." *Id.* ¶ 17. Plaintiff was then able to move his face to shield it from Defendant Mahar's blows; however, Defendant Mahar responded by striking Plaintiff twice with his pistol. *Id.* ¶ 18. Throughout the assault, Defendants Doe and Forkeutis tased Plaintiff until he was on the verge of losing consciousness. *Id.* ¶ 19. However, when Defendant Masters realized that Plaintiff was beginning to lose consciousness, Defendant Masters told the other Defendants "[t]hat's enough ... [b]efore he dies." *Id.* ¶ 20.

**\*2** After Plaintiff heard this warning, he lost consciousness. *Id.* ¶ 21. Plaintiff awoke first in an ambulance and then regained consciousness in a hospital. *Id.* At the hospital, Plaintiff was treated for burn marks on his back from the taser and received five staples to the top left part of his head as

treatment for the injuries from being struck with the pistol. *Id.* ¶ 22.

For a complete statement of Plaintiff's allegations, reference is made to the Amended Complaint.

## III. STANDARD OF REVIEW

### A. **Rule 12(b)(6)**

In order to survive a motion to dismiss pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 663, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see also* FED. R. CIV. P. 12(b)(6). Such a determination "requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679 (citation omitted). A Court must accept as true the factual allegations contained in the complaint and draw all inferences in favor of the plaintiff. *See Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir.2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." *Id.* at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (citing *Twombly,* 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. *See Id .* at 678–79. Finally, in reviewing a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*pro se* complaint, a court has a duty to show liberality toward *pro se* litigants, *see Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008).

**B. Rule 12(b)(2)**

Where a party moves to dismiss an action for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. *Metro. Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.1996). Prior to discovery, a plaintiff may survive a 12(b)(2) motion to dismiss by pleading in good faith legally sufficient allegations of jurisdiction. *Id.* (citing *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.1990)). Where a court relies only upon the pleadings and supporting affidavits, a plaintiff need only make a *prima facie* showing of personal jurisdiction over a defendant. *Grand River Enters. Six Nations, Ltd. v. Pryor,* 425 F.3d 158, 165 (2d Cir.2005); *Cutco Indus., Inc. v. Naughton,* 806 F.2d 361, 364 (2d Cir.1986) (citing *Marine Midland Bank N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981)).

**IV. DISCUSSION**

*3 Defendants first contend that Plaintiff's allegations are time-barred and that his Amended Complaint should therefore be dismissed for failure to state a claim. Def.'s Mem at 7–11. Because the Court grants Defendants' Motion on 12(b)(6) grounds, the Court need not address Defendants' alternative request for dismissal under Rule 12(b)(2).

In New York, the three-year statute of limitations applicable to personal injury actions also applies to § 1983 claims and runs from the date the plaintiff had reason to know of her injury. See, e.g., *Connolly v. McCall,* 254 F.3d 36, 40 (2d Cir.2001); *Murphy v. Lynn,* 53 F.3d 547, 548 (2d Cir.1995); *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980). Because the alleged injury in this case occurred on November 30, 2008, the statute of limitations expired on November 30, 2011. While there is no question that Plaintiff's original Complaint—filed on October 26, 2011—was timely, Defendants contend that: (1) the Complaint was improperly drafted because it named only "John Doe" Defendants; (2) Plaintiff failed to file his Amended Complaint within the window permitted by the statute of limitations; and (3) the Amended Complaint "does not meet the criteria set forth in Federal Rule of Civil Procedure 15(c) so as to relate-back to the date of the originally filed complaint." Defs.' Mem. at 7–11.

In order to add a party to a complaint after the statute of limitations has run, a plaintiff must satisfy the relation back doctrine set forth in Rule 15.

An amendment adding a party to the complaint after the statute of limitations has run relates back to the timely filed complaint if (1) the amendment asserts a claim arising from the "conduct, transaction or occurrence" in the original pleading; and (2) within 120 days after the complaint is filed, the party to be added (i) "received such notice of the action that it will not be prejudiced in defending on the merits" and (ii) "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."

*Abdell v. City of New York,* 759 F.Supp.2d 450, 454 (S.D.N.Y.2010) (quoting FED. R. CIV. P. 15(c)(1)(B–C)).

In this case, there is no question that the claims asserted in the Amended Complaint relate back to the original Complaint; indeed, the claims are identical but are simply leveled against named individuals as opposed to generic placeholders. *Compare* Compl., *with* Am. Compl. Plaintiff, however, makes no suggestion that he provided Defendants with notice during the time period prescribed by Rule 4(m) of the Federal Rules of Civil Procedure. Therefore, the only question for the Court in determining whether Plaintiff's claims should be dismissed as time-barred is whether Defendants "knew

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity ." *Abdell,* 759 F.Supp.2d at 454 (quoting FED. R. CIV. P. 15(c)(1)(B)-(C)).

**\*4** The law on cases of "mistake" and "knowledge" under Rule 15, however, is currently in a state of flux. Until recently, the Second Circuit directives on such cases were clear. However, the Supreme Court's decision in *Krupski v. Costa Crociere S.P.A.,* —— U.S. ——, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010), has destabilized these rules, creating a degree of uncertainty among courts within the circuit. *See Archibald v. City of Hartford,* 274 F.R.D. 371, 377 (D.Conn.2011) (collecting cases).

Prior to *Krupski,* the Second Circuit had stated that Rule 15 of the Federal Rules of Civil Procedure "is meant to allow an amendment changing the name of a party to relate back to the original complaint only if the change is the result of an error, such as a misnomer or misidentification." *Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 469 (2d Cir.1995), *modified* 74 F.3d 1366 (2d Cir.1996). " Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities." *Id.* at 470; *see also Johnson v. Constantellis,* 221 F. App'x 48, 50 (2d Cir.2007); *Johnson v. Stinson,* 28 F. App'x 71, 72 (2d Cir.2002); *Malesko v. Correctional Servs. Corp.,* 229 F.3d 374, 383 (2d Cir.2000), *rev'd on other grounds,* 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001); *Bove v. New York City,* No. 99–9181, 2000 WL 687720, at \* 1 (2d Cir. May 24, 2000); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 151–52 (2d Cir.1999).

Even where a defendant "file[d] his complaint naming the defendant officers as 'John Does' within the three-year statute of limitations period, '[i]t is familiar law that 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued.' "

*Tapia–Ortiz v. Doe,* 171 F.3d at 151–52 (quoting *Aslanidis v. U.S. Lines, Inc.,* 7 F.3d 1067, 1075 (2d Cir.1993) (citations omitted)). "And even when a suit is brought by *pro se* litigant [sic], 'an amended complaint adding new defendants [cannot] relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities." FN3 *Id.* at 152 (quoting *Barrow,* 66 F.3d at 470 (alteration in original)).

> FN3. "[S]ome district courts in the Second Circuit have recognized an exception to the Second Circuit's seemingly categorical rule for cases in which a plaintiff attempted to discover the identity of the unknown defendant prior to the expiration of the statute of limitations but did not receive an adequate response to his discovery requests." *Archibald,* 274 F.R.D. at 377 (citations omitted). Because Plaintiff has not claimed that Defendants interfered with his discovery of the Doe Defendants' identities, and there are no facts to support such a claim on the record, the Court merely notes the existence of this exception and does not discuss it further.

In *Krupski,* the Supreme Court held that "Rule 15(c)(1)(C) (ii) asks what the prospective defendant knew or should have known during the Rule 4(m) period, not what the plaintiff knew or should have known at the time of filing her original complaint." 130 S.Ct. at 2493. Further, "the Supreme Court arguably confirmed that the reference to 'mistake' in Rule 15(c)(1)(C) does not necessarily bar relation back for a plaintiff who failed to properly name a defendant because he lacked knowledge of that defendant's name." *Archibald,* 274 F.R.D. at 377. Therefore, disagreement persists among courts in this circuit as to whether *Barrow* and its progeny survive *Krupski. See, e.g., id.* (collecting cases).

**\*5** Here, construing Plaintiff's pleadings liberally, the Court concludes that Plaintiff lacked knowledge of Defendants' identity at the time he filed his original Complaint. Under *Krupski,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

however, that Plaintiff lacked knowledge of the John Does' true identities does not necessarily mean that Plaintiff's Amended Complaint is time-barred. FN4 Rather, the Court must determine whether Defendants knew or should have known that Plaintiff intended to name them as parties to his suit during the Rule 4(m) period. Even granting Plaintiff's submissions the generous reading that they are owed, the Court finds no basis to conclude that Defendants had actual knowledge of Plaintiff's claims against them. Therefore, the otherwise untimely amendment of Plaintiff's Complaint to add party names would only have been proper under Rule 15 if Defendants should have known that they were the intended parties in this suit. *See Krupski,* 130 S.Ct. at 2493.

> FN4. As noted, *supra,* debate among district courts in this circuit as to the continued applicability of *Barrow* after *Krupski* continues. Without lunging headlong into the fray, the Court concludes that because of the facts of the instant case, the defendant's-knowledge requirement set forth by the Supreme Court yields the same result as the plaintiff's-knowledge requirement that undergirded the Second Circuit's reasoning. Therefore, even if tension might exist between the blanket rule articulated in *Barrow* and its progeny as to the use of Doe defendants and the more case-specific inquiry into a defendants knowledge articulated in *Krupski,* the specific facts of this case do not require the Court to resolve any such tension at this time.

In this case, however, the Court cannot identify any possible basis to conclude that Defendants should have known that they were the John Does in this action. During the Rule 4(m) period, the Complaint was not served on the Albany County Sheriff or any other attorney or official whose knowledge of the action might be imputed to Defendants. FN5 The Court is mindful of the challenges faced by *pro se* plaintiffs—particularly those who are incarcer-

ated—in effectively navigating the treacherous waters of legal practice and therefore remains wary of allowing procedural defects to prevent Plaintiff from having his day in court and seeing his case decided on the merits. However, in this case, Plaintiff was afforded ample opportunity to remedy these errors and provide notice to Defendants. As Judge Treece stated in his Order:

> FN5. *See, e.g., Blaskiewicz v. Cnty. of Suffolk,* 29 F.Supp.2d 134, 139 (E.D.N.Y.1998); *Byrd v. Abate,* 964 F.Supp. 140, 146 (S.D.N.Y.1997); *Scott v. Coughlin,* 944 F.Supp. 266, 270 (S.D.N.Y.1996).

In light of Plaintiff's *pro se* status, the Court will permit Plaintiff to amend his Complaint to name a defendant for service and discovery. However, in this case Plaintiff faces an additional impediment. The wrongdoing alleged in the Complaint took place in Albany County. Plaintiff is now incarcerated and being housed in Wende Correctional Facility, located in Erie County. Plaintiff may therefore have difficulty obtaining the names of any Albany County Sheriff's Department employees. The Court will therefore allow Plaintiff to amend his Complaint to add James Campbell, Sheriff of Albany County Police Department as a named defendant so that service may proceed and issue joined.

Dec. Order at 3. Plaintiff failed to comply with this Order, and, in so doing, failed to provide Defendants with the notice needed to support a finding of knowledge for Rule 15 purposes.

Therefore, the Court concludes that Plaintiff's amendment to add parties to this action was untimely and grants Defendants' Motion to dismiss pursuant to Rule 12(b)(6).

**V. CONCLUSION**

Accordingly, it is hereby:

**ORDERED,** that Defendants' Motion (Dkt. No. 15) to dismiss pursuant to Fed.R.Civ.P.

12(b)(6) is **GRANTED;** and it is further

**\*6 ORDERED,** that Plaintiff's Amended Complaint (Dkt. No. 9) is **DISMISSED in its entirety;** and it is further

**ORDERED,** that the Clerk serve a copy of this Memorandum–Decision and Order on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2013.
Callicutt v. Scalise
Not Reported in F.Supp.2d, 2013 WL 432913 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2008 WL 4501881 (W.D.N.Y.)
**(Cite as: 2008 WL 4501881 (W.D.N.Y.))**

---

**C**

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Robert CASTILLO, Plaintiff,
v.
COMMISSIONER NEW YORK STATE DE-
PARTMENT OF CORRECTIONAL SERVICES,
Warden Wende Correctional Facility, Medical Dir-
ector Wende C.F., Defendants.

No. 06-CV-858A.
Sept. 30, 2008.

West KeySummary**Civil Rights 78 ☞1358**

78 Civil Rights
　78III Federal Remedies in General
　　78k1353 Liability of Public Officials
　　　78k1358 k. Criminal Law Enforcement;
Prisons. Most Cited Cases

　An inmate's § 1983 claim, which alleged that
prison officials did not provide the inmate with im-
mediate medical attention after a cleaning product
was spilled on his head, was dismissed because the
inmate failed to allege personal involvement by any
of the defendants. Indeed, it was well settled that §
1983 did not permit liability for monetary damages
on the basis of respondeat superior. 42 U.S.C.A. §
1983.

Lawrence E. Wright, Brooklyn, NY, for Plaintiff.

Darren Longo, Office of the New York State Attor-
ney General, Buffalo, NY, for Defendants.

DECISION AND ORDER
RICHARD J. ARCARA, Chief Judge.
*INTRODUCTION*
　**\*1** The plaintiff, an inmate at Wende Correc-
tional Facility, filed this action in the Eastern Dis-
trict of New York seeking damages under 42
U.S.C. § 1983 arising from a claim of deliberate in-

difference to his medical condition in violation of
his "Fifth, Eighth, Ninth and Fourteenth Amend-
ment rights." FN1 The action was subsequently
transferred to this District, where venue was proper.

> FN1. Although the complaint alleges viola-
> tions of plaintiff's Fifth, Ninth and Four-
> teenth Amendment rights, it is clear that
> the gravamen of his claim is an Eighth
> Amendment violation of deliberate indif-
> ference to a serious medical condition.

　Counsel for the defendants brought a motion to
dismiss the complaint arguing that: (1) the com-
plaint fails to properly "name" the defendants; and
(2) even if named properly, the complaint fails to
allege that any of the defendants were personally
involved in the alleged constitutional deprivation.

　Plaintiff opposed the motion to dismiss. The
matter was deemed submitted without oral argu-
ment. For the reasons stated, the Court grants the
defendants' motion to dismiss.

*BACKGROUND*
　Plaintiff asserts that, on or about December 22,
2004, while housed as an inmate at Wende Correc-
tional Facility, he was directed by the mess hall
duty officer to clean the mess hall sink. The mess
hall duty officer provided plaintiff with
"Lime-A-Way LP (a multipurpose lime scale re-
mover) in a spray bottle, gloves and a paper hat."
Compl. at ¶ 6. While preforming the assigned task,
the Lime-A-Way dripped on plaintiff's head, caus-
ing an "immediate burning sensation." Plaintiff
rinsed his head but was unable to alleviate the burn-
ing sensation. He advised Correction Officer
Branch about the situation but was not provided
with immediate medical attention.

　Plaintiff alleges that he again requested medic-
al attention and was not afforded a "sick call" treat-
ment but his name was placed on a list to be seen
by a medical doctor. Plaintiff saw a doctor on Janu-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ary 25, 2005, who referred him to a dermatologist. On February 18, 2005, plaintiff saw the dermatologist and was provided with a topical ointment.

Plaintiff alleges that the defendants violated his constitutional rights when they failed to provide him with immediate medical attention.

### DISCUSSION

Defendants have moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). In evaluating a 12(b)(6) motion, the Court must accept the factual allegations in the complaint as true. *See Erickson v. Pardus,* ---U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam). The Supreme Court recently clarified standard applicable in evaluating a motion to dismiss under Rule 12(b)(6). *See Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court replaced the prior standard that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *see Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), with the requirement that the complaint allege "only enough facts to state a claim to relief that is plausible on its face." *Twombly,* 127 S.Ct. at 1974. However, the Supreme Court reaffirmed the principle that the complaint must recite factual allegations sufficient to raise the right to relief about the speculative level, and conclusory allegations or formulaic recitation of the elements will not do. *See Twombly,* 127 S.Ct. at 1964-65 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (internal quotations and citations omitted).

**\*2** As stated, the defendants move to dismiss the complaint on two grounds. First, they claim that the complaint fails to comply with the requirements of Fed.R.Civ.P. 10(a) (requiring a complaint to

"name" a party) because it fails to refer to any of the defendants by *name* and instead refers to each defendant only by his *official title.* Second, the defendants assert that dismissal is proper because the complaint fails to allege personal involvement by any of the defendants.

Putting aside the issue of whether the defendants are properly named under Rule 10(a), the Court finds that complaint must be dismissed because it fails to allege personal involvement by any of the defendants. It is well settled that § 1983 does not permit liability for monetary damages on the basis of *respondeat superior. See Monell v. Department of Soc. Serv.,* 436 U.S. 658, 694, n. 58, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). To be liable for monetary damages under § 1983, a defendant must have had some personal involvement in the alleged constitutional deprivations. *See Colon,* 58 F.3d at 873; *Wright,* 21 F.3d at 501. Personal involvement by a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the right of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.

Even accepting the allegations in plaintiff's complaint as true, plaintiff has not alleged any facts suggesting that the defendants in this case had personal knowledge of the alleged deprivation of medical care. Plaintiff does not claim that any of the defendants participated in the alleged deprivation or had any personal knowledge that medical care was being denied. Although plaintiff does allege that the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendants have "have adopted polices, practices and procedures which Defendants knew or should have reasonably known would be ineffective in delivering medical treatment and care," *see* Compl. at ¶ 15, such conclusory allegations are insufficient to sustain a § 1983 claim. *See Covington v. Coughlin,* No. 93 Civ. 8372(JSM), 1994 WL 163692 at *2-3, (S.D.N.Y. Apr.28, 1994) (finding that a "vague reference" to alleged unconstitutional policy is insufficient to establish personal involvement); *see also Funches v. Reish,* 97 Civ. 7611(LBS), 1998 WL 695904 (S.D.N.Y. Oct. 5, 1998) (dismissing deliberate indifference to medical care claim against Warden of prison facility based upon conclusory allegation that Warden created "custom" of denying medical care). Plaintiff does not specify the particular policy or custom that each defendant created, or allege how that policy or custom resulted in the alleged deprivation. Plaintiff's theory of liability appears to be grounded simply upon the fact that the defendants were in charge of the prison. However, as stated, § 1983 damages will not be imposed based upon a *respondeat superior* theory of liability. *See Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) ("Dismissal of a § 1983 claim is proper where, as here, the plaintiff does no more that allege that [defendant] was in charge of the prison.") (internal quotations omitted). *See also Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (*per curiam* ) ("[P]laintiff's claim for monetary damages against [prison officials] requires a showing of more than the linkage in the prison chain of command."). Absent any indication that the defendants played any role in the alleged constitutional deprivations, plaintiff's deliberate indifference claim must be dismissed.

### CONCLUSION

**\*3** For the reasons stated, the defendants' motion to dismiss is granted and the complaint is dismissed in its entirety. The Clerk of the Court is directed to take all steps necessary to close the case. FN2

FN2. Although the Court grants *pro se* in-

carcerated inmates with an opportunity to file an amended complaint, that accommodation is unnecessary where, as here, the plaintiff is represented by counsel.

SO ORDERED.

W.D.N.Y.,2008.
Castillo v. Commissioner New York State Dept. of Correctional Services
Not Reported in F.Supp.2d, 2008 WL 4501881 (W.D.N.Y.)

END OF DOCUMENT

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dale HENDRICKSON, Plaintiff,
v.
UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet
Keith, Otisville Medical Department, Defendants.

No. 91 CIV. 8135.
Jan. 24, 1994.

MEMORANDUM AND ORDER
McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale
Hendrickson ("Plaintiff" or "Hendrickson"), an in-
mate then in confinement at the Federal Correction-
al Institution in Otisville, New York ("Otisville"),
filed this action for injunctive relief and damages
based upon alleged violations of his rights under
the United States Constitution, Amendments I, IV,
V, VI, IX, and XIII, and upon violations of various
laws and/or regulations governing prison adminis-
tration.FN1 The Complaint named as defendants
G.L. Hershberger ("Hershberger"), the United
States Attorney General ("Attorney General"), Gary
Morgan ("Morgan"), Pamela Ashline ("Ashline"),
Kenneth Walicki ("Walicki"), Hulett Keith
("Keith"), the Bureau of Prisons ("BOP"), and the
Otisville Medical Department ("OTV Medical De-
partment") (collectively "Defendants"). Defendants
moved for judgment on the pleadings pursuant to
Rule 12(c) of the Federal Rules of Civil Procedure,
or, in the alternative, for summary judgment pursu-
ant to Rule 56 of the Federal Rules of Civil Proced-
ure. For the reasons set out below, Defendants' Rule
12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Com-
plaint, pursuant to Rule 12(c) of the Federal Rules
of Civil Procedure, for failure to state a claim upon

which relief can be granted. Rule 12(c) provides:

After the pleadings are closed but within such
time as not to delay the trial, any party may move
for judgment on the pleadings. If, on a motion for
judgment on the pleadings, matters outside the
pleadings are presented to and not excluded by
the court, the motion shall be treated as one for
summary judgment and disposed of as provided
in Rule 56, and all parties shall be given reason-
able opportunity to present all material made per-
tinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that
are employed for dismissing a complaint for failure
to state a claim under Fed.R.Civ.P. 12(b)(6) are ap-
plicable" to a Rule 12(c) motion to dismiss for fail-
ure to state a claim upon which relief can be gran-
ted. *See Ad–Hoc Comm. of the Baruch Black &
Hispanic Alumni Ass'n v. Bernard M. Baruch Col-
lege,* 835 F.2d 980, 982 (2d Cir.1987); *see also Vi-
acom Int'l. Inc. v. Time, Inc.,* 785 F.Supp. 371, 375
n. 11 (S.D.N.Y.1992);* 5A Charles Wright and Ar-
thur R. Miller, *Federal Practice and Procedure* ¶
1367, at 515–16 (1990). Thus, the Court must read
the Complaint generously, drawing all reasonable
inferences from the complainant's allegations. *See
California Motor Transp. v. Trucking Unlimited,
404 U.S. 508, 515 (1972).* Moreover,
"consideration is limited to the factual allegations
in [the] amended complaint, which are accepted as
true, to documents attached to the complaint as an
exhibit or incorporated in it by reference, to matters
of which judicial notice may be taken, or to docu-
ments either in plaintiff['s] possession or of which
plaintiff[ ] had knowledge and relied on in bringing
suit." *Brass v. American Film Technologies, Inc.,*
987 F.2d 142 (2d Cir.1993);* *accord Allen v. West-
point–Pepperell, Inc.,* 945 F.2d 40, 44 (2d
Cir.1991);* *Cortec Indus., Inc. v. Sum Holding L.P.,*
949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 112
S.Ct. 1561 (1992);* *Frazier v. General Elec. Co.,*
930 F.2d 1004, 1007 (2d Cir.1991).* Defendants,
therefore, are entitled to dismissal for failure to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

state a claim only if the Court finds beyond a doubt that "plaintiff can prove no set of facts" to support the claim that plaintiff is entitled to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H[earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [FN2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint, mentioned by name any of the individual named Defendants. Defs.' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint

must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

*Summary and Order*

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

> FN1. The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna of 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

> FN2. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

S.D.N.Y.,1994.
Hendrickson v. U.S. Atty. Gen.
Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 6816615 (E.D.N.Y.)
**(Cite as: 2013 WL 6816615 (E.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Jonathan LEWIS, Plaintiff,
v.
The CITY OF NEW YORK, Police Officer Shawn
Johnston, Police Officer Stephen Kerekes, Police
Officer John Damacco, and Sargeant Alex Mont-
esquieu, Defendants.

No. 12–CV–2836 (RRM)(RML).
Dec. 24, 2013.

Anthony C. Ofodile, Brooklyn, NY, for Plaintiff.

Noreen M. Stackhouse, New York City Law De-
partment, New York, NY, for Defendant.

**MEMORANDUM AND ORDER**

ROSLYNN R. MAUSKOPF, District Judge.

**\*1** Plaintiff Jonathan Lewis brings this action
under 42 U.S.C. § 1983 and New York state law
against the City of New York (the "City") and four
police officers, alleging false arrest, excessive
force, and malicious prosecution. Presently before
the Court are (i) a motion by all defendants except
Officer Kerekes for judgment on the pleadings and
(ii) plaintiff's cross-motion to amend his
complaint. For the following reasons, defendants'
motion is granted, and plaintiff's cross-motion is
denied.[FN1]

> FN1. The moving defendants state that
> plaintiff has not served Kerekes with the
> summons and complaint, and Kerekes has
> not requested that the Office of Corpora-
> tion Counsel (the "Corporation Counsel")
> represent him. Nor has plaintiff provided
> proof of service. For failure to serve, the
> action against Kerekes must be dismissed.
> Moreover, even if plaintiff served Kerekes
> properly, the Court's reasoning herein

would apply with equal force as to
Kerekes. *See, e.g., Hecht v. Commerce
Clearing House, Inc.,* 897 F.2d 21, 26 n. 6
(2d Cir.1990) ("*[S]ua sponte* dismissal of
the complaint with respect to [non-moving
defendant] is appropriate here, because the
issues concerning [non-moving defendant]
are substantially the same as those con-
cerning the other defendants, and
[plaintiff] had notice and a full opportunity
to make out his claim.").

**BACKGROUND**

The following facts, which the Court assumes
to be true for purposes of this motion, are taken
from the amended complaint filed on October 28,
2012 (First Am. Compl. (Doc. No. 8)) and any doc-
uments properly considered on this motion. *See L–7
Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422
(2d Cir.2011) ("On a 12(c) motion, the court con-
siders the complaint, the answer, any written docu-
ments attached to them, and any matter of which
the court can take judicial notice for the factual
background of the case.") (internal quotation marks
omitted).

**I. The Underlying Criminal Action**

On July 4, 2009, plaintiff was stabbed in the
left forearm by someone who then ran away. When
defendant Police Officers Johnston, Kerekes, and
Damacco and defendant Sargeant Montesquieu
(collectively, "Defendant Officers") arrived on the
scene, plaintiff was bleeding from the stab wound.
Although plaintiff described his assailant to De-
fendant Officers and told them the assailant had run
toward the street corner after stabbing him, Defend-
ant Officers did not attempt to locate the assailant.
Plaintiff also requested that Defendant Officers take
plaintiff to the hospital. Defendant Officers
searched plaintiff and found no weapon on him. At
the corner where plaintiff told them his assailant
had run, the Defendant Officers recovered the knife
with which the assailant had stabbed plaintiff.

After recovering this knife, the Defendant Officers hit plaintiff, pushed him to the ground, and put their knees on his back. Plaintiff's mother was present and protested that Defendant Officers should not beat plaintiff in front of her. Defendant Officers immediately handcuffed plaintiff and arrested him for stabbing someone, even though no complainant alleged being stabbed by plaintiff and everyone at the scene told Defendant Officers that plaintiff was the person who had been stabbed. Nevertheless, Defendant Officers told plaintiff that the knife had blood on it and were adamant that plaintiff must have stabbed someone with it. Defendant Officers drove plaintiff to the 113th Precinct, where they charged him with criminal possession of a weapon in the third degree and resisting arrest.

Plaintiff was incarcerated on July 4, 2009 and arraigned the following day. A Queens County grand jury voted to indict plaintiff on July 10, 2009, and the indictment was filed on July 17, 2009. Plaintiff's criminal case went to trial in New York City Criminal Court. At the trial, plaintiff presented medical evidence reflecting that he was stabbed on the date of his arrest, and that the blood on the knife Defendant Officers recovered was plaintiff's. On October 29, 2009, plaintiff was acquitted of all charges and released from incarceration.

## II. The Instant Action

**\*2** Plaintiff commenced this action on June 6, 2012 by filing a complaint that named the City of New York and five "John Doe" police officers as defendants (the "Original Complaint").

On June 27, 2012, the City requested, with plaintiff's consent, a sixty-day enlargement of the deadline to answer the complaint. The City explained that this enlargement would allow the City to forward to plaintiff for execution authorizations for the City to view his criminal records, which were sealed pursuant to N.Y.Crim. P.L. § 160.50, and his medical records. The following day, the Court granted the adjournment.

On August 27, 2012, the City moved to compel plaintiff to execute the releases. In this motion, counsel for the City represented that she had recently learned from plaintiff's counsel that plaintiff (1) was deported to St. Vincent, West Indies before receiving the requisite releases, (2) received a second set of the releases from his counsel on August 10, 2012, and (3) lacked the resources to express-mail the executed releases to his counsel, such that the executed releases would take several weeks to reach plaintiff's counsel. Accordingly, the City requested an additional thirty-day extension of its time to answer. On August 27, 2012, the Court granted the City's motion, ordering plaintiff to provide the executed releases by October 1, 2012 and extending the City's time to answer until November 1, 2012.

On October 12, 2012, plaintiff moved to compel the City to disclose the Defendant Officers' identities by October 25, 2012. In this motion, plaintiff's counsel stated that plaintiff wished to amend his complaint to name these officers before October 29, 2012, when the limitations period for his malicious prosecution claims would expire. Counsel also stated that due to plaintiff's deportation, plaintiff had experienced difficulty working with his counsel to commence the case earlier and return executed releases to the City. Accordingly, counsel argued that equity and the interest of justice required the City to disclose the officers' identities in time for plaintiff to amend his complaint. The City opposed plaintiff's motion, arguing that the motion was premature because discovery had not yet commenced, plaintiff was responsible for any delay in the City's investigation, and the limitations period for plaintiff's false arrest and excessive force claims had already expired on July 4, 2012, such that amending those claims would be futile. On October 19, 2012, the Court granted plaintiff's motion in part, ordering defense counsel to provide the arresting officer's name by October 26, 2012 and the names of any other officers involved in the incident by October 29, 2012.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

On October 28, 2012, plaintiff filed the First Amended Complaint, in which he identifies Defendant Officers. Plaintiff alleges that Defendant Officers falsely arrested him, used excessive force against him, and "malicious[ly] prosecut[ed]" him by charging him without probable cause and arresting him in retaliation for his mother's protected speech. (First Am. Compl. ¶¶ 30–37.) Plaintiff also alleges the City is liable for damages.

**\*3** After answering the complaint on November 13, 2012, the City requested, on January 3, 2013, a pre-motion conference concerning the instant motion, which request plaintiff opposed. On April 18, 2012, the Court granted the City's April 17, 2012 motion to stay discovery pending a decision on the pre-motion conference request. On May 9, 2013, the Court held a pre-motion conference and set a briefing schedule for the instant motions, which the parties filed on August 13, 2013.

## DISCUSSION

## I. Defendant's Motion for Judgment on the Pleadings

### A. Standard

Fed.R.Civ.P. 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." The standard of review for a Rule 12(c) motion is the same as the standard for a Rule 12(b)(6) motion. *Bank of New York v. First Millennium, Inc.,* 607 F.3d 905, 922 (2d Cir.2010). To survive a motion to dismiss, a complaint must contain "sufficient factual matter ... to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court "consider[s] the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor." *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir.2009). In

doing so, the court is not bound to accept as true a legal conclusion couched as a factual allegation. *Iqbal,* 556 U.S. at 678. The court may consider the pleadings, "documents attached to the pleadings as exhibits or incorporated by reference, and items of which judicial notice may be taken." *Daniels ex rel. Daniels v. Comm'r of Soc. Sec.,* 456 F. App'x 40, 41 (2d Cir.2012).

### B. False Arrest and Excessive Force Claims

### 1. *The Claims are Time–Barred*

In New York, Section 1983 claims are subject to a three-year statute of limitations. *See Shomo v. City of New York,* 579 F.3d 176, 181 (2d Cir.2009); *Fabal v. City of New York.,* No. 09 Civ. 5605, 2011 WL 3652320, at \*2 (S.D.N.Y. Aug.19, 2011); *see also Jones v. Brooklyn Hosp.,* No. 13–CV–3504, 2013 WL 4008777, at \*4 (E.D.N.Y. Aug.5, 2013) (finding false arrest and excessive force claims barred by three-year statute of limitations). "While state law supplies the statute of limitations for claims under § 1983, federal law determines when a federal claim accrues ... [which is] when the plaintiff knows or has reason to know of the harm." *Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001) (internal quotation marks omitted). A false arrest claim accrues under federal law when the false arrest ends, which occurs once the arrestee "becomes held pursuant to legal process—when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace v. Kato,* 549 U.S. 384, 384, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007).

**\*4** " 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued." *Barrow v. Wethersfield,* 66 F.3d 466, 468 (2d Cir.1995) (internal quotation marks omitted); *Tapia—Ortiz v. Doe,* 171 F.3d 150, 151–52 (2d Cir.1999) (internal quotation marks omitted). Where a plaintiff names "John Doe" as a placeholder defendant because he does not know the defendant's identity, the plaintiff is generally required to replace the placeholder with a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

named party within the applicable limitations period. *Abreu v. City of New York,* 657 F.Supp.2d 357, 363 (E.D.N.Y.2009).

The limitations period for plaintiff's excessive force claim accrued on July 4, 2009, when plaintiff alleges Defendant Officers used excessive force against him, and expired three years later, on July 4, 2012. Similarly, the limitations period for plaintiff's false arrest claim accrued on July 5, 2009, when he was arraigned, and expired three years later, on July 5, 2012.

When plaintiff filed the Original Complaint on June 6, 2012, well within the limitations periods for the false arrest and excessive force claims, he named "John Doe" officers as defendants. Plaintiff first moved to compel the City to provide the Defendant Officers' identities on October 12, 2012 (Doc. No. 6), more than three months after the limitations periods expired, and first amended his complaint to name Defendant Officers on October 28, 2012. (First Am. Compl.)<sup>FN2</sup>

> FN2. Plaintiff offers no grounds to justify tolling the statute of limitations or otherwise excuse his untimely filing. *See* N.Y. C .P.L.R. § 208 (providing that court may extend limitations period if claimant "is under a disability because of infancy or insanity at the time the cause of action accrues"); *Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.2007) (stating that New York allows equitable tolling when plaintiff "was induced by fraud, misrepresentations or deception to refrain from filing a timely action") (internal quotation marks omitted). Accordingly, there is no basis for the Court to equitably toll the statute of limitations.

Accordingly, plaintiff's excessive force and false arrest claims against Defendant Officers are time-barred.

2. *The First Amended Complaint does not Relate Back*

After the limitations period has expired, a plaintiff may seek leave of court to amend the complaint to add additional defendants, but Fed.R.Civ.P. 15(c) requires that the proposed amendment "relate back" to the date plaintiff filed the original complaint. Fed.R.Civ.P. 15(c); *Soto v. Brooklyn Corr. Facility,* 80 F.3d 34, 35 (2d Cir.1996). For an amendment naming a new party to relate back, the amendment must "assert[ ] a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading," and, "within the period provided by Rule 4(m) for serving the summons and complaint," the party to be added must have "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed.R.Civ.P. 15(c)(1)(C); *see Reliance Ins. Co. v. Polyvision Corp.,* 292 F. App'x 106, 106 (2d Cir.2008); *Conteh v. City of New York,* No. 00 Civ. 5787, 2001 WL 736783, at *2 (S.D.N.Y. June 28, 2001).

There is no dispute that the amendments naming Defendant Officers arise from the same conduct and occurrence as the Original Complaint. Plaintiff fails, however, to establish that, within 120 days of the Original Complaint's filing, Defendant Officers (i) received notice of the Original Complaint and (ii) knew or should have known that plaintiff would have named them in the Original Complaint but for a mistake concerning their identities.

*i. Notice*

**\*5** "The linchpin [of Rule 15(c) ] is notice, and notice within the limitations period." *Rodriguez v. City of New York,* 10 Civ. 1849, 2011 U.S. Dist. LEXIS 102725, at *18, 2011 WL 4344057 (S.D.N.Y. Sept. 7, 2011) (quoting *Schiavone v. Fortune,* 477 U.S. 21, 31, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986)). Though actual notice is preferable, the court may impute constructive knowledge of the lawsuit "to a new defendant government offi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cial through his attorney, when the attorney also represented the officials originally sued, so long as there is 'some showing that the attorney(s) knew that the additional defendants would be added to the existing suit.' " *Id.,* at *19 (quoting *Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989). In most cases where courts in this Circuit have applied the constructive notice doctrine, the attorneys had "clear knowledge of the identity of the unidentified defendant, within the limitations period, such that it would be logical to assume that a reasonable attorney would either (1) inform his client of the prospective lawsuit or (2) takes steps to begin preparing a defense." *Velez v. Fogarty,* 06 Civ. 13186, 2008 U.S. Dist. LEXIS 96999, at *19, 2008 WL 5062601 (S.D.N.Y. Nov. 20, 2008).

Plaintiff argues that because Corporation Counsel now represents all of the defendants, the Court should impute to Defendant Officers the notice Corporation Counsel received when plaintiff served the City with the Original Complaint. (*See* Pl.'s Mem. of L. Opp'n Defs.' Mot. and Supp. Cross–Mot. ("Pl.'s Mem.") at 2 (Doc. No. 24 .).) The Court disagrees. As an initial matter, Corporation Counsel does not represent, and has never represented, defendant Kerekes in this action; accordingly, plaintiff's representation that all the defendants share counsel is inaccurate. Moreover, the record reflects that as of August 27, 2012, plaintiff still had not executed a release for the City to access the sealed record from plaintiff's underlying criminal case, and the Court gave plaintiff an October 1, 2012 deadline to execute the release (*see* Aug. 27, 2012 Order). This timeline suggests that Corporation Counsel may not have obtained the underlying criminal file until well into October 2012, past the 120–day service period. But absent evidence concerning when Corporation Counsel received the underlying criminal file, the Court cannot simply assume that Corporation Counsel had notice of Defendant Officers' identities, or some other reasonable basis to know their identities, during the service period. *Cf. Rodriguez,* 2011 U.S. Dist. LEXIS 102725, at *20–22, 2011 WL 4344057

(finding that police officer defendants lacked notice pursuant to Rule 15(c), where Corporation Counsel represented only the City during service period, complaint did not identify the officers, and Corporation Counsel was unable to obtain records of alleged incident). Plaintiff therefore fails to satisfy Rule 15(c)(1)(C).

*ii. New Parties' Knowledge that Plaintiff Would Have Sued But For Mistake*

Even if plaintiff satisfied Rule 15(c)(1)(C)'s notice requirement, he fails to establish that, within the Rule 4(m) period, the Defendant Officers knew or should have known that he would have timely sued them but for a mistake. Fed.R.Civ.P. 15(c)(1)(C). The Second Circuit has long held that where a plaintiff sues John Doe defendants because he knows he must timely sue but is unaware of their identities, a subsequent amendment to identify the defendants does not relate back for purposes of Rule 15(c). *See Barrow,* 66 F.3d at 470. Such an amendment serves "not to correct a mistake," as the Rule requires, "but to correct a lack of knowledge." *Id.; see also Tapia–Ortiz,* 171 F.3d at 151–52 ("[I]t is familiar law that 'John Doe' pleadings cannot be used to circumvent statutes of limitations.") (internal quotation marks omitted).

**\*6** In *Barrow,* as in the instant case, the plaintiff sued individual police officers as John Does because he did not know their names. 66 F.3d at 470. After the limitations period expired, Barrow amended his complaint to identify the officers. *Id.* at 467. The district court granted the officer defendants' motion to dismiss on statute of limitations grounds because Barrow made no showing that these defendants had even constructive knowledge of his claims against them within the timely original complaint's Rule 4(m) period. *Id.* at 470. The Second Circuit affirmed, holding that Rule 15(c) does not permit relation back where the plaintiff originally sued John Doe defendants because he knew he had to timely name them but was unaware of their identities. *Id.* at 470 (reasoning that amendment served to correct a lack of knowledge rather

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

than a mistake). Because the instant case involves identical facts, *Barrow* is squarely on point.

Plaintiff's argument that the Supreme Court's holding in *Krupski v. Costa Crociere S.p.A.,* 560 U.S. 538, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010), somehow invalidates *Barrow* 's applicability is incorrect. In *Krupski,* the plaintiff timely sued the wrong of two related, similarly named corporations for injuries she sustained on a cruise ship. *Id.* at 2490. Krupski made this mistake even though she possessed a passenger ticket that listed the proper defendant's name. *Id.* After the limitations period expired, Krupski attempted to add the proper defendant. *See id.* at 2491. The district court found that Krupski had made a deliberate decision not to timely sue the proper defendant and, therefore, the amendment did not relate back for purposes of Rule 15(c). *Id.* at 2492. The district court reached this decision notwithstanding that the proper defendant had constructive notice of the complaint within the Rule 4(m) period. *See id.* at 2497. The Eleventh Circuit affirmed, reasoning that plaintiff did not make a mistake (1) because she had the correct defendant's name in her possession during the limitations period and, therefore, knew, or should have known, the correct defendant's identity; or, in the alternative, (2) because she unduly delayed in seeking leave to amend, and then in amending, her complaint. *Id.* at 2492. The Supreme Court reversed, emphasizing that "relation back under Rule 15(c)(1)(C) depends on what *the party to be added* knew or should have known, not on the amending party's knowledge." *Id.* at 2489–90 (emphasis added). Accordingly, the Court explained, information a plaintiff possessed, or a plaintiff's dilatory conduct after filing, is relevant "only if it bears on the defendant's understanding of whether the plaintiff made a mistake regarding the proper party's identity." *Id.* at 2493–94; *see also id.* at 2496.

Krupski is inapplicable to the facts of the instant case. "*Krupski* did not involve the scenario found in John Doe cases in which a plaintiff sues the wrong party at the outset of litigation because he is unaware of the identity of the proper defendant." *Cooper v. City of New Rochelle,* 925 F.Supp.2d 588, 601 n. 9 (S.D.N.Y.2013) (quoting *Askins v. City of New York,* No. 09 Civ. 10315, 2011 WL 1334838, at *1 n. 3 (S.D.N.Y. Mar.25, 2011)). As a result, *Krupski* does not address whether a plaintiff's lack of knowledge as to the identity of John Doe Defendants can be considered a "mistake," and *"Barrow* remains good law even after *Krupski." Morales v. Cnty. of Suffolk,* 10–CV–03686, 2013 WL 3388387, at *4–5 (E.D.N.Y. July 6, 2013) (quoting *Feliciano v. Cnty. of Suffolk,* No. CV 04–5321, 2013 WL 1310399, at *9 (E.D.N.Y. Mar. 28, 2013) (collecting cases); *see Dominguez v. City of New York,* 10 CV 2620, 2010 U.S. Dist. LEXIS 88818, at *6, 2010 WL 3419677 (E.D.N.Y. Aug. 27, 2010) (stating that *Barrow* 's holding that a lack of knowledge is not a mistake "is still intact [after *Krupski* ]"; *Martinez v. City of New York,* No. 12–CV–3806, 2012 WL 4447589, at *2 n. 3 ( "*Krupski* did not overturn or limit *Barrow* .... *Barrow* asked whether a mistake had been committed; *Krupski* assumes the presence of a mistake and asked whether it is covered by Rule 15(c)(1)(C)(ii).") (internal quotation marks omitted); *Felmine v. City of New York,* 09 CV 3768, 2012 U.S. Dist. LEXIS 77299, at *11–12, 2012 WL 1999863 (E.D.N.Y. June 4, 2012) (*Krupski* "does not appear to alter the requirement that the plaintiff's failure to name the defendant within the limitations period be attributable to a 'mistake.' ")

**\*7** Moreover, even if plaintiff could show mistake, he would still need, pursuant to Rule 15(c) and the central holding of *Krupski,* to establish that Defendant Officers knew, or should have known, that he would have timely sued them but for the mistake. *See* Fed. R. Civ. P 15(c)(1)(C); *Krupski,* 130 S.Ct. at 2489–90. Plaintiff makes no such argument, and the record warrants no such inference. Accordingly, plaintiff fails to satisfy Rule 15(c)(1)(C), the amendment identifying Defendant Officers does not relate back to the Original Complaint, and defendants' motion to dismiss the excessive force

and false arrest claims against Defendant Officers is granted.

### C. Plaintiff's Remaining Claims

The Court will discuss the sufficiency of plaintiff's remaining causes of action in conjunction with discussing his cross-motion for leave to file his Proposed Second Amended Complaint.

## II. Plaintiff's Cross–Motion for Leave to File the Proposed Second Amended Complaint

### A. Standard

Fed.R.Civ.P. 15(a) provides that a plaintiff may amend the complaint once as a matter of right prior to defendant's filing a responsive pleading. Fed.R.Civ.P. 15(a). In all other cases, however, a plaintiff may amend the complaint "only with the opposing party's written consent or the court's leave," which the court should give freely when justice so requires. Fed.R.Civ.P. 15(a)(2). Courts may deny leave to amend, however, when the party opposing amendment shows "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment (4)27" *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Williams v. Citigroup Inc.,* 659 F.3d 208, 213–14 (2d Cir.2011).

### B. Malicious Prosecution and Denial of Right to Fair Trial

A plaintiff who claims that a government official deprived him of his liberty by maliciously initiating criminal proceedings against him without probable cause invokes the Fourth Amendment. *Morse v. Spitzer,* No. 07 CV 4793, 2012 WL 3292963, at *2 (E.D.N.Y. Aug. 3, 2012). The elements of malicious prosecution under New York law are "(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the

proceeding; and (4) that the proceeding was instituted with malice." *Droz v. McCadden,* 580 F.3d 106, 109 (2d Cir.2009) (quoting *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003)). To state a malicious prosecution claim under 42 U.S.C. § 1983, a plaintiff must assert, in addition to the elements of a malicious prosecution claim under state law, that there was "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. New York City Transit Auth.,* 215 F.3d 208, 215 (2d Cir.2000).

**\*8** Indictment creates a presumption of probable cause, which the plaintiff may overcome only by showing that the police witnesses did not make a complete and full statement of facts to the grand jury or prosecutor, misrepresented or falsified evidence, withheld evidence, or otherwise acted in bad faith. *Rothstein v. Carriere,* 373 F.3d 275, 282–83 (2d Cir.2004) (citing *Colon v. City of New York,* 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1251 (N.Y.1983)). Therefore, for a plaintiff who was indicted to state a malicious prosecution claim, he must allege that the indictment "was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* at 283 (citing *Colon,* 468 N.Y.S.2d 453, 455 N.E.2d at 1251). Where a plaintiff claiming malicious prosecution alleges that a police officer fabricated evidence and forwarded it to prosecutors to provide probable cause for an arrest or prosecution, "the question of whether the defendant fabricated evidence becomes synonymous with the question of whether genuine probable cause existed." *Morse,* 2012 WL 3292963, at *6.

In contrast, a claim that a government official denied an accused his right to a fair trial invokes the Sixth Amendment, as well as the due process clauses of the Fifth and Fourteenth Amendments. *Id.,* at *3. When a police officer creates false information "likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscion-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

able action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir.1997). Unlike a claim for malicious prosecution, a claim for denial of the right to a fair trial is not subject to a defense that probable cause existed for the prosecution. *Morse,* 2012 WL 3292963, at *3. Where a plaintiff claiming both malicious prosecution and denial of his right to a fair trial alleges that a police officer fabricated evidence and forwarded it to prosecutors to provide probable cause for an arrest or prosecution, his "malicious prosecution and fair trial claims ... rise or fall together." *Id.,* at *6; *see Abdul–Rahman v. City of New York,* No. 10 Civ. 2778, 2012 WL 1077762 (E.D.N.Y. Mar.30, 2012) (dismissing malicious prosecution and fair trial claims); *Struthers v. City of New York,* No. 12 CV 242, 2013 WL 2390721, at *10, 13 (E.D.N.Y. May 31, 2013) (denying summary judgment on malicious prosecution and fair trial claims because genuine issue of material fact existed concerning whether arresting officer sent prosecutor fabricated evidence that formed sole basis for criminal complaint against plaintiff).

1. *Plaintiff Fails to State a Claim for Malicious Prosecution*

Plaintiff makes no allegations in his First Amended Complaint that, if true, would rebut the presumption of probable cause that his indictment creates. *See Rothstein,* 373 F.3d at 283. Plaintiff alleges nothing about how his indictment was procured; he alleges only that Defendant Officers charged him without admissible evidence and prosecuted him without probable cause. (First Am. Compl. ¶¶ 30–37.) Because plaintiff's allegations do not overcome the presumption of probable cause, he does not state a claim for malicious prosecution. Accordingly, absent leave to amend, the claim must be dismissed.

2. *Amending the Malicious Prosecution and Fair Trial Claims Would be Futile*

**\*9** In his Proposed Second Amended Complaint, plaintiff modifies his malicious prosecution

claim (and asserts a new claim for denial of a fair trial) by asserting that Defendant Officers gave the prosecutor fabricated evidence that the prosecutor used to indict him. Specifically, plaintiff alleges that Defendant Officers "fabricated the claim of criminal possession of a knife, charged Plaintiff with that crime and forwarded that fabricated evidence to the ... prosecutor who used it to indict plaintiff" (Proposed Second Am. Compl. ¶ 14 (Doc. No. 23–1)); "fabricat[ed] evidence which was forwarded to the prosecutor when the officers were clearly aware that their allegations that Plaintiff criminally possessed a knife was false" (*id.* ¶ 17); and "falsely forwarded to the prosecutor information alleging that Plaintiff stabbed someone with the knife, or possessed the knife with intent to use it for a criminal activity" (*id.* ¶ 27).

Notably, although this is plaintiff's third attempt at an adequate complaint, plaintiff does not allege any facts concerning the form or substance of the evidence or information he claims Defendant Officers fabricated. Plaintiff does not specify whether the fabricated evidence came in the form of an eyewitness account, the Defendant Officers' own observations, a self-incriminating statement, or something else. Moreover, he does not specify the fabricated evidence's content, instead equivocating as to whether the fabricated evidence reflected that he stabbed someone "or" possessed the knife with intent to use it criminally. (*Id.* ¶ 27.). His allegations are tantamount to a mere surmise, given his professed innocence, that one, some, or all of the Defendant Officers must have fabricated evidence to provide probable cause for his arrest and indictment. These threadbare, conclusory allegations are insufficient to overcome the presumption of probable cause that the indictment creates. *See Abdul–Rahman,* 2012 WL 1077762, at *10 (dismissing malicious prosecution claim where plaintiff alleged that defendant officers fabricated false statements against him but did not allege what the false statements were); *Iqbal,* 129 S.Ct. at 1950 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of mis-

conduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief.' ") (quoting Fed.R.Civ.P. 8(a)(2)). Accordingly, plaintiff's proposed amendments to his malicious prosecution claim would be futile, and leave to amend it is denied.

Based on the same proposed amended allegations concerning evidence fabrication, plaintiff also seeks to bring a claim for denial of his right to a fair trial. As explained above, plaintiff does not state a plausible claim that Defendant Officers fabricated evidence which they forwarded to the prosecutor. *See Abdul–Rahman,* 2012 WL 1077762, at *12 (dismissing fair trial claim because plaintiff "has presented only the most conclusory and generalized allegations, failing to specify in what way the statements, information, or testimony were false"); *Morse,* 2012 WL 3292963, at *6 (stating that malicious prosecution and fair trial claims will "rise or fall together" where plaintiff alleges that police fabricated evidence and forwarded it to prosecutors to provide probable cause for arrest or prosecution); *see also Waddlington v. City of New York,* No. 10 CV 5010, 2013 WL 5295247, at *9 (E.D.N.Y. Apr. 23, 2013) ("Plaintiff at no point alleges with specificity what false information [police officers] created or forwarded to the D.A.'s Office"). Accordingly, plaintiff's proposed fair trial claim would be futile, and leave to amend is denied.

## C. Retaliatory Arrest in Violation of the First Amendment

**\*10** Plaintiff alleges that Defendant Officers arrested him maliciously, and without probable cause, in retaliation for his mother's speech concerning how the Defendant Officers were treating him. (First Am. Compl. ¶¶ 30–31.) Plaintiff incorrectly styles this claim as one for "malicious prosecution," which sounds in the Fourth Amendment and requires a criminal proceeding rather than a mere arrest. *See Droz,* 580 F.3d at 109. Drawing all reasonable inferences in the plaintiff's favor, the Court construes this claim as one for retaliatory arrest in violation of the First Amendment.

To state a claim for retaliatory arrest in violation of the First Amendment, plaintiff must allege that "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir.2000). With regard to the second element, the Supreme Court has expressly declined to opine concerning whether a retaliatory arrest claim may lie despite the presence of probable cause to support the arrest. *See Reichle v. Howards,* ––– U.S. ––––, ––––, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012). Courts in this Circuit, however, have held that where defendant officers had probable cause to arrest the plaintiff, the court need not inquire into the underlying motive for the arrest. *See Curley,* 268 F.3d at 73; *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 120 (2d Cir.1995) ("[I]f the officer ... had probable cause ..., then we will not examine the officer's underlying motive in arresting and charging the plaintiff."); *Mesa v. City of New York,* No. 09 Civ. 10464, 2013 WL 31002, at *24 (S.D.N.Y. Jan.3, 2013).

Because plaintiff incorrectly styled this claim as one for malicious prosecution, defendants did not, in their opening brief, interpret plaintiff's allegations to include a separate claim for retaliatory arrest. Nevertheless, defendants' valid argument that plaintiff's "malicious prosecution" claim fails given the unrebutted presumption of probable cause applies with equal force when construing the claim as one for retaliatory arrest. *See Goldner v. City of New London,* 443 F. App'x 622, 624 (2d Cir.2011) ("The District Court found that ... [plaintiff's] arrests were based on probable cause; therefore, his First Amendment claim fails on a retaliation theory ...."). Moreover, the claim is time-barred. *See, e.g., Fabal,* 2011 WL 3652320, at *2. For each of these reasons, plaintiff fails to state a claim for retaliatory arrest.

Plaintiff's Proposed Second Amended Complaint contains no modifications that would correct

© 2015 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

these deficiencies. Accordingly, leave to amend would be futile and is denied.

### D. Municipal Liability

Although a municipality cannot be held vicariously liable under § 1983 for its employees' actions, it may be liable where the municipality itself causes the constitutional violation. *Johnson v. Dep't of Housing Preservation and Dev.,* 218 F. App'x 5, 5 (2d Cir.2007). A municipality causes the injury when (1) a government policy or custom causes the injury, *see Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690–691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), (2) an employee with final, relevant policymaking authority causes the injury, *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion), or (3) the municipality acted with deliberate indifference, *Johnson,* 218 F. App'x at 5. Accordingly, a municipality cannot be liable if the plaintiff fails to allege that defendant officers violated his constitutional rights, *Curley,* 268 F.3d at 71, alleges only "isolated unconstitutional acts of individual officers," *Sankar v. City of New York,* 867 F.Supp.2d 297, 308 (E.D.N.Y.2012), or alleges no "causal link" between an official policy or custom and his injury, *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983).

**\*11** Here, in support of his claim for municipal liability, plaintiff alleges that the City failed to properly train, supervise, and discipline police officers; instructed officers to stop citizens who have committed no crimes; failed to establish, publish, and teach officers the practical meaning of probable cause and reasonable cause, as well as the importance of conducting an investigation before arresting a person; de-emphasized the importance of judgeordered arrest warrants; encouraged officers to arrest first and ask questions later; and created the impression that crime reduction is paramount over constitutional rights in all circumstances. (First Am. Compl. ¶ 42.)

These allegations are insufficient to state a claim for municipal liability. As an initial matter,

plaintiff states no claim that Defendant Officers violated a constitutional right. *See, e.g., Widget v. Town of Poughkeepsie,* No. 12 Civ. 3459, 2013 WL 1104273, at *12 (S.D.N.Y. Mar. 18, 2013 (dismissing municipal liability claim, where plaintiff failed to state claim for underlying constitutional violation); *Jennis v. Rood,* 310 F. App'x 439, 440–41 (2d Cir.2009) (dismissing municipal liability claim because underlying claims were time-barred). Further, plaintiff states no claim that a government policy or custom existed. *See Missel v. Cnty. of Monroe,* 351 F. App'x 543, 545 (2d Cir.2009) (affirming dismissal of *Monell* claim, where plaintiff pled no facts to suggest alleged municipal policy actually existed). Moreover, plaintiff does not allege a direct connection between Defendant Officers' actions and any municipal policy or custom. *See Johnson,* 218 F. App'x at 5. Nor does plaintiff allege that any of the Defendant Officers had policymaking authority. *See Moore v. City of New York,* No. 08 Civ. 8879, 2010 WL 742981, at *6 (S.D.N.Y. Mar.2, 2010) (dismissing municipal liability claim, where plaintiff did not allege that defendants had policymaking authority for municipality). For all these reasons, plaintiff fails to state a claim for municipal liability.

Plaintiff does not modify these deficient allegations in his Proposed Second Amended Complaint. Amendment would, therefore, be futile, and leave to amend is denied.

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is GRANTED, plaintiff's motion to amend is DENIED, and the complaint is dismissed in its entirety. The Clerk of the Court is directed to enter judgment accordingly and close this case

SO ORDERED.

E.D.N.Y.,2013.
Lewis v. City of New York
Slip Copy, 2013 WL 6816615 (E.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
**(Cite as: 2007 WL 4115936 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
MENTAL HYGIENE LEGAL SERVICE and
Shawn Short, Plaintiffs,
v.
Elliot SPITZER, Andrew Cuomo, Michael Hogan,
Diana Jones Ritter, and Brian Fischer, Defendants.

No. 07 Civ. 2935(GEL).
Nov. 16, 2007.

Sadie Zea Ishee, New York, NY, and Dennis Bruce Feld, Mineola, NY, for plaintiff Mental Hygiene Legal Service.

Hollie S. Levine, Binghamton, NY, for plaintiff Shawn Short.

Edward J. Curtis, Jr., and Bruce B. McHale, Assistant Attorneys General, New York, NY, for defendants.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

*1 On March 14, 2007, Governor Spitzer signed the Sex Offender Management and Treatment Act, which became effective on April 13, 2007, in part as Article 10 of the New York Mental Hygiene Law ("MHL"), creating a new legal regime for "Sex Offenders Requiring Civil Commitment or Supervision." As part of the Act, the New York Legislature found that "recidivistic sex offenders pose a danger to society that should be addressed through comprehensive programs of treatment and management," MHL § 10.01(a), and that some "sex offenders have mental abnormalities that predispose them to engage in repeated sex offenses," MHL § 10.01(b). The Legislature concluded that such offenders

should receive ... treatment while they are incar-

cerated as a result of the criminal process, and should continue to receive treatment when that incarceration comes to an end. In extreme cases, confinement of the most dangerous offenders will need to be extended by civil process in order to provide them such treatment and to protect the public from their recidivist conduct.

*Id.*

On April 12, 2007, Plaintiff Mental Hygiene Legal Service ("MHLS") filed a declaratory judgment action attacking the constitutionality of certain provisions of the Act, and subsequently moved for preliminary injunctive relief and a temporary restraining order. Subsequently, Shawn Short, an individual subject to various provisions of the law, intervened in the matter and joined MHLS's motions. Plaintiffs do not attack the substantive constitutionality of the statutory provision for civil commitment. Rather, their motion focuses narrowly on particular procedural provisions of the Act, contending that specific aspects of the regime it creates fail to provide the requisite procedural safeguards necessary to comport with the constitutional command that persons may not be deprived of liberty without due process of law. Plaintiffs also contend that certain aspects of the statutory regime deny the individuals subject to those provisions the equal protection of laws guaranteed by the Constitution. Together, the plaintiffs challenge:

(A) MHL § 10.06(f), which authorizes the New York Attorney General to issue a "securing petition" to detain certain individuals beyond the completion of their term of imprisonment, in advance of the probable cause hearing, without notice or opportunity for review;

(B) MHL § 10.06(k), which mandates involuntary civil detention pending the commitment trial, based on a finding at the probable cause hearing that the individual may have a mental abnormality, without a finding of current dangerousness;

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

(C) MHL § 10.06(j)(iii), which forbids an individual indicted for a crime but found incompetent to stand trial to contest the commission of the acts that constituted the crime at the probable cause hearing;

(D) MHL § 10.07(d), which authorizes civil commitment for persons found incompetent to stand trial and never convicted of any offense based on a showing by clear and convincing evidence that they committed the sexual offense with which they were charged;

**\*2** (E) MHL § 10.07(c), which authorizes the factfinder at the commitment trial to make a retroactive determination by clear and convincing evidence that certain non-sex crimes were committed with a "sexual[ ] motivat [ion];"

(F) MHL § 10.05(e), which authorizes certain pre-hearing psychiatric examinations, in the absence of counsel, of individuals subject to the Act. FN1

> FN1. At oral argument, plaintiffs withdrew their application for preliminary injunctive relief with respect to a seventh provision, MHL § 33.13(c)(9)(vii), which permits the release of confidential clinical and medical records of certain individuals subject to the act under certain specified circumstances. (Tr. 5).

Oral argument was heard on September 14, 2007.

For the reasons discussed below, plaintiffs have demonstrated irreparable injury as well as a likelihood of success in demonstrating that § 10.06(k) is unconstitutional insofar as it permits civil detention pending trial without an individualized finding of current dangerousness and that § 10.07(d) is unconstitutional insofar as it allows detention of individuals after the commitment trial absent a finding beyond a reasonable doubt that such individuals committed the acts which constituted

the crime for which they had been charged. Defendants' motion to dismiss these portions of plaintiffs' complaint will therefore be denied. Plaintiffs have failed to make a showing sufficient for a preliminary injunction against the restrictions on contesting certain past events at the probable cause hearing as provided for in § 10.06(j)(iii). Defendants' motion to dismiss that portion of plaintiffs' facial attack against this provision will be granted. Both plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss regarding challenges to the securing petition procedures, as provided for in § 10.06(f), the retroactive determination of the "sexual motivation" of a past crime, as provided for in § 10.07(c), and the failure to appoint counsel in advance of certain pre-hearing psychiatric exams, as provided for in § 10.05(e), will be denied.

### DISCUSSION

#### I. Article Ten of the MHL

Provisions of the Act are triggered when a "person who may be a detained sex offender is nearing an anticipated release" from confinement or parole. MHL § 10.05(b).FN2 A "[d]etained sex offender" is (for the most part) a person "in the care, custody, control, or supervision of an agency with jurisdiction," as a result of having been adjudicated to have committed certain sex offenses or certain designated felonies with a "sexual[ ] motivat[ion]." MHL § 10.03(g).FN3 As such a person nears release, a case review team ("CRT") of three individuals, at least two of whom must be mental health professionals meeting certain statutory requirements, MHL § 10.05(a), are to determine whether the person is a "sex offender requiring civil management." MHL § 10.06(a).

> FN2. "Release" is defined to include "release, conditional release or discharge from confinement, from supervision by the division of parole, or from an order of observation, commitment, recommitment or retention." MHL § 10.03(m).

> FN3. The complete definition of "detained sex offender" is:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

a person who is in the care, custody, control, or supervision of an agency with jurisdiction, with respect to a sex offense or designated felony, in that the person is either: (1) A person who stands convicted of a sex offense as defined in subdivision (p) of this section, and is currently serving a sentence for, or subject to supervision by the division of parole, whether on parole or on post-release supervision, for such offense or for a related offense; (2) A person charged with a sex offense who has been determined to be an incapacitated person with respect to that offense and has been committed pursuant to article seven hundred thirty of the criminal procedure law, but did engage in the conduct constituting such offense; (3) A person charged with a sex offense who has been found not responsible by reason of mental disease or defect for the commission of that offense; (4) A person who stands convicted of a designated felony that was sexually motivated and committed prior to the effective date of this article; (5) A person convicted of a sex offense who is, or was at any time after September first, two thousand five, a patient in a hospital operated by the office of mental health, and who was admitted directly to such facility pursuant to article nine of this title or section four hundred two of the correction law upon release or conditional release from a correctional facility, provided that the provisions of this article shall not be deemed to shorten or lengthen the time for which such person may be held pursuant to such article or section respectively; or (6) A person who has been determined to be a sex offender requiring civil management pursuant to this article.

MHL § 10.03(g).

As defined by the Act, a "[s]ex offender requiring civil management" is a "detained sex offender who suffers from a mental abnormality," who is either "a dangerous sex offender requiring confinement" or "a sex offender requiring strict and intensive supervision." MHL § 10.03(q). A "[d]angerous sex offender requiring confinement" is a "detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." MHL § 10 .03(e). A "[s]ex offender[ ] requiring strict and intensive supervision" is a "detained sex offender who suffers from a mental abnormality but is not a dangerous sex offender requiring confinement." MHL § 10.03(r). A mental abnormality is defined to be a "congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct." MHL § 10.03(i).

**\*3** If the CRT finds the offender to require civil management, then the Attorney General may file a "sex offender civil management petition" in New York State court. MHL § 10.06(a). Within 30 days after the petition is filed, the court "shall conduct a hearing to determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management." MHL § 10 .06(g). At the conclusion of the probable cause hearing as described in § 10.06(g), the court "shall determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management." MHL § 10.06(k). If the court so determines, it "shall order the respondent ... committed to a secure treatment facility ... [and] the respondent shall not be released pending the completion of [the] trial [contemplated in MHL § 10.07]." MHL § 10.06(k).

Under § 10.07, at the commitment trial, which

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

is supposed to begin within 60 days of the probable cause determination, the jury (or judge if the right to a jury trial is waived) determines by clear and convincing evidence "whether the respondent is a detained sex offender who suffers from a mental abnormality." MHL §§ 10.07(a), (d). If such a determination is made, then the judge "shall consider whether the respondent is a dangerous sex offender requiring confinement or a sex offender requiring strict and intensive supervision." MHL § 10.07(f). If at the commitment hearing the court finds:

> by clear and convincing evidence that the respondent has a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the respondent is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility, then the court shall find the respondent to be a dangerous sex offender requiring confinement.

MHL § 10.07(f). Upon such a finding, the respondent "shall be committed to a secure treatment facility ... until such time as he or she no longer requires confinement." *Id.* Once committed, the individual shall have a yearly psychiatric exam, and a right to be examined by an independent examiner. MHL § 10.09(b). In certain circumstances, the detained individual has a right to petition the court for an evidentiary hearing, and detention will continue only if the Attorney General can demonstrate by clear and convincing evidence that the respondent is still a dangerous sex offender requiring confinement. MHL § 10.09(h). While committed, sex offenders shall be kept in "secure treatment facilit[ies]," MHL § 10.06(k)(i), segregated from those who are not "sex offenders." MHL § 10.10(e). If the court grants a subsequent hearing based on the detainee's petition and finds that the detained individual suffers from a mental abnormality, but is no longer a dangerous sex offender, then the court will discharge the individual from custody but order a regimen of strict and intensive supervision and treatment. MHL § 10.09(h).

**\*4** If the judge does not find that the respondent is a dangerous sex offender requiring confinement, "then the court shall make a finding of disposition that the respondent is a sex offender requiring strict and intensive supervision, and the respondent shall be subject to a regimen of strict and intensive supervision and treatment." MHL § 10.07(f).FN4 In making such a finding, the court shall consider "the conditions that would be imposed upon the respondent if subject to a regimen of strict and intensive supervision, and all available information about the prospects for the respondent's possible reentry into the community." *Id.* An individual may petition every two years for modification or termination of the strict and intensive supervision. MHL § 10.11(f). Upon receipt of a petition for termination, the court may, in its discretion, hold a hearing where the Attorney General must show by clear and convincing evidence that the individual is still a sex offender in need of civil management. MHL § 10.11(h).

> FN4. The statute allows the mental abnormality issue to be relitigated after two years of strict and intensive supervision, MHL § 10.11(f), and if a court agrees to hear a petition for discharge by an individual adjudicated to be a dangerous sex offender requiring civil confinement. MHL § 10.09(h).

II. Legal Standards

A. Preliminary Injunction

To obtain a preliminary injunction the moving party must show irreparable injury and either (i) likelihood of success on the merits or (ii) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor. *Green Party of New York State v. New York State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir.2004); *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir.1995); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F .2d 70, 72 (2d Cir.1979) (per curi-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
**(Cite as: 2007 WL 4115936 (S.D.N.Y.))**

am).

B. Procedural Due Process

Procedural due process claims are to be examined in "two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ... [and] the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989) (citations omitted). Whether a deprivation affects a liberty or property interest can be a difficult question. In this case, however, there is no question. Persons affected by Article 10 are threatened with deprivation not merely of *a* liberty interest, but of liberty *tout court,* as the Act contemplates that those found within its scope may be confined against their will.

If a protected liberty interest is implicated by state action, then the Court must determine what process is due. Due process is not a fixed concept, but flexible, and depends on the particular circumstances. *Zinermon v. Burch,* 494 U.S. 113, 127 (1990). The extent of process due is analyzed under the framework established by *Mathews v. Eldridge:*

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

**\*5** 424 U.S. 319, 335 (1976). When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard. *Hamdi v. Rumsfeld,* 542 U.S. 507, 533 (2004) (plurality opinion) (The "central meaning of procedural due process" is that parties "whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.") (citations and internal quotation marks omitted); *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965); see also *United States v. James Daniel Good Real Property,* 510 U.S. 43, 53 (1993); *Wisconsin v. Constantineau,* 400 U.S. 433, 437 (1971).

Though the *Mathews v. Eldridge* analysis requires an evaluation of each challenged statutory provision or instance of government deprivation, certain general comments are appropriate. The personal interests implicated by Article 10 are fundamental human interests, including (i) liberty per se, which may be lost to involuntary commitment or strict probation-like conditions which must be complied with on pain of involuntary commitment;[FN5] (ii) involuntary psychiatric or behavior modification medication or other treatment;[FN6] and (iii) the lifelong stigma attached to the label of sex offender that may adversely affect an individual's ability to live and work.[FN7] An erroneous deprivation due to inadequate procedures in this context will likely lead to, at a minimum, substantial stigma and mandated strict supervision. The governmental interests involved are also serious. Individuals who are mentally ill and dangerous, and prone to the commission of sexual offenses, pose serious risks to our communities. New York thus has a strong interest in ensuring the safety of potential victims of such offenses.

> FN5. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno,* 481 U.S. 739, 755 (1987). "[A]n unchecked system of detention carries the potential to become a means for oppression and abuse." *Hamdi v. Rumsfeld,* 542 U.S. 507, 530 (2004) (plurality opinion). *See also Vitek v. Jones,* 445 U.S. 480,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

492 (1980) (" '[A]mong the historic liberties' protected by the Due Process Clause is the 'right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.' "), quoting *Ingraham v. Wright,* 430 U.S. 651, 673 (1977). "[I]nvoluntary commitment to a mental hospital, like involuntary commitment of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law." *O'Connor v. Donaldson,* 422 U.S. 563, 580 (1975) (Burger, C.J., concurring), citing *Specht v. Patterson,* 386 U.S. 605, 608 (1967), and *In re Gault,* 387 U.S. 1, 12–13 (1967). *See also Vitek,* 445 U.S. at 491 ("[F]or the ordinary citizen, commitment to a mental hospital produces a massive curtailment of liberty ... [and] in consequence requires due process protection.") (citations and internal quotation marks omitted); *see also Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983).

FN6. One has a liberty interest against "[c]ompelled treatment in the form of mandatory behavior modification programs" absent adequate justification. *Vitek,* 445 U.S. at 492. *See also Mills v. Rogers,* 457 U.S. 291, 299 n. 16 (1975) (assuming without deciding "that involuntarily committed mental patients do retain liberty interests protected directly by the Constitution ... and that these interests are implicated by the involuntary administration of antipsychotic drugs") (citations omitted); *Project Release v. Prevost,* 722 F.2d 960, 979 (2d Cir.1983) ("Although *Mills* did not definitively resolve the question of whether a liberty interest in refusing antipsychotic medication exists as a federal constitutional matter, the case appears to indicate that there is such an interest."); *id.* ("[I]t appears that New York State recognizes the right" to refuse antipsychotic medica-

tion).

FN7. Due process is implicated not only when an individual's physical liberty is impaired, but also "[w]here a persons's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Wisconsin v. Constantineau,* 400 U.S. 433, 437 (1971). Harm to "reputation alone ... is [not] 'liberty' ... by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis,* 424 U.S. 693, 701 (1976). The Second Circuit has required some additional impediment beyond harm to reputation alone to establish a constitutional deprivation. *See, e.g., Valmonte v. Bane,* 18 F.3d 992, 999 (2d Cir.1994); *Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.1989). The liberty interests implicated by involuntary civil commitment based on mental illness include "adverse social consequences to the individual ... [and] [w]hether we label this phenomena 'stigma' or choose to call it something else ... we recognize that it can occur and that it can have a very significant impact on the individual." *Vitek,* 445 U.S. at 492, citing *Addington v. Texas,* 441 U.S. 418, 425–26 (1979); *Neal v. Shimoda,* 131 F.3d 818, 829 (9th Cir.1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender ."). *See also Doe v. Pataki,* 3 F.Supp.2d 456, 469 (S.D.N.Y.1998).

## C. Involuntary Detention of Persons With Mental Illness

The Constitution does not guarantee an "absolute right in each person to be, at all times and in all circumstances, wholly free from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
**(Cite as: 2007 WL 4115936 (S.D.N.Y.))**

safety to its members." *Kansas v. Hendricks,* 521 U.S. 346, 356–57 (1997) (citations and internal quotation marks omitted). Civil commitment is appropriate in certain circumstances, but it "must be justified on the basis of a legitimate state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding. Equally important, confinement must cease when those reasons no longer exist." *O'Connor,* 422 U.S. at 580 (Burger, C .J., concurring), citing *McNeil v. Director, Patuxent Inst.,* 407 U.S. 245, 249–50 (1972) and *Jackson v. Indiana,* 406 U.S. 715, 738 (1972). States have, in "certain narrow circumstances," provided for "forcible civil detainment of people who ... pose a danger to the public," and the Supreme Court has

> **\*6** consistently upheld ... involuntary commitment statutes when (1) the confinement takes place pursuant to proper procedures and evidentiary standards, (2) there is a finding of dangerousness either to one's self or others, and (3) proof of dangerousness is coupled ... with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'

*Kansas v. Crane,* 534 U.S. 407, 409–10 (2002), citing *Hendricks,* 521 U.S. at 357–58 (internal quotation marks omitted). "[E]ven if ... involuntary confinement [is] initially permissible [and founded upon a constitutionally adequate basis], it [can] not constitutionally continue after that basis no longer exist[s]." *O'Connor,* 422 U.S. at 575 (citation omitted); FN8 see also *Foucha v. Louisiana,* 504 U.S. 71, 78 (1992) ("[K]eeping [someone] against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness.").

> FN8. These constitutional concerns were reflected in the Kansas civil commitment statute at issue in *Hendricks* and *Crane,* where "[i]f, at any time, the confined person is adjudged 'safe at large,' he is statutorily entitled to immediate release." *Hendricks,* 521 U.S. at 364. The Kansas

statute "permit[s] immediate release upon a showing that the individual is no longer dangerous or mentally impaired." *Id.* at 368–69.

The substantive standards governing involuntary civil detention are well established: "A finding of 'mental illness' alone cannot justify a State's locking up a person against his will and keeping him indefinitely in simple custodial confinement." *O'Connor,* 422 U.S. at 575. "Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty." *Id.* (citations omitted). Involuntary civil confinement "may entail indefinite confinement, [which] could be a more intrusive exercise of state power than incarceration following a criminal conviction." *Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983). Though "involuntary civil commitment constitutes a significant deprivation that requires due process protection, ... the difference between civil and criminal confinement may nonetheless be reflected in different standards and procedures applicable in the context of each of the two systems—so long as due process is satisfied." *Id.* (citations and internal quotation marks omitted). In the case of civil confinement, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson,* 406 U.S. at 738. However, "due process does not tolerate the involuntary confinement of a nondangerous individual." *Project Release,* 722 F.2d at 972 (citations and internal quotation marks omitted).

III. The Challenged Provisions
    Plaintiffs do not challenge New York's authority to involuntarily commit individuals who have in the past committed sexual crimes and are at present mentally ill and dangerous. Nor can they, because the Supreme Court has held that such detention is constitutionally authorized. See *Hendricks,* 521 U.S. at 356, 369–71 (holding that confinement of sex offenders based on proof of mental abnormality and a finding of dangerousness does not violate

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
**(Cite as: 2007 WL 4115936 (S.D.N.Y.))**

substantive due process, and rejecting claims that sexual offender detention provisions violate the Double Jeopardy Clause or constitute impermissible ex post facto lawmaking). Plaintiffs' challenges therefore leave untouched the central provisions of the new statutory scheme, which authorize detention based on a finding that an individual who (i) has committed a sex crime (or the acts which constitute the crime) and (ii) is mentally ill and dangerous may be involuntarily committed. Plaintiffs object, however, to some provisions of the statute that they claim permit an offender to be detained on an inadequate showing of these factors. Five of their six challenges to the statute relate to this basic concern. Their sixth challenge relates to the timing of the appointment of counsel.

A. MHL § 10.06(f)

*7 Article 10 authorizes detention both after the probable cause hearing and after the commitment hearing. However, Article 10 also authorizes detention of a potential sexual offender even *before* the probable cause hearing, and in advance of any judicial hearing, solely on the basis of an executive order of detention, and plaintiffs challenge the constitutionality of these pre-hearing detention provisions.

When an individual subject to the Act may be released from incarceration or parole before the CRT is able to make a determination as to whether the individual may be a sex offender in need of civil management, the Attorney General, if she "determines that the protection of public safety so requires," may file a "securing petition." MHL § 10.06(f).FN9 The filing of such a "securing petition" in and of itself requires that the individual shall be (or remain) detained and "there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management." Id.FN10

FN9. The statute incorporates certain timelines anticipating that the evaluation of the individual will be completed before an individual is scheduled for release. *See, e.g.,*

MHL § 10.05(b) (agencies shall give notice to the Attorney General and Commissioner of Mental Health 120 days prior to an individual's release); MHL § 10.05(g) (if the CRT determines that the individual is a sex offender requiring civil management, it shall give notice of this fact to the Attorney General and the respondent within 45 days of the Commissioner of Mental Health's receipt of the notice of the individual's release); MHL § 10.06(a) (Attorney General shall seek to file the sex offender civil management petition with the court within 30 days after receiving the case review team's finding). However, as certain of the provisions explicitly note, *see, e.g.,* MHL §§ 10.05(g), 10.06(a), and the statute more generally provides, these deadlines are almost always aspirational, and the failure to meet these deadlines "shall not invalidate later agency action except as explicitly provided by the provision in question." MHL § 10.08(f). Thus, Article 10 anticipates that some individuals may be scheduled for release before the CRT can complete its work and the normal judicial process is instituted.

FN10. The full text of the provision states:

Notwithstanding any other provision of this article, if it appears that the respondent may be released prior to the time the case review team makes a determination, and the attorney general determines that the protection of public safety so requires, the attorney general may file a securing petition at any time after receipt of written notice pursuant to subdivision (b) of section 10.05 of this article. In such circumstance, there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management. If the case review

team determines that the respondent is not a sex offender requiring civil management, the attorney general shall so advise the court and the securing petition shall be dismissed.

MHL § 10.06(f).

Plaintiffs contend that these provisions violate the most basic tenets of due process: notice to the individual and an opportunity to challenge the continued detention. (MHLS Mot. 5–7.) Defendants contend that plaintiffs' concerns are overblown, and that their criticisms take the statute out of context. (D.Opp.8–10.) They insist that the securing petition provision actually "protects rather than injures the respondent" because it ensures that a judge can only determine whether an individual has a "mental abnormality" with the benefit of technical clinical evidence provided by the CRT evaluation. (*Id.* at 8.) Defendants also suggest that "the securing provisions come into play only after notice" and only in situations where "the protection of public safety so requires." (*Id.* at 10.)

On these points, defendants' arguments are unpersuasive. It is true that some form of "notice" must be given in advance of a securing petition; however, it is not notice given *to* the individual subject to the petition, and it is not notice *regarding* the potential detention by securing petition. The statute anticipates that the agency that has jurisdiction over a person who may be a detained sex offender nearing release will give notice to the Attorney General and the Commissioner of Mental Health within 120 days before such a person's release. MHL § 10.05(b). The Attorney General is authorized to issue a securing petition "at any time after receipt of written notice" pursuant to § 10.05(b), regardless of whether the Commissioner of Mental Health has received such notice. MHL § 10.06(f). Whatever notice might in due course be given to a respondent about Article 10's potential applicability to him in advance of the filing of a securing petition,[FN11] the statute unquestionably does not require that anyone give notice to the re-

spondent, in advance of the detention, that he will be detained by a securing petition. Moreover, the statute gives an individual no opportunity to contest the petition, and thus his detention, in advance of its issuance. In addition, individuals subject to securing petitions would not necessarily have state-appointed counsel to assist them in determining how to respond to a securing petition. MHL § 10.06(c) (appointment of counsel is triggered by the filing of a sex offender civil management petition or the request for the attorney general for a court-ordered psychiatric examination, not the filing of a securing petition).

> FN11. *See, e.g.,* MHL § 10.05(e) ("If the person is referred to a case review team for evaluation, notice of referral shall be provided to the respondent.").

**\*8** Defendants also contend that any deprivation of liberty will be modest, because the statute requires a probable cause hearing to be held within 72 hours of the filing of the securing petition. (D. Opp. at 8.) However, this is not strictly accurate. Though the probable cause hearing is initially scheduled to be held within 72 hours of the filing of a securing petition, the probable cause hearing may be delayed due to (i) delay caused or consented to by the individual, or (ii) a showing by the Attorney General, to the satisfaction of the court, of "good cause why the hearing could not ... commence." MHL § 10.06(h). Moreover, the statute provides that in the event of the filing of a securing petition, "there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management." MHL § 10.06(f). Thus, the confinement occasioned by the securing petition could extend well beyond 72 hours.

The Second Circuit has upheld against constitutional challenge brief detentions of less than 72 hours in certain situations involving persons who may be mentally ill and dangerous to themselves or others. Project Release, 722 F.2d at 966, upheld a statutory provision authorizing involuntary deten-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion for 72 hours of a previously voluntary admittee to a mental hospital who gave notice of his desire to leave, so as to give the hospital administrator sufficient time to determine whether the individual should be converted from voluntary to involuntary commitment. *Charles W. v. Maul* authorized detention for less than 72 hours in a New York State psychiatric center of an individual adjudicated incompetent to stand trial on a misdemeanor charge, in order to "evaluate whether he presented a danger to himself or others warranting invocation of New York's civil commitment law." 214 F.3d 350, 353 (2d Cir.2000).

The situation surrounding the detentions authorized here appears different from those involved in Project Release or Maul. First, the nature of the dilemma faced by New York is different. Both Project Release and Maul involved situations where the release of the potentially dangerous or ill person was necessarily unpredictable. A hospital director does not know that a voluntary admittee wishes to leave until the admittee gives the director notice of those wishes. Similarly, when, or whether, a criminal defendant will be adjudicated incompetent to stand trial is also unpredictable, and the "state will not necessarily be prepared to undertake civil commitment proceedings immediately after criminal charges are dismissed." *Maul,* 214 F.3d at 359. In those situations, therefore, brief emergency detention periods are in some sense functionally necessary. Here, in contrast, the conclusion of a term of parole or imprisonment is generally a predictable event, and one for which, at least in the normal course of events, the CRT has at least 120 days in advance of the offender's release to prepare by conducting its investigation.

**\*9** Second, the procedures and deadlines involved in the 72–hour period of review here appear to be less rigorous than those at issue in Project Release and Maul. Under the regulatory scheme challenged in Project Release, upon written notice of the patient's desire to leave, the hospital director could continue that person's detention based on

"reasonable grounds for belief that the patient may be in need of involuntary care and treatment." 722 F.2d at 966, citing MHL § 9.13(b). During that period, the director "must have two physicians examine the patient and report their findings and conclusions separately to the director, who must then either release the patient or apply for a court order authorizing involuntary retention." *Id.,* citing N.Y. Comp.Codes R. & Regs. tit. 14, § 15.7 (1980). Upon application to a court, written notice is given to the patient and the patient's nearest known relative, and to a number of other parties (including Mental Health Information Service, an organization that provides information and assistance to patients and others interested in their welfare), any of whom can demand a judicial hearing to be held within three days of the court's receipt of such a demand. *Id.* The normal procedures for court authorization of detention of an involuntary patient then apply. *Id.,* citing MHL §§ 9.13(b), 9.33. In Maul, the government policy authorizing detention required evaluation within 72 hours of a finding of incompetency to stand trial before initiating civil confinement proceedings. 214 F.3d at 356.

Here, in contrast, the judicial review at the 72–hour stage may be no more than a determination that the Attorney General has shown "good cause" for delaying the CRT evaluation. The statute does not provide *any* absolute outer limit to the time that a CRT may spend in making its determination in the wake of a filed securing petition. There are no standards in the statute for what may constitute "good cause," no requirement that this "good cause" showing be established by any sort of hearing, and no requirement that petitioner participate in such a process. Furthermore, the "good cause" finding appears to relate to the existence of an excusable failure to complete the CRT evaluations, and is not necessarily a mechanism by which the judge may review the Attorney General's determination that the individual is sufficiently dangerous so as to require a securing petition. Though the detention may be based on an executive branch determination that an individual is dangerous, that determin-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

ation may be unreviewable by a court for a potentially indefinite period of time.

The securing petition thus may operate as a mechanism by which an executive branch official is empowered to order that an individual be held in custody beyond his sentence or judicial order of confinement on the mere say-so of the Attorney General. It may operate to authorize executive detention without notice to the individual being detained, without an opportunity to be heard, without advance judicial approval of the detention. There is no provision for immediate review by any court that the emergency action was justified and that the individual is in fact dangerous or may be dangerous, and no requirement that the court make an immediate decision as to whether an offender merits detention. Moreover, the detention could potentially last indefinitely, where "good cause" is shown why the CRT is unable to render a decision as to whether the individual may suffer a "mental abnormality" as defined by the statute.

**\*10** However, this is not a case in which any plaintiff is challenging his or her confinement pursuant to a securing petition. Rather, the plaintiffs here are challenging the provisions of § 10.06(f) as facially unconstitutional. Such plaintiffs bear a heavy burden. Facial invalidation of a statute is an extraordinary remedy and generally disfavored. *National Endowment for the Arts v. Finley,* 524 U.S. 569, 580 (1998) (Facial challenges to statutes are "generally disfavored," as facial invalidation is "strong medicine" that "has been employed by the Court sparingly and only as a last resort."), citing *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 223 (1990), and *Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973). "A facial challenge will only succeed if there is no set of circumstances under which the challenged practices would be constitutional." *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 347 (2d Cir.1998). Therefore, a court need only determine "whether there are 'any circumstances under which the [provisions] of the Act are permissible in order to uphold the Act.' " *Velazquez v. Leg-*

*al Services Corp.,* 164 F.3d 757, 763 (2d Cir.1999), quoting *Able v. United States,* 88 F.3d 1280, 1290 (2d Cir.1996). At least outside the special context of the First Amendment, plaintiffs challenging the facial constitutionality of a statute must demonstrate that the statute is invalid "in all applications." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.,* 462 F.3d 219, 228 (2d Cir.2006).

Although the analysis above suggests that under certain circumstances the broad authorization of confinement by direction of the Attorney General may operate unconstitutionally, whether by extending detention for too long a period or by permitting detention without a genuine emergency, the present record does not demonstrate that the statute cannot be administered or interpreted in a way to avoid these problems. To obtain a preliminary injunction, plaintiffs have the burden of demonstrating a likelihood of success in proving that "each time that [the] statute is enforced, it will necessarily yield an unconstitutional result." *Nat'l Abortion Fed'n v. Gonzales,* 437 F.3d 278, 293–94 (2d Cir.2006) (Walker, C.J., concurring).

There are situations, however, in which an executive official, with cause to believe that an individual is dangerous, can constitutionally detain such an individual in advance of a court hearing. See, e.g., *County of Riverside v. McLaughlin,* 500 U.S. 44, 56 (1991) (noting that probable cause hearing must follow within 48 hours of warrantless arrest); see also *Project Release,* 722 F .2d at 966; *Maul,* 214 F.3d at 353. The constitutionally of the detention depends, among other things, on (i) the reason for the detention, including existence of good or probable cause to detain the individual in the first place, and the nature of the exigency requiring action without prior notice and hearing, (ii) the nature of the detention, including the length of the detention pending the judicial hearing, and (iii) the nature and meaningfulness of the judicial review, when it actually comes. Thus, there exist situations in which an individual who may be a sexual offender may constitutionally be detained in ad-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

vance of a decision by an impartial decision maker that the individual is in fact dangerous. However, detention in advance of meaningful review by a judicial officer or other impartial factfinder is usually only appropriate for a matter of days. See, e.g., *County of Riverside,* 500 U.S. at 56; *Project Release,* 722 F.2d at 966; *Maul,* 214 F.3d at 353.

**\*11** Thus, while plaintiffs have raised serious and legitimate concerns about the potential operation of § 10.06(f), they have not established that they are likely to succeed in establishing the facial invalidity of this provision. It is not possible to conclude on the basis of the present record that the statute will necessarily function in an unconstitutional manner. In the first six months of the statute's operation, the parties agree, securing petitions have been used only twice.FN12

> FN12. The first securing petition was filed on the date the Act became effective. (Letter of Edward J. Curtis, Esq., to the Court, dated September 21, 2007, at 2.) The second securing petition was filed on July 11, 2007, and withdrawn in two days. (Letter of Edward J. Curtis, Esq., to the Court, dated September 26, 2007, at 1 .)

In these cases, it appears that the periods of detention without judicial review were brief, and the record is unclear as to the reasons, if any, why the CRT was unable to complete its review before the offender's scheduled release.

It is conceivable that the statute may be susceptible to constitutional application. If there are situations in which a potentially dangerous offender who may qualify as a mentally abnormal sex offender requiring confinement is unexpectedly scheduled for imminent release, and the detention is limited to a brief period before a judicial hearing, the resulting emergency may justify a short period of detention pending such a hearing. At this early stage of the proceedings, it is unclear whether such situations exist. A factual record detailing the circumstances under which the relevant authorities be-

come aware of the scheduled release of offenders, and how the CRTs operate, may reveal whether genuine emergency conditions warranting executive detention actually exist.

But plaintiffs have not established that it is likely that such conditions do not exist. And in any event, as a matter of equitable discretion, an injunction on these facts would be inappropriate. Since the statute was recently enacted, New York State courts have not yet had an opportunity to interpret these provisions. As a matter of equitable discretion, it is preferable to give the New York State courts the opportunity to determine the proper scope of a New York law before a federal court declares whether it offends the federal Constitution. New York courts may well interpret the securing petition as a mere emergency device, only to be utilized in compelling circumstances, and may narrowly interpret the exceptions to the provision of judicial review within 72 hours. Depending upon how New York courts interpret their own statute, there may be no need to reach any federal constitutional issue.

In short, this Court declines to issue a preliminary injunction against a provision that may rarely if ever be used, or if used, may be capable of being interpreted or applied in a manner that does not offend the due process clause. Because a fuller factual record is necessary for the Court to determine whether the statute may be capable of constitutional application, both plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss will be denied as they pertain to MHL § 10.06(f).

**B. MHL § 10.06(k)**

Once the Attorney General, based on the report of the CRT, determines that an individual may be a sex offender in need of civil management, he may file a "sex offender civil management petition" with a New York court. MHS § 10.06(a). Within 30 days of the filing of the sex offender management petition, the court must conduct a hearing without a jury to determine if there exists "probable cause to believe that the respondent is a sex offender requir-

ing civil management." MHL § 10.06(g). If, at the conclusion of the hearing, the court finds such probable cause, the judge is required to commit the individual to a secure treatment facility, where the individual shall be detained pending the civil commitment trial. MHL § 10.06(k). Detention may last more than 60 days.[FN13]

> FN13. The statute requires a trial to begin within 60 days of the probable cause hearing. MHL § 10.07(a). However, since the statute mandates detention through the completion of the trial, MHL § 10.06(k)(iii), the statute authorizes detention beyond 60 days. In the first case that went to trial, the time of detention extended to 80 days. (Tr. 53.) In complicated trials, detention may even be longer. Both the significant period of detention authorized, as well as the purpose of the detention itself, separate this case from other statutes which authorize very short periods of detention for the purpose of determining whether or not an individual is dangerous or is in need of confinement. See *Project Release,* 722 F.2d at 966 (72 hours); *Charles W. v. Maul,* 214 F.3d at 358–59 (2d Cir.2000) (less than 72 hours).

**\*12** Plaintiffs contend that these provisions are unconstitutional because they mandate the confinement of an individual pending the commitment trial without a finding that the individual detained is in fact dangerous, or even without probable cause to believe that the individual *might* be dangerous. An evaluation of this contention requires careful attention to the details of the regulatory scheme.

It is undisputed that when a proceeding may result in an adjudication of detention, a court may detain the defendant pending adjudication of the matter based on a finding of probable cause to believe the facts justifying ultimate detention exist, plus a finding that lesser conditions of supervision during pendency of the action will not be sufficient to guarantee the safety of the community. That is

the teaching of *United States v. Salerno,* 481 U.S. 739 (1987), which upholds a statute permitting pretrial detention of defendants in criminal cases on just such a showing. There is no reason why a similar standard should not apply in civil commitment proceedings: if there is probable cause to believe the respondent is likely to be adjudicated a dangerously mentally ill person or a sex offender requiring confinement as defined in the Act, the same need to guarantee the safety of the community that warrants detention of a criminal defendant while he is still presumed innocent warrants a similar detention pending trial of potentially dangerous persons who have not yet been found to require civil commitment.

Plaintiffs do not dispute this general principle. They argue, however, that unlike the pre-trial detention regime upheld in Salerno, the statute at issue here requires the detention pending trial of *all* respondents as to whom there is probable cause that they qualify as sex offenders requiring civil management, without an individualized judicial determination that they cannot safely be at liberty pending adjudication. They contend, in effect, that this is analogous to a statute that denied bail to *all* criminal defendants pending trial, based only on a finding of probable cause to believe they committed an offense that *might* lead to a prison sentence.

Defendants respond that the analogy fails, because a finding of dangerousness is implicit in the probable cause determination required by MHL § 10.06(k). They note that the required finding, is among other things, a finding of probable cause to believe that the respondent suffers from a mental abnormality which is defined to include only those mental abnormalities which "predispose [ ] [an individual] to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct." MHL § 10.03(i). Therefore, defendants contend, a degree of dangerousness sufficient to justify 60 days of detention pending a trial is embedded into the definition of mental abnormality itself.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

But that is not quite so. What is relevant to the pre-trial release decision is not merely a generalized notion that a person presents some degree of potential danger—if that were so, any person that there is probable cause to believe committed a crime of violence could be detained without more—but also a finding that the person is sufficiently dangerous that less intrusive conditions than detention cannot guarantee the safety of the community pending trial.

*13 Article 10 itself makes clear, however, that not all persons who have a mental abnormality sufficient to meet the definition of a "sex offender requiring civil management" require actual confinement. Under the statute, "sex offender requiring civil management" is a catch-all category that includes individuals subject to the act who are *not* individuals "likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." MHL §§ 10.03(e), (q), (r). At least some individuals who fit this broader category will *not* be subject to detention, but only to parole—or probation-like conditions of supervision while at liberty in the community, even *after* a jury finding that they have been *proven,* by clear and convincing evidence, to be sex offenders in need of civil management.

The Act is not simply a mechanism to extend the confinement of individuals currently incarcerated; it can also operate to extend parole-like conditions to persons who are currently on parole. In certain situations, New York apparently believes that strict and intensive supervision of (and medication and therapy for) a respondent, under conditions resembling parole supervision, is adequate to protect the community. Defendants do not contest that persons across a broad spectrum of treatment needs and threat levels may be classified as "sex offenders requiring civil management." That there is probable cause to believe that an individual requires some kind of civil management, and may be dangerous *if not treated,* does not necessarily mean that such a person will be dangerous *if released,* and

would therefore require detention.[FN14]

> FN14. The presence of a mental abnormality combined with the commission of a past crime may be sufficient to institute proceedings against an individual, and surely the commission of past sexually violent crimes is relevant to a psychiatrist's or judge's determination of whether an individual is at present violent. *Hendricks,* 521 U.S. at 357 ("[P]revious instances of violent behavior are an important indicator of future violent tendencies.") (citations and internal quotation marks omitted). However, it is current dangerousness, not past crimes, which ultimately justifies civil detention in these situations. *See, e.g., id.* (the act held constitutional in *Hendricks* "unambiguously requires a finding of dangerousness either to one's self or to others as a prerequisite to involuntary confinement").

Nevertheless, the Act requires the detention, pending trial, on a mere finding of probable cause to believe that the respondent suffers from a "mental abnormality," of those for whom detention is not a necessary or intended remedy, even if such abnormality is proven at trial. Mandatory detention pending trial is triggered by a court finding of probable cause to believe that a person is a "sex offender requiring civil management," not by a finding of probable cause to believe that such a person is dangerous or requires secure confinement. Under the Act, then, a person may be detained for 60 days or more based on a determination that there is probable cause to believe that he may have committed a sexual felony and may have a mental abnormality.[FN15] Comparing a federal sex offender statute's definition of "sexually dangerous" demonstrates how Article 10's definition of "mentally abnormal" does not incorporate a finding of dangerousness. The comparable federal sex offender statute defines a "sexually dangerous" individual to be one who "suffers from a serious mental illness, abnormality,

or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation *if released.*" 18 U.S.C. § 4247(a)(6) (italics added). Likewise, by provision of Article 10, a "dangerous sex offender requiring confinement" is a person who suffers from a mental abnormality such that "the person is likely to be a danger to others and to commit sex offenses *if not confined to a secure treatment facility.*" MHL § 10.03(e) (italics added). Both incorporate a finding that the individual would likely be sexually violent *if released.* In critical contrast, Article 10's definition of mental abnormality includes those individuals whose tendencies may be controlled by remedies that fall short of confinement, such as medicine, treatment, or some other form of supervision.

> FN15. Article 730 defendants, a subset of the larger category of "detained sex offender," MHL § 10.03(g)(2), may have only been indicted for a crime before a court found them incompetent to stand trial. N.Y.Crim. Proc. Law ("CPL") § 730.50(1). Article 10 requires that only those 730 defendants that "did engage in the conduct constituting" the offense be subject to Article 10. However, such a determination is presumed at the probable cause stage, MHL § 10.06(j)(iii), and only needs to be proved by clear and convincing evidence at the trial stage, MHL § 10.07(d).

**\*14** The intervenor's situation illustrates the point.FN16 He alleges that in the Article 10 proceeding against him, New York seeks only an order, in effect, of continued parole. (Intervenor Complaint ¶¶ 4, 21, 26.) Such parole-like community treatment is apparently all New York contends is required, and all the State asks the Court to impose if a jury finds that he indeed requires any treatment at all. Such treatment without detention, indeed, is all that was imposed on the intervenor before institution of proceedings under the Act.

> FN16. At this stage of the proceedings, the

Court makes, and can make, no findings on the facts of the intervenor's case. Rather, the Court assumes the truth of the intervenor's allegations for the purposes of this discussion. The point is not whether these facts are indeed true as to the intervenor, but simply that what he contends are the facts of his case illustrate the conceded structure of the statute. Indeed, the Court has been advised that since the briefing in this case, the intervenor has been detained on a charge of parole violation.

Nevertheless, under § 10.06(k), upon a finding of probable cause to believe that the intervenor may have a mental abnormality as defined by the statute, a person in the intervenor's situation must be automatically detained pending trial. Such detention is potentially catastrophic. Not only will the intervenor lose his liberty, but he will likely lose his job and his house, and default on loans. (*Id.* ¶ 33.) He will thus, by mandatory operation of the statute, be deprived of more liberty *before* he is adjudicated in need of treatment, based on a mere showing of probable cause to believe treatment is required, than New York seeks to impose *after* he is shown by clear and convincing evidence to need treatment. This is perverse, and at oral argument the State was unable to give any rational explanation of how this furthers any legitimate government interest.FN17 Nor can it—there is no convincing reason that an individual should be detained for a substantial period of time pending a trial to determine whether a person does or does not need outpatient treatment.

> FN17. *See* (Tr. at 54–59); (*id.* at 59, "It is a difficult thing to justify. I have explained why I believe it's there, and that's about all I can offer.").

The Supreme Court has never held that an individual can be detained for a substantial period of time based on mental incapacity alone. See, e.g., *O'Connor,* 422 U.S. at 575 ("A finding of 'mental illness' alone cannot justify a State's locking up a person against his will and keeping him indefinitely

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

in simple custodial confinement."). Those civil commitment statutes that the Supreme Court has upheld require a specific "finding of dangerousness either to one's self or to others" that "links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior." *Crane,* 534 U.S. at 410, citing *Hendricks,* 521 U.S. at 357–58. Due process "does not tolerate the involuntary confinement of the nondangerous individual." Project Release, 722 F.2d at 972 (citations and internal quotation marks omitted).

In practice, the automatic detention provisions operate less as a precise tool to determine who is dangerous enough to be committed pending trial, and more as a hammer to coerce individuals to enter into plea arrangements with the State, and thereby accept both designation as a sex offender and intensive ongoing treatment in order to avoid spending what may be more than 60 days in involuntary confinement. A respondent as to whom posttrial detention is not sought will have an overwhelming incentive to agree to an adjudication that he is a sex offender in need of treatment, and to accept continuation of community supervision, rather than contest the State's case, in order to avoid a potentially lengthy period of detention pending trial, even if he believes he may avoid any adverse consequence by going to trial.

**\*15** Detention will of course be warranted in some cases; however, it should be triggered, as the Legislature notes, "[i]n extreme cases" and only for "the most dangerous offenders." MHL § 10.01(b). [FN18] In contrast, § 10.06(k) extends automatic detention to all individuals who may receive treatment subject to Article 10, without a judicial proceeding to determine dangerousness, and with no rational basis for determining whether the particular individual would pose a danger to the community if released. New York may not automatically detain any individual who may be subject to the statute for a significant period of time without proving that there

is at least probable cause to believe that he is dangerous. [FN19]

FN18. In other portions of the brief, defendants note that the "array of protections, evaluations, judicial determinations and necessary findings which are built into the legislative scheme provide ample constitutional protections, at both the probable cause and trial stages." (D.Mot.12–13.) However, at no point previous to the mandatory detention does any person at any level make any determination that an individual is so dangerous as to necessitate detention.

FN19. Defendants argue that in order to mount a successful facial challenge to a statute, plaintiffs must establish that there is no set of circumstances under which the statute would be valid. (D. Opp. 29, quoting *Salerno,* 481 U.S. at 745.) However, MHL § 10.06(k) can never be constitutional, because individuals subject to these provisions, and faced with a substantial period of detention, are entitled to an individualized determination that they are in fact dangerous. The question is not whether *detention pending trial* will ever be valid—plaintiffs concede it sometimes will be—but whether *mandatory* detention pending trial, without the showing of dangerousness necessary to justify such detention, is on its face invalid.

Plaintiffs have thus demonstrated a likelihood of success on the merits with respect to the unconstitutionality of MHL § 10.06(k). Plaintiffs have also demonstrated irreparable injury. When a complaint alleges denial of a constitutional right, irreparable harm is presumed. *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984). Unjustified confinement to a mental institution is a "massive curtailment of liberty." *Vitek,* 445 U.S. at 491. Being coerced into accepting a designation of "mentally abnormal sex offender" is also highly stigmatic. See

*Vitek,* 445 U.S. at 492; *Neal v. Shimoda,* 131 F.3d 818, 829 (9th Cir.1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender ."). The harm to respondent either in being involuntarily committed without a finding of dangerousness or in being coerced to accept a designation of sex offender without an opportunity to contest the Attorney General's petition is both grave and irreparable.

This dispute must be resolved with urgency because respondents in the civil commitment proceedings are entitled to contest the State's case against them. However, if they know that they will be detained pending trial, where the pre-trial consequences are more severe than the post-trial consequences even were they to be adjudicated at the commitment trial to be a sex offender in need of civil management, then there is overwhelming and enormous pressure for an individual to accept the designation of sex offender and related treatment rather than face the 60 days of involuntary confinement. This statutory provision raises serious due process concerns with respect to all individuals who may be subject to its terms, not only because it does not require a finding of dangerousness before a period of substantial involuntary commitment, but also because it functions as a club to coerce waivers of very serious and important rights.

Plaintiffs have demonstrated a likelihood of proceeding on the merits as well as irreparable injury. Section 10.06(k) is inherently coercive, and plaintiffs' motion for a preliminary injunction will be granted insofar as the section requires detention pending trial absent a specific, individualized finding of probable cause to believe that a person is sufficiently dangerous to require confinement, and that lesser conditions of supervision will not suffice to protect the public during pendency of the proceedings.

C. MHL § 10.06(j)(iii)

**\*16** Plaintiffs also challenge a provision of the Act that forbids a class of individuals known as

Article 730 defendants from contesting at the probable cause hearing the facts that form the basis of the criminal charges against them. Article 730 defendants are individuals who have been charged with a crime and found incompetent to stand trial pursuant to Article 730 of the New York Criminal Procedure Law, N.Y.Crim. Proc. Law ("CPL") §§ 730.10 –70. FN20 MHL § 10.03(g)(2). Although these individuals have never been found guilty of a crime, nevertheless a respondent's commission of a sex offense shall be "deemed established" and shall not be re-litigated at the probable cause hearing where it "appears that ... the respondent was indicted for such offense by a grand jury but found to be incompetent to stand trial for such offense." MHL § 10.06(j)(iii).

FN20. Article 730 authorizes criminal courts to order psychiatric investigations of criminal defendants under certain circumstances and when the court "is of the opinion that the defendant may be an incapacitated person." CPL § 730.30(1). Upon the receipt of an examination order, two qualified psychiatric examiners must examine the defendant to determine his capacity. CPL § 730.20(1). If the examiners are not of the same opinion regarding the capacity of the defendant, a third psychiatric examiner must examine the defendant. CPL § 730.20(5). When the examiners are not unanimous in their opinion that the defendant is a dangerous incapacitated person, the court must conduct a hearing to make that determination. CPL § 730.30(4). Where the examiners are unanimous, the court may *sua sponte* conduct a capacity hearing, and must do so on motion by the defendant or the district attorney. CPL § 730.30(3). If the court concludes that the defendant is not incapacitated, the criminal action against him will proceed. CPL § 730.50(1). If the court is satisfied that the defendant lacks the capacity to assist in his defense, or if no party objects to the unan-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
**(Cite as: 2007 WL 4115936 (S.D.N.Y.))**

imous conclusion of the psychiatrists that the defendant is incapacitated, the court must issue either an order of observation or an order of commitment. CPL § 730.50(1). In the case of those charged with non-felony offenses, upon the order of observation or commitment the court must dismiss the criminal indictment with prejudice. CPL § 730.50(1). In the case of those charged with felony offenses, the criminal action may proceed against the defendant if the defendant regains capacity. CPL §§ 730.50(2)-(3). A defendant charged with a felony but found unable to stand trial cannot be detained in the aggregate for longer than two-thirds of the authorized maximum term of imprisonment for the highest class felony charged in the indictment. CPL § 730.50(3).

Plaintiffs attack these procedures, pointing out that Article 730 defendants may be detained pending an Article 10 trial without any finding that they committed the underlying offense charged, while all other persons to whom the Act applies have been found to have committed all of the elements of the offense charged. (MHLS Mot. 16 .) Plaintiffs claim that this provision violates both due process and equal protection.

Plaintiffs' due process argument is founded on the concern that an individual may be detained following the probable cause hearing pending the commitment trial based on insufficient evidence that he in fact committed a crime and is in fact dangerous. Defendants argue that indictment by a grand jury demonstrates the existence of "legally sufficient evidence" to establish that a person committed such an offense. (D. Mot. 20, citing CPL §§ 190.65(1)(a)-(b) & 70.10(1)-(2)). Plaintiffs rightly point out that neither an indictment nor a finding of incompetence establishes guilt. However, detention pending criminal trial does not require a finding that the defendant in fact committed the crime charged, but only probable cause to believe that the

individual committed an offense (and is dangerous or a flight risk). See, e.g., *Salerno,* 481 U.S. at 749, 755; *Bell v. Wolfish,* 441 U.S. 520, 534 (1979). In criminal cases, moreover, an indictment by a grand jury is sufficient to establish probable cause. CPL § 190.65(1); *U.S. v. Beyer,* 426 F.2d 773, 774 (2d Cir.1970). If an indictment is sufficient to conclusively establish probable cause that the person committed the offense at issue in the criminal proceeding, then surely it is sufficient to perform the same function in a civil commitment proceeding. Article 730 defendants, like other persons subject to the Act, will have the opportunity to contest the State's case against them at the commitment trial. So long as they are detained pending trial based on an individualized finding of dangerousness and mental abnormality (see discussion above regarding MHL § 10.06(k)), due process requires no more than a probable cause finding with respect to the underlying alleged offense.

**\*17** Plaintiffs' contention that this provision violates equal protection is also unpersuasive. Unlike others subject to the Act who have been convicted of crimes, individuals who lack capacity to assist in their own defense may not constitutionally be tried; and definitive findings about whether such a defendant in fact committed the charged crime are thus precluded. See, e.g., *Cooper v. Oklahoma,* 517 U.S. 348, 354 (1996) ("A defendant may not be put on trial unless he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.") (citations and internal quotation marks omitted). New York has not had the opportunity to try Article 730 defendants in advance of the Article 10 proceedings. Their inability to stand trial, however, should not prevent Article 730 defendants from being committed pursuant to an otherwise constitutional sexual offender commitment scheme. Persons who are unable to stand trial may still have committed violent sexual crimes, be mentally ill, and pose a serious danger to the community. New York has a strong interest in detaining and treating such indi-

viduals. New York also has a strong interest in preventing the probable cause hearing, intended as an efficient screening mechanism, from turning into the first of two trials. That some persons subject to the Article 10 proceedings have been found guilty of crimes while others have not does not deny equal protection to either group.

Plaintiffs have not demonstrated a likelihood of success on the merits in their claims that MHL § 10.06(j)(iii) is facially unconstitutional, and subject to the other provisions of this opinion, plaintiffs' motion for preliminary injunction with respect to this provision is denied. Moreover, defendants' motion to dismiss the complaint will be granted as it pertains to plaintiffs' attack of MHL § 10.06(j)(iii), because as a matter of law, the probable cause established by an indictment is a sufficient showing of potential guilt to warrant pretrial detention where an individualized showing of mental abnormality and dangerousness have been made.

D. MHL § 10.07(d)

The statute predicates detention after the commitment trial on findings that an individual is (i) a sex offender who is (ii) mentally ill and (iii) dangerous. The vast majority of persons subject to the Act have been found by a jury beyond a reasonable doubt to have committed at least one crime.[FN21] For two groups, however, the Act authorizes detention following the commitment trial of individuals who have not been convicted of any crime. The first group consists of those persons who, at a criminal trial, had been found by a jury beyond a reasonable doubt to have committed the conduct constituting the offense charged, but were also found to be not guilty by virtue of some mental disease or defect. MHL § 10.03(g)(3); see also NYPL § 40.15. The second group consists of Article 730 defendants, those persons charged with sex offenses but determined by a court to have been so incapacitated as to have been unable to help prepare their own defense, and therefore unable to stand trial. MHL § 10.03(g)(2). For such defendants, the statute permits post-trial detention where the Attorney General can "prov[e] by clear and convincing evidence [at the commitment trial] that respondent did engage in the conduct constituting [the sex] offense" for which the Article 730 defendant was indicted. MHL § 10.07(d). Therefore, of all individuals subject to the Act, only the Article 730 defendants face a designation of "sex offender," and potentially involuntary detention, without having been found beyond a reasonable doubt to have committed the acts which constitute *any* crime, sexual or otherwise.

> FN21. In most cases, that crime will have been determined by a jury, beyond a reasonable doubt, to have been sexual in nature. There are certain circumstances in which that is not the case, as discussed in Part III E of this Opinion, below.

*18 Plaintiffs attack the provisions relating to the post-trial detention of these Article 730 defendants, claiming that the procedures violate due process. Defendants, relying on *Addington v. Texas,* 441 U.S. 418 (1979), insist that the procedures set forth in the statute are adequate, because such necessary to support involuntary civil commitment need only be found by clear and convincing evidence. (D.Opp.21–22.)

Defendants' argument is not without force. As a general matter, plaintiffs concede that an individual may be civilly committed based on a finding, by clear and convincing evidence, that an individual is mentally ill and dangerous. (See Tr. at 35, 36–38.) Plaintiffs concede this, as they must, because the Supreme Court's opinion in Addington supports exactly that proposition, holding that an individual can be indefinitely civilly committed upon a showing by clear and convincing evidence that an individual is mentally ill and would be a danger if released. 441 U.S. at 420, 433. See also *Hollis v. Smith,* 571 F.2d 685, 692, 695 (2d Cir.1978). Indeed, Article 730 defendants who may be detained under Article 10 may have been committed pursuant to just such a civil commitment scheme,[FN22] and presumably the legislature could, if it chose,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

permit lengthier commitment for such individuals than is currently permitted by Article 730.[FN23]

> FN22. *See* MHL § 10.03(g)(2) (Article 730 defendants must have been charged for committing a sex offense.); MHL § 10.03(p) (All sex offenses are felonies.); CPL § 730.50(1) (If the court determines that defendant is an incapacitated person it must adjudicate defendant an incapacitated person, and "[w]hen the indictment charges a felony ... it must issue an order of commitment ... for care and treatment in an appropriate institution for a period not to exceed one year from the date of such order."); CPL § 730.50(2) (upon the conclusion of a period of confinement pursuant to Article 730, when the State believes that the defendant continues to be incapacitated, it can apply for an order of retention, and if the court adjudicates the defendant an incapacitated person, it must issue an order of retention for a period not to exceed one year); CPL § 730.60(6) (If an Article 730 defendant is about to be released and the court determines that the defendant is a danger to himself or others, then "the court shall issue an order to the commissioner authorizing retention of the committed person in the status existing at the time notice was given hereunder, for a specified period, not to exceed six months.").

> FN23. *See* CPL § 730.50(3) (The civil detention for a defendant charged with a felony but found unable to stand trial "must not exceed two-thirds of the authorized maximum term of imprisonment for the highest class felony charged in the indictment.").

But Article 10 is not a mere civil commitment statute that may apply to any citizen. Rather, it applies only to those who have committed a sexual offense (or at least, the conduct constituting such an offense). The Article 10 respondent is labeled not merely a person in need of treatment, but a "sex offender," a label premised on the conclusion that the accused committed a crime (or at least, the conduct constituting a crime). Application of the stigma associated with a finding of criminality elevates the statute beyond the ordinary civil standards of proof, and requires proof beyond a reasonable doubt, regardless of the "civil" label attached to the statute.

*In re Winship,* 397 U.S. 358 (1970), is instructive. In Winship, the Supreme Court held that when a juvenile is "charged with an act which would constitute a crime if committed by an adult," that act must be proved beyond a reasonable doubt. *Id.* at 359. New York defined juvenile delinquents as persons older than seven but younger than 16 who "do[ ] any act which, if done by an adult, would constitute a crime." *Id.* at 359, citing N.Y. Fam. Ct. Act § 712. The Court rejected the argument that a lesser standard of proof was required because "delinquency status is not made a crime [and therefore] the proceedings are not criminal," *id.* at 365, concluding that "civil labels and good intentions do not themselves obviate the need for criminal due process safeguards" and that a "proceeding where the issue is whether the child will be found to be 'delinquent' and subject to the loss of his liberty for years is comparable in seriousness to a felony prosecution." *Id.* at 365–66, citing *In re Gault,* 387 U.S. 1, 36 (1967) (internal quotation marks omitted). The Court noted that though a different label was used, the individual was still subject to the "stigma of a finding that he violated a criminal law" and the "possibility of institutional confinement on proof insufficient to convict him were he an adult." *Id.* at 367.

**\*19** Although Winship establishes that a civil label is not always dispositive of the requisite standard of proof, the Supreme Court has made clear that a legislature's declaration of the civil nature of confinement may be overcome only where there is "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

as to negate [the State's] intention" to deem it civil. *Hendricks,* 521 U.S. at 361, citing *United States v. Ward,* 448 U.S. 242, 248–49 (1980). Here, plaintiffs have met that high burden. The situation presented here is indistinguishable from that addressed in Winship. In neither case can the State use a particular label to obviate the need for appropriate procedural protections in determining whether an individual in fact committed acts that constitute a crime, where such a determination not only triggers the possibility of long-term detention, but also labels the person an "offender." Just as with a juvenile adjudication, the statute combines the severe deprivation of liberty attendant on detention and rehabilitative treatment with a stigmatic label. The statute subjects an Article 730 defendant found to have committed a sex offense both to the "stigma of a finding that he violated a criminal law" and to the "possibility of institutional confinement on proof insufficient to convict him were he an adult" competent to stand trial. *Winship,* 397 U.S. at 367. The consequences of the adjudication are significant. Article 730 defendants who are confined pursuant to the Act will be confined in secure treatment facilities, segregated alongside dangerous sexual criminals found to suffer from mental abnormalities. MHL §§ 10.06(k), 10.07(c). And the prerequisite for that confinement is a conclusion that they too have committed sexual offenses.

Article 10 is a civil statute, and provides civil, not criminal, remedies for individuals who are mentally ill and dangerous. Those remedies, however, are predicated on criminal conduct. The statute applies only to *criminals* or to individuals who would be criminals if they had been sane when they committed the acts which constituted the crime and had been competent to stand trial. The title of Article 10 is *"Sex Offenders* Requiring Civil Commitment or Supervision." (Emphasis added.) The statute refers to those subject to its provisions as "sex offenders" and "recidivist sex offenders." See, e.g., MHL §§ 10.01(a), (g). Individuals subject to the Act are termed "sex offender[s] requiring civil management." MHL § 10.03(q). The instrument that the

Attorney General must file to instigate commitment proceedings is a "sex offender civil management petition." MHL § 10.06(a). Both the terms "offender" and "recidivist" have clear criminal implications. Black's defines an "offender" as "[a] person who has committed a crime," and a "recidivist" as "one who has been convicted of multiple criminal offenses, usually similar in nature." Black's Law Dictionary (8th ed.2004). The procedures involved as well as the terminology used impart an aspect of moral condemnation, normally reserved for criminal judgments, upon those found guilty at the Article 10 trial.[FN24]

> FN24. On these matters, the current statute stands in contrast to Kansas's sexual offender civil commitment statute upheld in *Hendricks.* 521 U.S. at 352. The Kansas statute applied to "sexually violent predator [s]," defined as those persons who "ha[ve] been convicted of or charged with a sexually violent offense and who suffer[ ] from a mental abnormality or personality disorder which makes [them] likely to engage in the predatory acts of sexual violence." *Id.* citing Kan. Stat. Ann. § 59–29a02(a) (1994). Though "predator" is not a gentle term, neither is it necessarily a criminal term. Furthermore, the Kansas statute applied not only to those who had been convicted of crimes, but also to those charged with committing crimes, and therefore did not purport to restrict itself to individuals who have committed criminal offenses. In any event, the Kansas statute only authorizes detention based on proof beyond a reasonable doubt that the individual was in fact a sexually violent predator. *Hendricks,* 521 U.S. at 352–53.

**\*20** Under the *Mathews v. Eldridge* standard, the severity of these consequences, normally resulting only from criminal conviction, argues for the imposition of the highest burden of proof. The second Eldridge factor, the risk of erroneous adju-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

dication, points in the same direction, as the risk is particularly high in the case of Article 730 defendants. The reason these defendants have not been put on trial for the acts that form the basis of the criminal charges against them is that they were found by a court to have been incompetent to participate in their own defense. To have put them on trial on the criminal charge would have violated due process. *Cooper,* 517 U.S. at 354 ("A defendant may not be put on trial unless he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.' "), quoting *Dusky v. United States,* 362 U.S. 402, 402 (1960). Even at a criminal trial, with a standard of proof beyond a reasonable doubt and all the other attendant protections of the criminal process, the risk of an erroneous conviction is too great when the defendant lacks the ability to assist his attorney in defending the case.

Every other category of "offender" to whom the law applies has been found guilty of conduct constituting a crime beyond a reasonable doubt, at a criminal trial at which the defendant was fully able to participate in his defense. To *reduce* the burden of proving guilt for Article 730 defendants perversely heightens the risk of erroneous conviction. The unique circumstances of these defendants, who were adjudicated to have been unable to participate in their own defense, suggest a need for stronger, not reduced, procedural protections against erroneous conviction.

The standard of proof "represents an attempt to instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Winship,* 397 U.S. at 370. A weakened standard of proof represents, by definition, the tolerance of a greater likelihood of error. When combined with the inherently greater risk of error implicated in trying a defendant who is unable to defend himself due to incompetence, the risk of erroneous adjudication of guilt becomes too great to

permit the imposition of the stigma of the "sex offender" label and the attendant long-term deprivation of liberty.

The third Eldridge factor, the importance of the governmental interest at stake, does not suggest a more lenient standard of proof. Without question, the government interest involved here is of the highest order, involving the protection of the public safety against serious imposition. It is precisely that interest that permits the State, in effect, to put the incompetent on trial at all: given the importance of protecting potential victims against repeat sexual offenders, the difficulties that prevent a criminal trial of the incompetent cannot preclude the State from taking preventive steps to provide necessary treatment.FN25 But the requirement of proof beyond a reasonable doubt that the respondent *is* an offender is not an obstacle to the statutory scheme. Indeed, a finding of criminal conduct beyond a reasonable doubt is prerequisite to "civil management" proceedings for every category of person subject to the scheme *other than* Article 730 defendants. There is no plausible reason to suggest that the governmental interest supporting Article 10 commitments would be undermined if the same requirement is imposed with respect to the category of defendants least able to defend themselves.

> FN25. Plaintiffs do not argue, and the Court does not hold, that individuals who were found either incompetent to stand trial or not guilty by virtue of insanity may not be detained pursuant to the Act because they have not been convicted of a crime. The statute is drafted to deal with individuals who are mentally ill, and it would be strange to prevent a state from dealing with mentally ill and dangerous individuals who have been adjudicated to have committed violent sexual acts via the civil remedies that this Act imposes. Even though *Winship* required certain procedural protections in the context of juvenile adjudications, it did not completely transform

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

all aspects of the juvenile delinquency system into a criminal system. *See, e.g., Winship*, 397 U.S. at 359 n. 1 (The opinion does not "rest[ ] ... on the assumption that all juvenile proceedings are criminal prosecutions, hence subject to constitutional limitations ... [W]e are not here concerned with ... the pre-judicial stages of the juvenile process, nor do we direct our attention to post-adjudicative or dispositional process.") (citations and internal quotation marks omitted). So too here, requiring that New York must prove beyond a reasonable doubt that the Article 730 defendant committed the acts that constitute a crime that may have been sexual does not transform all aspects of Article 10, at least with respect to Article 730 defendants, into criminal proceedings.

**\*21** Due process therefore requires that when an individual is subject to the stigma of being labeled a "sexual offender" and of a finding that he violated a criminal law triggering the possibility of institutional confinement, proof that he in fact committed the acts that form the basis for being labeled an "offender" must be made beyond a reasonable doubt.[FN26] Plaintiffs have demonstrated a likelihood of success in prevailing on their claim that the "clear and convincing" burden of proof does not afford the protections that due process requires in determining that Article 730 defendants are in fact "offenders" subject to the Act. Therefore, plaintiff's motion for a preliminary injunction will be granted with respect to this portion of the statute.

> FN26. Plaintiffs do not argue that due process requires any other procedures to ensure that Article 730 defendants are dealt with fairly, and the Court expresses no view on any such issue.

**E. MHL § 10.07(c)**

The same constitutional difficulty that undermines § 10.07(d) affects § 10.07(c), albeit in a different way that presents a closer issue.

Eligibility for extended supervision under Article 10 is premised on the fact that an individual is not only an offender, but specifically a *sexual* offender. A sexual offender may be one who has committed either a crime that by definition includes a sexual element (for example, rape or sexual abuse) or a crime not necessarily sexual by definition (for example, kidnapping) in a sexual manner or with a sexual motive.[FN27] The Act thus recognizes that crimes that are not sexual in their essential nature may still constitute sexual offenses. New York's criminal code did not previously recognize such a category of "as-applied" sexual crimes, and the Act amends the code to create a new crime: the commission of any one of a set of serious felonies "for the purpose, in whole or substantial part, of his or her own direct sexual gratification." NYPL § 130.91. That crime will be, by definition, a sexual offense. For those individuals subject to Article 10 by reason of a crime committed after the enactment of Article 10, that crime must be one of a defined set of sexual crimes, including a "sexually motivated felony" as defined by NYPL § 130.91. MHL § 10.03(p); NYPL §§ 130.00–130.91. In such cases, the "sexual motivation" will be an element of a crime that will have been charged, submitted to the jury, and proved beyond a reasonable doubt in the underlying criminal case, before an offender will be subject to the extended supervision provisions of the Act.

> FN27. The provisions of Article 10 apply to individuals who have committed certain specialized crimes that are inherently sex-based offenses, such as rape and sexual abuse. MHL § 10.03(p); NYPL §§ 130.00–130.90. The provisions also apply to individuals who have committed certain "designated felon[ies]," MHL § 10.03(f), crimes not necessarily sexual in nature, in a way that demonstrates a "sexual [ ] motivat[ion]." MHL § 10.03(g)(4); NYPL § 130.91.
>
> However, for those individuals sought to be de-

tained based on a crime committed before the enactment of Article 10, that crime need not have been proven before a criminal jury to have been inherently sexual or committed with a sexual motivation. The Act authorizes the detention of such individuals if they have committed any one of a set of serious "designated felonies" with a "sexual motivation." For most of these individuals, it would have been impossible for the sexual motivation determination to have been made at the underlying trial. FN28 Therefore, for those who have committed the crime that forms the basis of their potential detention before the enactment of Article 10, the statute allows the "sexual motivation" determination to be made not at an underlying criminal trial, but at the civil commitment trial, at which the determination is to be made on the basis of clear and convincing evidence. MHL §§ 10.03(g)(4), 10.03(p)(4), 10.07(d).

> FN28. Some persons subject to Article 10 have been charged with, and convicted of, a designated felony before Article 10 was enacted or proposed. For such offenders, it would obviously have been impossible to have put the "sexual motivation" issue to the jury at the underlying criminal trial. For an offender who committed his allegedly sexual crime before the enactment of the Act, but who has been or will be charged with (and convicted of) his crime after the enactment of the Act, New York could perhaps put the issue of "sexual motivation" before the jury in the underlying criminal trial, so as to determine his eligibility for the detention provisions of Article 10. However, unlike those who committed their crimes after the Act's enactment, those who committed their crimes before its enactment cannot be found guilty of, and punished for, a crime that did not exist at the time that they committed the allegedly criminal acts. U.S. Const. art. 1, § 9. cl. 3. Moreover, such a procedure could be at best unwieldy and at worst prejudi-

cial to defendants. In any event, New York apparently has not attempted to provide a procedure for putting the issue before the underlying criminal jury in such cases.

**\*22** Plaintiffs contend the "sexual motivation" determination is in fact an element of a crime, and that due process therefore requires that it be proved beyond a reasonable doubt. Defendants insist that due process requires only a "clear and convincing" standard of proof for civil commitment proceedings, relying on Addington for support. 441 U.S. at 432 (concluding that "the reasonable-doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment").

Plaintiffs argue, however, that a retroactive determination that a pre-existing crime was committed with a sexual motive is essentially a criminal finding that necessitates a heightened standard of proof. They point out that in Addington, the Supreme Court rested its acceptance of the lesser standard of proof on the inherent uncertainties of the diagnostic and predictive findings of "mental illness" and "future dangerousness," which are not the sort of historical facts for which the standard of proof beyond a reasonable doubt was designed. The nature of a psychiatric diagnosis at issue in Addington raised a "serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous" because the "subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." 441 U.S. at 429–30 (citations omitted). See also, Hollis v. Smith 571 F.2d 685, 692, 695 (2d Cir.1978) (making determinations about a person's character and prospects for future conduct "beyond a reasonable doubt would either prevent the application of [commitment statutes predicated on such findings] except in the most extreme cases or invite hypocrisy on the part of judges or juries"); Id. (The

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

"ultimate issue" is "not as in a criminal case whether an alleged act was committed or event occurred, but the much more subjective issue of the individual's mental and emotional character. Such a subjective judgment cannot ordinarily attain the same 'state of certitude' demanded in criminal cases."); *United States v. Comstock,* No. 5:06–HC–2195BR, —— F.Supp.2d ——, ——, 2007 WL 2588815 at *26 (E.D.N.C. Sep. 7, 2007).

In contrast, a determination of "sexual motivation," as Article 10 itself makes clear, is capable of being made by a jury beyond a reasonable doubt. "The state of a man's mind," as Lord Justice Bowen famously remarked, "is as much a fact as the state of his digestion." *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716–17 (1983), quoting *Edgington v. Fitzmaurice,* 29 Ch. Div. 459, 483 (1885). See also *Arave v. Creech,* 507 U.S. 463, 473 (1993) ("The law has long recognized that a defendant's state of mind is not a 'subjective' matter, but a fact to be inferred from the surrounding circumstances.") (citations omitted). Unlike the findings at issue in Addington that an individual is both mentally ill and dangerous, a determination that an individual committed a crime with a sexual motivation is a factual determination, normally based on inferences from the facts and circumstances, that can be made beyond a reasonable doubt, as similar findings of purpose and intent are made every day in criminal trials.

**\*23** Of course, the Supreme Court in Addington articulated other reasons besides the difficulty of making findings regarding mental illness and dangerousness beyond a reasonable doubt for holding the clear and convincing burden of proof standard acceptable for civil commitment proceedings. The most fundamental reason for the clear and convincing standard is that, unlike criminal commitment, "[i]n a civil commitment state power is not exercised in a punitive sense." *Addington* 441 U.S. at 428. Furthermore, the standard of proof beyond a reasonable doubt "historically has been reserved for criminal cases," and the calculation of interests relevant to civil commitment is different such that it "cannot be said ... that it is much better for a mentally ill person to 'go free' than for a mentally normal person to be committed." *Id.* at 428–29. Although Article 10, like the traditional civil commitment regime discussed in Addington, is intended to be therapeutic, protective, and regulatory rather than punitive, the sexual offender provisions of the Act differ crucially from other civil commitment regimes, in that they are reserved for persons who have already been brought into the criminal justice system, and either found guilty of sexual crimes, or determined in the commitment trial to have engaged in conduct constituting such crimes. A determination that one may need treatment is fundamentally different from a determination that one committed a crime, or that one is a sexual offender.

Applying the *Mathews v. Eldridge* standard to these offenders presents issues broadly similar to those discussed above in relation to Article 730 defendants, but with significant differences. First, with respect to the importance of the individual interests involved, the ultimate stakes remain of the highest level, since the respondent's personal liberty is at risk in these proceedings. As noted above, however, in the discussion regarding MHL § 10.07(d), the Constitution permits deprivation of liberty in the form of civil commitment on a showing of mental illness and dangerousness by clear and convincing evidence, without any finding of criminality at all. Such findings are to be made in the course of the detention hearing contemplated by Article 10 in any event. What is at stake in the determination of whether a respondent committed a crime with a sexual motivation is not whether such an offender can be detained, but whether the respondent can be detained pursuant to this sexual offender regime.

This, of course, is no small matter, not only because it is intertwined with the ultimate detention decision, but also because there is, as noted above, a significant stigma associated with the declaration that a person is a "sex offender." In this regard,

however, individuals covered by MHL § 10.07(c) differ importantly from the Article 730 defendants covered by MHL § 10.07(d). The persons covered by § 10.07(c) have already been found, beyond a reasonable doubt, to have committed a serious felony, while the incompetent defendants covered by § 10.07(d), although accused of crimes, have never been tried or found guilty, and continue to be presumed innocent of any crime. To designate the latter "sex offenders" requires that persons who have never been convicted of a crime nevertheless be declared functionally guilty of serious felonies—which in turn will subject them to a scheme of extended detention or other supervision not imposed on any other person who has not been found beyond a reasonable doubt to have committed the conduct constituting such a felony. The defendants covered by MHL § 10.07(c), in contrast, have already been formally condemned as felons based on proof beyond a reasonable doubt. The further determination that their crimes had a sexual motivation is surely a serious matter that must be weighed carefully in the Eldridge balance. But the interest in question is not quite as strong as the interest of Article 730 defendants in avoiding a declaration of criminal guilt.

**\*24** The risk that an offender will erroneously be found a sexual offender if the clear and convincing standard is applied is also less great for this group of respondents. Unquestionably, the lessening of the burden of proof from "beyond a reasonable doubt" to "clear and convincing evidence" makes it easier for the finding to be made, and thus increases the chance of an erroneous finding of guilt (while, of course, reducing the risk that a respondent will erroneously be found *not* to have acted from a sexual motive). But because defendants covered by MHL § 10.07(c) are competent to assist in their defense, they are far better able to make use of the assistance of counsel and the other procedural rights accruing to respondents at trial, to defend against erroneous accusations, and to raise doubts in the mind of jurors about the accuracy of the State's charges.

Moreover, the narrowness of the issue presented reduces the chance of erroneous condemnation. Since the Article 730 defendants have never been found guilty of any crime, all of the elements of the underlying offense would be in play at an Article 10 trial. The respondent would thus have the full panoply of criminal defenses, including mistaken identity, alibi, and challenges to the witnesses' or victim's version of events available. Because of the respondent's incompetence, a lawyer representing the respondent would have little or no understanding of her client's version of the events, and thus would be enormously hampered in investigating the facts, selecting a defense, and challenging what may be a fundamentally mistaken understanding of the case. In the case of a defendant who has been found guilty of a non-sexual serious felony, however, there is no chance of error about the perpetrator's identity, or about whether the basic underlying crime was in fact committed: those facts have already been found by a jury beyond a reasonable doubt. In many cases, the sexual aspect of the case may be apparent, or, conversely, clearly absent. As compared with the cases covered by § 10.07(d), there will thus be fewer § 10.07(c) cases in which the burden of proof will likely make a difference, and in those, the respondent will be able to mount a defense. The extent to which the reduction of the burden of proof increases the risk of error is thus less in the case of § 10.07(c) than in the case of § 10.07(d).[FN29]

> FN29. Plaintiffs argue that evidence that an individual has, at the present time, a sexual abnormality, another element at issue in the Article 10 trial, is "all but guaranteed" to taint the determination as to whether that individual has, in the past, committed crimes with a sexual motivation. (MHLS Mot. 9–10.) The argument has a certain air of unreality about it: it is far more likely that the evidence that the crime of conviction had a sexual aspect is what triggered the inquiry into the defendant's mental abnormality in the first place.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

In any event, as in all trials, the jurors will be properly instructed about the different issues they will be required to decide, the relevance or irrelevance of different pieces of evidence to each of those issues, and the need to follow any necessary limiting instructions, and it will be presumed that the jurors will follow those instructions.

Finally, as is the case with the Article 730 defendants, while the interest of the State in the Article 10 scheme as a whole is extremely strong, the State's interest in the reduced burden of proof is more attenuated. For all sexual offenders who engage in criminal activity after the effective date of the Act, the sexual nature of their offense will have to be proven beyond a reasonable doubt, because such offenders will not be eligible for extended detention or treatment under Article 10 unless they are convicted beyond a reasonable doubt either of an offense that is sexual in its nature, or of the new crime created by the Act and codified at NYPL § 130.91. This makes it difficult for defendants to argue either that the retroactive finding of sexual motivation is not a finding of the element of a criminal offense, or that requiring such a finding to be make beyond a reasonable doubt will cripple, or even hamper, accomplishment of the State's salutary purposes in enacting Article 10.

**\*25** Defendants argue that the State could constitutionally justify civil detention based on a finding by clear and convincing evidence, at the underlying criminal trial, that the individual committed the crime with a sexual motivation, and that the Legislature did not provide for such a lesser standard at the underlying criminal trial simply in order to avoid confusing the jury with multiple standards of proof.[FN30] That argument is unpersuasive.

> FN30. Counsel for defendants contended at oral argument that the State required a heightened standard of proof for the "sexual motivation element" at the underlying criminal trial not as a constitutional necessity, but as a matter of legislative

"genero[sity]." (*See* Tr. 40 ("I think what the legislature wanted to do was avoid confusing the juries or other triers of fact about what standard of proof they are supposed to employ. I mean, it was generous to those individuals who were charged after, but it makes sense in light of that.").)

First, the commission of the new crime—"sexually motivated felony"—also triggers a sentencing scheme, NYPL § 70.80, requiring certain mandatory minimum sentences that differ from the mandatory minimum sentences applicable to the commission of the underlying felonies without a sexual motivation.[FN31] It is thus not clear that New York could constitutionally reduce the burden of proving this element at the underlying criminal trial.[FN32]

> FN31. Pursuant to NYPL § 70.80(4)(a), a person who has committed a felony sex offense as criminalized by NYPL § 130.91 is subject to certain mandatory minimums to which they would not otherwise be subject. *See* NYPL §§ 70.80, 130.92(3). Whereas the standard mandatory minimum for those who have committed a class B through class E felony is one year, NYPL §§ 70.00(2), 70.00(3), for those who committed a class B felony with a sexual motivation, the minimum term of imprisonment is five years, NYPL § 70.80(4)(a)(i), for those who committed a class C felony with a sexual motivation, the minimum term of imprisonment is three and a half years and the maximum term of imprisonment is 15 years, NYPL § 70.80(4)(a)(ii), for those who committed a class D felony with a sexual motivation, the minimum term of imprisonment is two years, NYPL § 70.80(4)(a) (iii), and for those who committed a class E felony with a sexual motivation, the minimum term of imprisonment is one and a half years, NYPL § 70.80(4)(a)(iv). Even higher mandatory

minimums apply if the individual who committed the sexually motivated felony is a "predicate felony sex offender" as defined by NYPL § 70.80(c). *See* NYPL §§ 70.80(4), (5).

FN32. A heightened mandatory minimum sentence with no corresponding increase in the maximum sentence may not offend the Supreme Court's recent jurisprudence holding that subjecting a defendant to enhanced sentencing based on an additional offense element requires a jury finding of that element beyond a reasonable doubt. *See Harris v. United States,* 536 U.S. 545, 557 (2002) (finding that facts affecting mandatory minimums need not be proved beyond a reasonable doubt); *McMillan v. Pennsylvania,* 477 U.S. 79, 91 (1986) (same); *cf. Apprendi v. New Jersey,* 530 U.S. 466 (2000); *Blakely v. Washington,* 542 U.S. 296 (2004); *United States v. Booker,* 543 U.S. 220 (2005). It is not clear, however, that a majority of the Supreme Court continues to accept the validity of *Harris* and *McMillan. See, e.g., Harris,* 536 U.S. at 569 (Breyer, J., concurring in part and concurring in the judgment) ("I cannot easily distinguish *Apprendi* ... from this case in terms of logic."); *id.* at 572 (Thomas, J., joined by Stevens, Souter, and Ginsburg, JJ., dissenting) ( *"McMillan ...* conflicts with the Court's later decision in *Apprendi."* ). However, NYPL § 130.91 is nonetheless a different crime from the commission of the underlying felony without a sexual motivation, and a crime for which the consequences are potentially more severe for a portion of those convicted.

Second, the prospective statutory scheme makes even clearer that the function of the "sexual motivation" element is not to decide who is in need of extended treatment, but to define a category of

*convicted criminals* who are then eligible for *assessment* for such treatment. The function of the finding of sexual motivation is to define the kind of crime that the offender committed, not to determine whether he requires treatment. The clear and convincing standard of proof applies under Addington to factual assessments relating to the latter question, not the former. Thus, contrary to the State's argument, when the criminal jury under Article 10's prospective scheme is assessing the offender's motivation, it is not making an assessment of his need for extended treatment beyond expiration of his criminal sentence. That is a decision that will be made at a later date and by another jury—possibly many years later—based on a finding of mental abnormality and dangerousness as of that time. The Article 10 jury's finding about the nature of the offense is a retrospective, historical finding about the nature of the offender's conduct that triggers such an assessment, not an aspect of the assessment itself.

Finally, even accepting arguendo defendants' premise that the State could have provided prospectively for a trial finding of sexual motivation by clear and convincing evidence (for example, by foregoing any sentencing consequences other than eligibility for civil commitment under Article 10), the fact is that it did not. The issue in this case is not the constitutionality of hypothetical statutes that the Legislature might have passed affecting future sexual offenders. Rather, the inquiry under *Mathews v. Eldridge* is whether the procedural protections provided by the actual legislation with respect to past offenders are adequate, given a balancing of factors including the strength of the governmental interest in the existing scheme. Thus, regardless of the reasons why New York elected to require proof beyond a reasonable doubt of sexual motivation on a prospective basis, the fact that it did—and that it says it did so in order to simplify trial procedure by avoiding multiple standards of proof—undermines any claim that requiring proof beyond a reasonable doubt will interfere with the accomplishment of the statute's purposes. FN33

FN33. Alternatively, counsel argues that the reduced standard of proof was necessary because the gap in time between the crime committed with the alleged sexual motivation and the commitment hearing makes proving the "sexual motivation" element "quite a burden," and thus provides adequate justification for easing the State's burden of proof. (Tr. 40.) But the burden of defending oneself against such a charge also becomes more difficult with time. Thus, to the extent that the difficulty of accurately determining the offender's motivation retrospectively is a factor in the decision, that suggests an increased risk of error (a factor arguing for stronger procedural protections) as much as it suggests greater difficulty in accomplishing the State's purposes.

**\*26** The balancing standard of *Mathews v. Eldridge* necessarily involves the Court in weighing factors that the Legislature presumably considered in enacting the statute. Caution is therefore appropriate in evaluating the statutory scheme, and deference to the Legislature's conclusions is appropriate to the judicial role. Moreover, precedent is sparse and conflicting. The case of juvenile delinquency adjudications addressed in *Winship* appears to be the only case in which the Supreme Court has mandated proof beyond a reasonable doubt in proceedings denominated civil, and *Addington's* holding that those found to be dangerous and mentally ill by clear and convincing evidence may be civilly committed stands as a counter-example supporting the State's conclusion. The case of persons already found guilty beyond a reasonable doubt of a serious felony is less clearly analogous to *Winship*, moreover, than that of the mentally incompetent Article 730 defendants, who have never been found guilty of any crime and whose ability to defend themselves is by definition seriously impaired. Thus, while the prospective statutory scheme appears to demonstrate that the State could accomplish its goals with respect to past offenders even if a higher burden of proof were imposed, the other factors in the Eldridge balance do not point as strongly in favor of enhanced procedural protection.

Arguably, the case of offenders convicted of serious but non-sexual felonies gravitates closer to Addington. A state may civilly commit an individual based on clear and convincing evidence that he or she is mentally ill and dangerous. It therefore appears somewhat anomalous to hold that a state may not civilly commit or subject to an extended treatment regime an individual who has already been convicted of a serious crime based on clear and convincing evidence that he is mentally abnormal and dangerous, along with the additional finding that his previous crime was committed with a sexual motivation. Unquestionably, in the civil proceeding contemplated by Article 10, evidence that the respondent's past criminal acts were committed with a sexual motivation would be admissible in any event to prove the existence of a mental abnormality or a present danger to others such that an individual merits detention. Rather than subject all criminal defendants to screening for possible proceedings under Article 10, New York has chosen to limit eligibility for extended detention to those whose crimes involved a sexual motivation. It is hardly clear that, in the absence of explicit guidance to the contrary, this Court should prevent a state from focusing on those types of individuals who, in the State's judgment, most likely require commitment.

With respect to these defendants, therefore, the question of constitutionality is more closely balanced than with respect to the Article 730 defendants discussed above. On the current record, plaintiffs have not demonstrated a likelihood of success on the merits, and therefore their motion for a preliminary injunction will be denied. It is also not clear, however, on the face of the complaint, that Winship or Addington forecloses relief. A fuller record with respect to the types of cases that are subject to MHL § 10.07(c) may well affect the proper understanding of the Eldridge factors. At

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

this stage of the case, the parties are unable to address how many offenders are subject to § 10.07(c), the length of time typically separating a criminal conviction from proceedings under Article 10, or the nature of the evidence that may be available to retrospectively assess the motivations of offenders, among other factors that may bear on the balancing of the Eldridge factors. Whether retrospective re-characterization of a crime in a civil proceeding requires the same procedural protections as are required for classifying an incompetent defendant as a criminal is an issue sufficiently complicated, with sufficiently broad ramifications, that the Court cannot simply find the statute constitutional on a motion to dismiss based solely on the pleadings. Accordingly, defendants' motion to dismiss that portion of the complaint that refers to MHL § 10.07(c) will also be denied.[FN34]

> [FN34.](#) Plaintiffs' equal protection argument adds nothing to the analysis. Essentially, plaintiffs argue that it is irrational to distinguish the standard of proof applicable to prospective offenders from that applicable to past offenders. However, the two categories of offenders are distinct, and present distinct problems. Going forward, New York has decided that the proper way to address the problem of sexually-motivated felons is to create a new category of crime, something that the State plainly is constitutionally forbidden from doing retrospectively by the Ex Post Facto Clause of the Constitution. U.S. Const. art. 1, § 9. cl. 3. But New York does have an interest in addressing the potential present and future need for extended treatment or detention of individuals whose crimes were committed in the past. The choice to deal with future offenders primarily through the creation of a new criminal prohibition does not foreclose New York from dealing otherwise with past offenders who are presently mentally abnormal and dangerous. The question is whether the pro-

cedures adopted to deal with such past offenders are consistent with due process in their own right. Any difference between those procedures and the procedures put in place with respect to future offenders is thus a rational product of the different situations of past and future offenders, and not of any irrational bias against or greater hostility toward past as opposed to future sex offenders.

## F. MHL § 10.05(e)

**\*27** Article 10 provides for a right to legal counsel, with the appointment of counsel at state expense for those who cannot afford it, upon the Attorney General's initiation of a formal action against a respondent. MHL § 10.06(c). Therefore, a respondent is guaranteed state-funded counsel for all judicial hearings pursuant to the Act. Plaintiffs contend, however, that counsel is also required before the Attorney General files any formal action before a court, when an individual who is being investigated by a CRT is asked to submit to a psychiatric exam. This psychiatric exam may affect both the CRT's recommendation to the Attorney General and the Attorney General's case for confinement at the probable cause hearing and commitment trial.

Article 10 provides for three potential psychiatric examinations before the commitment trial. First, during the investigational stage, before institution of any judicial proceeding, the CRT may request that an offender submit to a psychiatric examination in connection with the CRT's investigation to determine "whether the respondent is a sex offender in need of civil management." MHL § 10.05(e). While the offender apparently may decline to participate in the interview, such a declination may be used against him. At the commitment trial, the jury "may hear evidence of the degree to which the respondent cooperated with the psychiatric examination" and, upon request and if it so finds, the court can "instruct the jury" that "respondent refused to submit to a psychiatric examination." MHL § 10.07(c). If the CRT finds that the respondent is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

such a sex offender, it must notify both the respondent and the Attorney General in writing. MHL § 10.05(g). This notification must include a written report from a psychiatric examiner that includes a finding as to whether the individual has a mental abnormality. *Id.* This determination necessarily occurs in advance of the filing of a civil management petition, and triggers the formal court process, including the probable cause hearing and the commitment hearing. MHL §§ 10.06(a); 10.06(g); 10.07(a). An individual is not entitled to counsel when asked by the CRT to submit to a psychiatric evaluation, MHL § 10.08(g), and the statute provides no notice to the respondent of the potential consequences of the examination.[FN35]

FN35. As was clarified at oral argument:

The Court: "Now, what kind of advice of rights, if any, does [a respondent asked to participate in a CRT-requested psychiatric examination] get ... When an individual gets told, we would like you to see Dr. So-and-so in connection with this process ... Then the doctor shows up. What is this person supposed to do? How is he supposed to make a decision as to do I go through [with] this, what does this mean, what are my rights? He is basically on his own to make that call?"

Counsel for Defendants: "I think he is pretty much on his own to make that call."

(Tr. 76–77.)

Second, upon receipt of the CRT report (but still before the filing of a sex offender civil management petition), the Attorney General may petition the court to order the respondent to submit to an evaluation by a psychiatric examiner. MHL § 10.06(d). If the court grants relief, the interview will be conducted by a psychiatric examiner of the Attorney General's choosing. *Id.* An individual is

entitled to counsel upon the Attorney General's filing of such a petition. MHL § 10.06(c).

Third, after the filing of a sex offender civil management petition but prior to the commitment trial, the individual against whom the petition was filed may ask the court to order that he be evaluated by a psychiatric examiner of his own choosing. MHL § 10.06(e). If so ordered, and if the respondent cannot afford to pay a psychiatric examiner, the court "shall appoint an examiner of the respondent's choice to be paid within the limits prescribed by law." *Id.* Following the examination, the examiner shall report his findings in writing to the respondent or his counsel, the Attorney General, and the court. *Id.* If unable to afford one, a respondent is entitled to counsel upon the filing of a civil management petition, MHL § 10.06(c), and therefore will have the assistance of counsel in petitioning the court for a respondent-requested psychiatric exam.

**\*28** The Second Circuit has suggested that involuntary commitment proceedings trigger a right to counsel. *Project Release,* 722 F.2d at 976. However, it has also declined to extend that guarantee to pre-hearing psychiatric interviews held pursuant to the civil commitment provisions of Article 9 of New York's Mental Hygiene Law. *Id.* ("[W]e [are not] prepared to require that legal counsel be guaranteed at pre-hearing psychiatric interviews" under Article 9.); cf. *Ughetto v. Acrish,* 518 N.Y.S.2d 398, 405 (1987) (holding that the New York legislature intended that "in the absence of any showing that counsel's presence would interfere with the psychiatric examination, counsel should be permitted to observe either directly or indirectly these [Article 9] prehearing psychiatric examinations"). In evaluating Article 9 of the Mental Hygiene Law, the Second Circuit found it constitutionally sufficient that commitment procedures specifically provided a right to counsel, at state expense, in all judicial proceedings. *Project Release,* 722 F.2d at 976. Article 10, like Article 9, provides a right to counsel, at state expense, in all judicial proceedings.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiffs contend that the interests implicated here are different from those at issue in Project Release. They note that the civil commitment as a mentally abnormal sex offender under Article 10 engenders greater stigma than a psychiatric commitment under Article 9. Furthermore, individuals are presumptively committed to a "secure treatment facility" under Article 10 in contrast to a non-secure hospital under Article 9. Also, Article 10 requires a court order for release of a detained individual, and does not permit release based solely on the clinical judgment of his treating doctors. Article 9 allows release based on the clinical judgment of the treating physicians without a court order. Plaintiffs argue that these greater intrusions on the detainees' liberty warrant greater protections against the erroneous deprivation. Plaintiffs also argue that not only is the CRT-prompted psychiatric interview functionally mandatory, but operates as a critical stage of the commitment hearing,[FN36] which, especially in view of the diminished capacity of many individuals subject to the provisions, merits the appointment of counsel. Plaintiffs do not contend that counsel should be permitted to intervene in the examination. Rather, they argue only that due process requires a passive observational role for counsel in the CRT psychiatric hearing only so as to ensure that the psychiatric report and testimony based on the interview is accurate. (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 4.)

FN36. *See, e.g.,* MHL § 10.08(g) (relevant written reports of psychiatric examiners are admissible in any hearing or trial pursuant to Article 10); MHL § 10.07(c) (jury may hear evidence of the "degree to which the respondent cooperated with the psychiatric examination" and if the respondent "refused to submit to a psychiatric examination").

Though there are differences between the two civil commitment provisions, it is unlikely that these differences are sufficiently significant to re-

quire a different constitutional mandate. First, and as a general proposition, the Second Circuit, like courts in other jurisdictions, has been reluctant to extend the right to counsel to psychiatric examinations. See, e.g., *Project Release,* 722 F.2d at 976; *Hollis v. Smith,* 571 F.2d 685, 692 (2d Cir.1978); *United States v. Baird,* 414 F.2d 700, 711 (2d Cir.1969); see also *Tippett v. Maryland,* 436 F.2d 1153, 1158 (4th Cir.1971); *United States ex rel. Wax v. Pate,* 409 F.2d 498 (7th Cir.1969); *United States v. Albright,* 388 F.2d 719, 726–27 (4th Cir.1968); *State v. Whitlaw,* 45 N.J. 3, 210 A.2d 763 (1965). Second, the specific statute at issue here provides that any one against whom a civil management petition has been filed has the option, with the assistance of appointed counsel if he cannot afford his own, to petition the Court for his own examiner, also paid for by the State, to examine the individual and potentially rebut any distortions or inaccuracies in the report or testimony of the CRT-prompted or Attorney General-petitioned psychiatric examiner. MHL § 10.06(e). Practically speaking, the most effective counter to an improperly-conducted psychiatric examination is not the presence of counsel, but a more professional examination by another psychiatrist. Based on both the statutory structure as well as the presence of cases from this Circuit suggesting otherwise, plaintiffs are unable to demonstrate a likelihood of success on the merits with respect to this constitutional claim. The chances of succeeding on this point appear slim, and therefore their motion for a preliminary injunction will be denied.

**\*29** It does not follow, however, that defendants' motion to dismiss must be granted. First, because plaintiffs seek relief different from that sought in *Project Release*[FN37] and because of the differences between the consequences of Article 9 and Article 10 proceedings set forth above, it cannot be said that Project Release absolutely forecloses the position advanced by plaintiffs. Second, the evaluation of plaintiffs' arguments requires a more detailed understanding of how the psychiatric examination provisions of Article 9 and Article 10

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

operate. Plaintiffs argue, for example, that these proceedings function as a critical stage in the proceeding, and the strength of such an argument depends on factual allegations whose accuracy cannot be assessed on a motion to dismiss .[FN38] Plaintiffs are entitled to develop their record, and it will be more appropriate to adjudicate the merits of this argument on summary judgment or at trial. Therefore, both plaintiffs' motion for preliminary injunctive relief and defendants' motion to dismiss the complaint will be denied.

FN37. Plaintiffs here seek only an observational role for counsel, and not a participatory role. (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 3 n. 2.) In *Project Release,* the plaintiffs contended that individuals had a statutory "right to have [someone] present as counsel at discussions between [themselves] and hospital staff." 722 F.2d at 969, citing *Project Release v. Prevost,* 551 F.Supp. 1298, 1303 n. 2 (S.D.N.Y.1982). The Second Circuit "found no error in this determination." 722 F.2d at 969. It is not clear from either the opinion of the district court or the Second Circuit the exact role that plaintiffs sought for the counsel at such discussions, though being present "as counsel" normally implies an active role. It is precisely because an active counsel may interfere in the course of a hospital discussion or psychiatric examination that courts are often reluctant to grant such a right to counsel. *See, e.g., Hollis,* 571 F.2d at 692 (" 'It is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is upon the cooperation of his patient, than the presence of a lawyer objecting to the psychiatrist's questions and advising his client not to answer this question and that.' "), quoting *Tippett,* 436 F.2d at 1158.

FN38. Plaintiff MHLS filed suit before the effective date of the Act, and "did not fully appreciate, until seeing SOMTA in operation, how critical the psychiatric exams under MHL 10.05(e) would prove" to the position of individuals subject to the Act. (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 2.) Plaintiffs claim that "[i]n practice, nearly all psychiatric exams so far conducted under Article 10 have been arranged by the case review team, rather than the attorney general, and accordingly, counsel has not been involved." (*Id.*) Upon the filing of an Article 10 petition, the psychiatric examiner who conducted the CRT evaluation "is ordinarily called as the State's primary or sole witness at the probable cause hearing" and that the State "may even enter the examiner's report without calling the examiner to testify." (*Id.*) Plaintiffs also note that in addition to the fact that the individuals being interviewed may be of impaired capacity, there exists an "emotional tension" inherent in a psychiatric interview that may determine the interviewee's eligibility for post-sentence civil commitment. They liken this to the context of criminal line-ups. (*Id.* at 3 n. 2, citing *United States v. Wade,* 388 U.S. 218, 230–31 (1967) (discussing how "emotional tension" may interfere with a suspect's ability to accurately observe and report on line-up procedures).)

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for a preliminary injunction is granted with respect to the challenged portion of MHL §§ 10.06(k) and 10.07(d), and denied in all other respects, and defendants' motion to dismiss is granted with respect to plaintiffs' challenge to MHL § 10.0(j)(iii), and denied in all other respects.

Plaintiffs are directed to submit a proposed form of order consistent with this opinion after consultation with defendants.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

SO ORDERED.

S.D.N.Y.,2007.
Mental Hygiene Legal Service v. Spitzer
Not Reported in F.Supp.2d, 2007 WL 4115936
(S.D.N.Y.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2009 WL 579445 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2009 WL 579445 (C.A.2 (N.Y.)))**

H

Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,
Second Circuit.
MENTAL HYGIENE LEGAL SERVICES,
Plaintiff-Appellee,
v.
David A. PATERSON FN*, and Rew Cuomo, Diane Jones Ritter, and Brian Fischer, Defendants-Appellants.

> FN* Pursuant to Federal Rule of Appellate Procedure 43(c)((2), Governor David A. Paterson is automatically substituted for former Governor Eliot Spitzer as an appellant in this case.

No. 07-5548-cv.
March 4, 2009.

Appeal from the United States District Court for the Southern District of New York (Gerard E. Lynch, Judge).
Cecelia C. Chang (Barbara D. Underwood and Benjamin N. Gutman, on the brief), for Andrew M. Cuomo, New York, N.Y.

Sadie Zea Ishee (Dennis B. Feld, on the brief), for Mental Hygiene Legal Services, New York, N.Y.

Present REENA RAGGI, RALPH K. WINTER, PETER W. HALL, Circuit Judges.

**SUMMARY ORDER**
**\*1** UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the order of the district court, entered on December 19, 2007, is AFFIRMED.

Defendants-appellants David A. Paterson, An-

drew Cuomo, Diane Jones Ritter, and Brian Fischer appeal from an order of the United States District Court for the Southern District of New York (Lynch, *J.*), granting in part and denying in part plaintiff-appellee Mental Hygiene Legal Services's motion for a preliminary injunction. Plaintiff had filed a declaratory judgment action attacking the constitutionality of six procedural provisions of Article 10 of the New York Mental Hygiene Law (MHL), which establishes a regulatory regime for "Sex Offenders Requiring Civil Commitment or Supervision," and subsequently moved for preliminary injunctive relief. The district court granted the motion with respect to sections 10.06(k) and 10.07(d). It determined that plaintiff demonstrated a likelihood of success in challenging § 10.06(k), concluding that the provision permitted the pre-trial detention of a "sex offender requiring civil management" without an individualized finding that the person is sufficiently dangerous to warrant confinement and that lesser conditions of supervision will not suffice to protect the public. The court also enjoined defendants from committing, pursuant to section 10.07(d), any person charged with, but never convicted of, a sex offense because of his or her mental incapacity to stand trial, unless a court or jury has found that the person did commit the conduct constituting the sex offense beyond a reasonable doubt. The district court denied plaintiff's motion with respect to the four other challenged portions of Article 10.

District courts may grant preliminary injunctions when the moving party demonstrates (1) irreparable injury absent injunctive relief, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships decidedly tipped in the movant's favor. *Lusk v. Village of Cold Spring,* 475 F.3d 480, 485 (2d Cir.2007). However, when "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Beal v. Stern,* 184 F.3d 117, 122 (2d Cir.1999) (internal quotation marks omitted). A district court has wide discretion in determining whether to grant a preliminary injunction, and this Court reviews the district court's determination only for abuse of that discretion. *Green Party of N .Y. State v. N.Y. State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir .2004). Such abuse occurs when the court applies an incorrect legal standard or makes clearly erroneous factual findings. *See Prayze FM v. F.C.C.,* 214 F.3d 245, 249 (2d Cir.2000). We identify neither error in this case.

**\*2** We agree with the district court that plaintiff has shown irreparable injury and, at least, a likelihood of prevailing on its constitutional claims with respect to sections 10.06(k) and 10.07(d). Our conclusion, like any ruling on a preliminary injunction, does not preclude a different resolution of plaintiff's facial challenge on a more fully developed record. *See id.* at 253 (declining to decide facial challenge on appeal of grant of preliminary injunction).

The district court's order is accordingly AFFIRMED.

C.A.2 (N.Y.),2009.
Mental Hygiene Legal Services v. Paterson
Slip Copy, 2009 WL 579445 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2008 WL 5062601 (S.D.N.Y.)
**(Cite as: 2008 WL 5062601 (S.D.N.Y.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Ruben VELEZ, Plaintiff,
v.
Sean P. FOGARTY and John Doe, Defendants.

No. 06 Civ. 13186(LAK)(HBP).
Nov. 20, 2008.

West KeySummary**Limitation of Actions 241**
**124**

241 Limitation of Actions
  241II Computation of Period of Limitation
    241II(H) Commencement of Proceeding; Relation Back
      241k124 k. Intervention or Bringing in New Parties. Most Cited Cases

An arrestee's claim of excessive force could not be related back to impute notice on a police officer who was not named before the statute of limitations had run. The unnamed defendants were not represented by corporation counsel during the limitations period, and the officer had no reason to be informed of the action. The arrestee had the wrong date of his arrest and the arresting officer could not have been identified through his vague descriptions. Further, even had the date been correct, the arrest records were sealed. and the officers' identities could not have been discovered. Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A.

*OPINION AND ORDER*
PITMAN, United States Magistrate Judge.
I. *Introduction*

**\*1** Plaintiff Ruben Velez moves pursuant to Rule 15 of the Federal Rules of Civil Procedure for leave to file a second amended complaint substituting Officer Kevin McCarthy for defendant "John Doe Officer." Defendants oppose the motion on the ground that the amendment would be futile because any claims against McCarthy would be barred by the statute of limitations. Plaintiff contends that the proposed amendment relates back to the date of his original complaint under Fed.R.Civ.P. 15(c) and is not, therefore, time-barred. For the reasons set forth below, plaintiff's motion is denied.

II. *Facts*

Plaintiff, Ruben Velez, commenced this Section 1983 action *pro se* on November 14, 2006, alleging excessive force in connection with his arrest. Plaintiff's original complaint named as defendants two John Doe officers "of the 46 percent [*sic* ] who worked on July 12, 2004 from 1am to 3am" (Plaintiff's Complaint, dated November 14, 2006 ("Compl.") at 2, 3). In his original complaint, plaintiff alleges that he was "assaulted from behind with a gun, then chased down and beaten with a billy club in the head. As [I was] being handcuffed I was given lashes on my back" (Compl. at 3). Plaintiff claims that as a result of this attack, he suffered three separate cuts which required a total of eighteen staples (Compl. at 3, 5). Finally, in his complaint, plaintiff states that he filed a grievance regarding his claim that he was "assaulted and [then] charged with assault" and identifies an individual named Jose as another person involved in the incident (Compl. at 4).

On January 3, 2007, plaintiff wrote a letter to the Honorable Lewis A. Kaplan, United States District Judge, explaining that he was having difficulty determining the names of the John Doe defendants and requesting the Court's assistance (Letter of Ruben Velez to Judge Kaplan, dated January 3, 2007, attached as Ex. C to the Declaration of Scott Smedley, Esq., dated June 16, 2008 ("Smedley Decl.")). On January 30, 2007, Judge Kaplan issued an Order instructing the plaintiff to serve interrogatories on the Office of Corporation Counsel of the City of New York ("Corporation Counsel") and directing the Corporation Counsel to answer plaintiff's interrogatories "for the purpose of ascertaining the identities and addresses of the John Does" (Docket

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5062601 (S.D.N.Y.)
**(Cite as: 2008 WL 5062601 (S.D.N.Y.))**

Item 4 at 1). The Order also instructed plaintiff that "[o]nce informed of the defendants' identities and addresses, plaintiff must file an amended complaint identifying his John Does by their proper names .... Plaintiff's failure to file an amended complaint within sixty (60) days of receiving the identifying information from the Office of Corporation Counsel may result in the dismissal of his complaint" (Docket Item 4 at 2).

Pursuant to this Order, plaintiff drafted a set of interrogatories, dated February 7, 2007, which requested that Corporation Counsel identify the defendants, their shield numbers and addresses (Plaintiff's Interrogatories to Discover Identities and Addresses of Defendants, dated February 7, 2007 (February 7, 2007 Interrogatories)"), attached as Ex. E to the Smedley Decl.). Plaintiff's February 7, 2007 Interrogatories described these officers as:

**\*2** [t]wo male Caucasian officers, [o]ne about 5'5-5'8, 200-220 pounds with light hair. The other officer is about 5'8-5'10, 160-200 pounds with plain clothes. Who were on duty or otherwise present on July 12, 2004 from 1:00am til 3:00am. From the 46 percent [*sic* ] in the Bronx.

On May 10, 2007, Corporation Counsel responded to these interrogatories in a letter to the Court, which stated that counsel's investigation had been unsuccessful and requested that plaintiff "provide additional information, such as birthmarks, eye color, or badge number" to assist in identifying the officers (Letter of Rachel A. Seligman, Esq., dated May 10, 2007, ("Seligman Letter") attached as Ex. F to the Smedley Decl.). The Seligman Letter also stated that part of the difficulty in identifying the officers was due to the fact that "based on our initial investigation, it appears plaintiff was not arrested on July 12, 2004 as he maintains in his interrogatories." FN1 (Seligman Letter at 1).

FN1. Plaintiff stated in his Complaint and in his interrogatories that he had been arrested on July 12, 2004, when in fact he had been arrested on July 14, 2004.

On May 15, 2007, in response to this letter, plaintiff served a second set of interrogatories on Corporation Counsel requesting the identities and addresses of the defendant officers (Plaintiff's Interrogatories to Discover Identities and Addresses of Defendants, dated May 15, 2007 ("May 15, 2007 Interrogatories"), attached as Ex. G to the Smedley Decl.). The May 15, 2007 Interrogatories were identical in all respects to the February 7, 2007 Interrogatories. Plaintiff also served a Freedom of Information Act ("FOIA") Request on the Office of Corporation Counsel, dated May 10, 2007, seeking:

all records, documents, notations, indications, representations, materials and information pertaining to (N.Y.SID # 1747478R) assault on a police officer which occurred on **July 12, 2004** and ended September 28, 2006.

(FOIA Request of Ruben Velez, dated May 10, 2007, attached as Ex. H to the Smedley Decl. (emphasis added)). Corporation Counsel failed to respond to both the May 15, 2007 Interrogatories and the May 10, 2007 FOIA request (Plf's Mem. at 2).

On September 12, 2007, the Honorable Judge Lewis A. Kaplan appointed counsel to represent plaintiff in this action (Docket Items 5, 6, 9, 10). On November 12, 2007, after the applicable three-year statute of limitations had run on the July 14, 2004 incident, plaintiff's counsel served a third set of interrogatories, requesting that Corporation Counsel:

Identify the two officers employed by the New York City Police Department who arrested the plaintiff in the above-captioned case on or about July 11-15, 2004 in New York City, Borough of the Bronx, and any other officer present at the arrest.

(Plaintiff's First Set of Interrogatories Directed to the Office of the Corporation Counsel of the City of New York, dated November 12, 2007, ("November 12, 2007 Interrogatories"), attached as

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Ex. I to the Smedley Decl.). On November 27, 2001, Corporation Counsel's Office responded that it was still unable to locate any information relating to the arrest of plaintiff in the Bronx on or about July 11-15, 2004 and requested that plaintiff execute a release providing access to sealed records pursuant to N.Y.Crim. Proc. L. 160.50(1)(d) (Letter of Jessica T. Cohen, Esq., dated November 27, 2001, attached as Ex. I to the Smedley Decl.). On December 17, 2007, after receiving the release from plaintiff, Corporation Counsel identified Officer Sean Fogarty as one of the arresting officers. Plaintiff filed an Amended Complaint on January 14, 2008 substituting Fogarty for defendant John Doe # 1. Following the filing of Fogarty's Answer on February 6, 2008, an initial pre-trial conference was held in this matter on April 16, 2008. At the conference, Corporation Counsel identified McCarthy [FN2] as another "individual likely to have discoverable information that defendant may use to support his claims or defenses" pursuant to Fed.R.Civ.P. 26(a)(1).

> FN2. McCarthy was Fogarty's partner and allegedly was present at plaintiff's arrest on July 14, 2004 (Plf.'s Mem. at 3-4).

### III. *Analysis*

**\*3** Plaintiff now seeks to amend his Complaint to substitute McCarthy for defendant John Doe # 2. Fogarty argues that plaintiff's motion to amend the complaint would be futile because any claims against McCarthy are barred by the three-year statute of limitations period (Def's Mem. at 6). Plaintiff claims that the motion to amend is not barred by the statute of limitations because it relates back to the date of the original Complaint (Plf. Mem. at 4).

### A. *Applicable Standard*

The standards applicable to a motion to amend a pleading are well settled and require only brief review. Leave to amend a pleading should be freely granted when justice so requires. Fed.R.Civ.P. 15(a); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Dluhos v. The Floating & Abandoned Vessel, Known as "New York",* 162 F.3d 63, 69 (2d Cir.1998); *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir.1984) (a *pro se* litigant in particular "should be afforded every reasonable opportunity to demonstrate that he has a valid claim"); *Gumer v. Shearson, Hamill & Co.,* 516 F.2d 283, 287 (2d Cir.1974). "Nonetheless, the Court may deny leave if the amendment (1) has been delayed unduly, (2) is sought for dilatory purposes or is made in bad faith, (3) the opposing party would be prejudiced, or (4) would be futile." *Lee v. Regal Cruises, Ltd.,* 916 F.Supp. 300, 303 (S.D.N.Y.1996), *aff'd,* 116 F.3d 465 (2d Cir.1997); *accord American Home Assur. Co. v. Jacky Maeder (Hong Kong) Ltd.,* 969 F.Supp. 184, 187-88 (S.D.N.Y.1997).

A proposed amended complaint is futile when it fails to state a claim. *Health-Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990); *Mina Inv. Holdings Ltd. v. Lefkowitz,* 184 F.R.D. 245, 257 (S.D.N.Y.1999); *Parker v. Sony Pictures Entm't, Inc.,* 19 F.Supp.2d 141, 156 (S.D.N.Y.1998), *aff'd in pertinent part, vacated in part on other grounds sub nom., Parker v. Columbia Pictures Indus. .,* 204 F.3d 326 (2d Cir.2000); *Yaba v. Cadwalader, Wickersham & Taft,* 931 F.Supp. 271, 274 (S.D.N.Y.1996); *Prudential Ins. Co. v. BMC Indus., Inc.,* 655 F.Supp. 710, 711 (S.D.N.Y.1987); *see generally Dluhos v. Floating & Abandoned Vessel known as "New York", supra,* 162 F.3d at 69-70. While the burden of proving that a proposed amendment will relate back is on the party seeking leave to amend the pleading [FN3], the party opposing the amendment has the burden of demonstrating that leave to amend would be futile. *Staskowski v. County of Nassau,* 05-CV-5984 (SJF)(WDW), 2007 WL 4198341 at \*4 (E.D.N.Y. Nov. 21, 2007) ("It is axiomatic that the party opposing an amendment has the burden of establishing that leave to amend would be futile."); *Lugosch v. Congel,* 00-CV-784, 2002 WL 1001003 at \*1 (N.D.N.Y. May 14, 2002); *citing Blaskiewicz v. County of Suffolk,* 29 F.Supp.2d 134, 137-38 (E.D.N.Y.1998), *citing Harrison v. N.B.D. Inc.,* 990 F.Supp. 179, 185 (E.D.N.Y.1998)).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN3. *VKK Corp. v. Nat'l Football League,* 187 F.R.D. 498, 500 (S.D.N.Y.1999) *aff'd,* 244 F.3d 114, 128 (2d Cir.2001) ("the plaintiff has the burden of demonstrating that the newly named defendant knew or should have known that the failure to name it in the original complaint resulted from a mistake"); *In re Enron Corp.,* 298 B.R. 513, 522 (Bankr.S.D.N.Y.2003).

Leave to amend may be denied on the ground of futility "where the claim or defense proposed to be added has 'no colorable merit' ". *Oliver v. De-marinis & Co.,* 90 Civ. 7950(SS), 1993 WL 33421 at *5 (S.D.N.Y. Jan. 29, 1993) (citation omitted); *see also Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 783 (2d Cir.1984) ("if the movant has colorable grounds to support its claim or defense, justice requires that leave to amend be granted"). The "colorable grounds requirement mandates that a district court may not deny a motion for leave to amend a pleading when said pleading is sufficient to withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Children First Foundation Inc. v. Martinez,* 04-CV-0927 (NPM), 2007 WL 4618524 at *5 (N.D.N.Y. Dec. 27, 2007); *citing Kassner v. 2nd Avenue Delicatessen, Inc.,* 496 F.3d 229, 244 (2d Cir.2007); *Estate of Ratcliffe v. Pradera Realty Co.,* 05 Civ. 10272(JFK), 2007 WL 3084977 at *4 (S.D.N.Y. Oct. 19, 2007). "The proposed Amended Complaint may therefore be scrutinized as if defendant's objections to the amendments constituted a motion to dismiss under Fed.R.Civ.P 12(b)(6)." *Journal Publ'g Co. v. American Home Assur. Co.,* 771 F.Supp. 632, 635 (S.D.N.Y.1991); *Prudential Ins. Co. v. BMC Indus., Inc., supra,* 655 F.Supp. at 711 (Although leave to amend be freely given, "it is inappropriate to grant leave when the amendment would not survive a motion to dismiss.")

*4 Therefore, an amendment may be denied as futile if defendant can show that there are no "set of facts consistent with the allegations in the com-

plaint" which would entitle plaintiff to relief. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 540, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007). To survive a motion to dismiss plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly, supra,* 550 U.S. 544, 127 S.Ct. 1955, 1959, 167 L.Ed.2d 929 (overruling the language of *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) that a motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"); *see also Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 252 (2d Cir.1991) (discussing the standard for denying an amendment as futile prior to *Bell Atlantic* ); *Blaskiewicz v. County of Suffolk, supra,* 29 F. Supp .2d at 138 (same).

The Second Circuit has interpreted *Bell Atlantic Corp. v. Twombly* as "requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible." Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (emphasis in original); *accord Boykin v. KeyCorp,* 521 F.3d 202, 213 (2d Cir.2008); *see also Wellnx Life Scis. Inc. v. Iovate Health Scis. Research, Inc.,* 516 F.Supp.2d 270, 283 (S.D.N.Y.2007); *Mazzaro de Abreu v. Bank of Am. Corp.,* 06 Civ. 673(LMM), 2007 WL 2609535 at *3 n. 10 (S.D.N.Y. Sept. 10, 2007).

The Court of Appeals has repeatedly noted that the Trial Court has "broad" discretion in ruling on a motion to amend. *Local 802, Associated Musicians v. Parker Meridien Hotel,* 145 F.3d 85, 89 (2d Cir.1998); *Krumme v. Westpoint Stvens Inc.,* 143 F.3d 71, 88 (2d Cir.1998); *see generally Grace v. Rosen-stock,* 228 F.3d 40, 53-54 (2d Cir.2000). "Although Rule 21, and not Rule 15(a) normally governs the addition of new parties to an action, the same standard of liberality applies under either rule." *Clarke v. Fonix Corp.,* 98 Civ. 6116(RPR),

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

1999 WL 105031 at *6 (S.D.N.Y. March 1, 1999) (internal quotation omitted), *aff'd,* 199 F.3d 1321 (2d Cir.1999); *see also Banco Central Del Paraguay v. Paraguay Humanitarian Found., Inc.,* 01 Civ. 9645(JFK)(FM), 2003 WL 21543543 at *2 (S.D.N.Y. July 8, 2003) (standard for adding parties under Rule 21 is the same as that under 15(a) for other amendments).

B. *Relation Back*

There is no federal statute of limitations for a section 1983 claim and, consequently, the "statute of limitations for a section 1983 claim is generally the applicable state-law period for personal injury torts." *City of Rancho Palos Verdes, Cal. v. Abrams,* 544 U.S. 113, 123 n. 5, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005); *citing Wilson v. Garcia,* 471 U.S. 261, 275, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *see also Owens v. Okure,* 488 U.S. 235, 240-241, 249-51, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). In this District, the statute of limitations applicable to actions brought under Section 1983 is three years. *Soto v. Brooklyn Correctional Facility,* 80 F.3d 34, 35 (2d Cir.1996); *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995). The pending motion was filed more than three years after July 14, 2004, the date of the alleged assault, and therefore, plaintiff's claims against McCarthy can be timely only if the proposed amendment relates back to the date on which the original complaint was filed. *See VKK Corp. v. Nat'l Football League,* 244 F.3d 114, 128 (2d Cir.2001) ("If a complaint is amended to include an additional defendant after the statute of limitations has run, the amended complaint is not time barred if it relates back to a timely filed complaint.").

**\*5** Under Fed.R.Civ.P. 15(c)(1)(C), an amendment which adds a new defendant relates back to the original pleading if

the claims against the new party arise out of the same conduct or occurrence set forth in the original pleading and if within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for the mistake concerning the proper party's identity.

Fed.R.Civ.P. 15(c)(1)(C); *Vasquez v. Mill,* 03 Civ. 3905(RJH), 2006 WL 2789914 at *4 (S.D.N.Y. Sept. 25, 2006).[FN4] There is no dispute here that the claims plaintiff seeks to assert against McCarthy arose out of the same occurrence set forth in the original complaint. Therefore, in order for plaintiff's amendment to relate back to the date of the original complaint (1) McCarthy must have received notice of this action during the 120 day period provided for by Rule 4(m) such that he will not be prejudiced and (2) McCarthy must have known or should have known that he would be named as a defendant in this action if not for a mistake concerning his identity.

FN4. Fed.R.Civ.P. 15(c)(1)(A) also permits an amendment to a pleading to relate back to the date of the original pleading when "the law that provides the applicable statute of limitations allows relation back." Thus, if, the proposed amendment relates back under New York state law, it would not be futile. Neither party addresses the possibility of relation back under state law, and, therefore, I do not consider it.

1. *Notice*

As the Supreme Court succinctly put it "[t]he linchpin [of Rule 15(c) ] is notice, and notice within the limitations period." *Schiavone v. Fortune,* 477 U.S. 21, 31, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986). In order for plaintiff's amended complaint to relate back to the date of the original complaint, Rule 15(c) requires that plaintiff demonstrate that McCarthy received notice of the lawsuit "within the period provided by Rule 4(m)" so that he will not be prejudiced in defending this action on the merits. Fed.R.Civ.P. 15(c)(1)(C)(i). The Advisory Commit-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tee Notes indicate that Fed.R.Civ.P. 15 allows a name correcting amendment within the 120 days specified in Rule 4(m) plus "any additional time resulting from any extension ordered by the court pursuant to that rule." 1991 Advisory Committee Notes to Fed.R.Civ.P. 15; *see, e.g., Aslanidis v. U.S. Lines, Inc.,* 7 F.3d 1067, 1076 (2d Cir.1993); *Vasquez v. Mill, supra,* 2006 WL 2789914 at *5. FN5

> FN5. The vast majority of cases interpret Fed.R.Civ.P. 15(c) as reguiring that the party to be brought into the case receive notice of the action within 120 days of the filing of the complaint. Some courts, however, have found that " Rule 15(c) provides that notice can be given within the limitations period, or within 120 days of the timely filing of the complaint, whichever is later." *Jermosen v. Coughlin,* 89 Civ. 1866(RJW), 1992 WL 131786 at *7 n. 9 (S.D.N.Y. June 3, 1992); *Reeder v. Svbron Transition Corp.,* 142 F.R.D. 607, 610 (M.D.Pa.1992) (same); *see also Yanez v. Columbia Coastal Transp. Inc., supra,* 68 F.Supp.2d 489, 493 (D.N.J.1999) (outlining the different approaches to Rule 15(c)' s notice requirement). Under the facts alleged in this case, the difference is immaterial because McCarthy did not receive notice within either period.

In this case, the Complaint was filed on November 14, 2006. Accordingly, Rule 15(c) required that McCarthy receive notice of this action before March 14, 2007. There is no evidence that McCarthy received personal notice of this action before March 14, 2007, as he had not yet been identified by plaintiff by that date. Plaintiff, however, argues that Corporation Counsel was put on notice of this action when he was served with plaintiff's first set of interrogatories and that notice can be imputed to McCarthy through notice to Corporation Counsel (Plf. Mem. at 6).FN6

> FN6. Plaintiff claims that Corporation

Counsel received his first set of interrogatories on or about February 7, 2007 (Plf. Mem. at 5-6), whereas Corporation Counsel contends that he did not receive these interrogatories until April 10, 2007 (Seligman Letter at 1). Drawing all inferences in favor of plaintiff, as I must on a motion to deny an amendment as futile, I assume that Corporation Counsel received plaintiff's first set of interrogatories on the earlier date and within the 120-day period required by Rule 4(m). *See Journal Publ'g Co. v. American Home Assur. Co., supra,* 771 F.Supp. at 635; *see also Grant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995).

"The court can impute knowledge of a lawsuit to a new defendant government official through his attorney, when the attorney also represented the official(s) originally sued so long as there is some showing that the attorney knew that the additional defendants would be added to the existing suit." *Velez v. Koehler,* 87 Civ.2019(KMW), 1991 WL 130913 at *2 (S.D.N.Y. July 18, 1991), *vacated on other grounds,* 138 F.3d 474 (2d Cir.1998), *citing, Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989). The constructive notice doctrine is based on the theory that the newly added defendant is not prejudiced by the lack of notice if his attorney has already begun preparing a defense for the named defendant during the limitations period. *See Ramos v. City of Philadelphia,* Civ.A. 01-5072, 2002 WL 32348790 at *4 (E.D.Pa. Sept.13, 2002) (The "concept of constructive notice is apparently based on the theory that if counsel is on notice to prepare a defense for additional defendants, then such defendants are not prejudiced by being named at a later date"), *citing Felix v. New York City Police Dept.,* 811 F.Supp.2d 124, 128 (S.D.N.Y. Nov. 12, 1992).

**\*6** Therefore, in the majority of cases in this Circuit applying the constructive notice doctrine, the attorneys have clear knowledge of the identity

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

of the unidentified defendant, within the limitations period, such that it would be logical to assume that a reasonable attorney would either (1) inform his client of the prospective lawsuit or (2) takes steps to begin preparing a defense. *Abdell v. City of New York,* 05 Civ. 8453(KMK) (MJCF), 2006 WL 2620927 at *4 (S.D.N.Y. Sept. 12, 2006) (Corporation counsel had notice of the unnamed defendant's identity because it was representing the unnamed defendant on related state claims of false imprisonment stemming from the same incident); *Mosley v. Jablonsky,* 209 F.R.D. 48, 53 (E.D.N.Y.2002) (complaint technically only named the city and the supervising officer as defendants but the body of the complaint identified the unnamed officers accused of mistreating plaintiff and, therefore, corporation counsel knew or should have known that these officers would be added as defendants); *Almeda v. City of New York,* 00-CV-1407, 2001 WL 868286 at *3 (E.D.N.Y. July 26, 2001) (despite naming only the City, along with "John Doe" and "Ronald Roe" as defendants, the complaint emphasized the role of Sergeant Robert Barnes as plaintiff's "chief assailant" and therefore counsel had notice); *Johnson v. Abate,* 93 CV 1134(JG), 1999 WL 1215560 at *3-4 (E.D.N.Y. Dec. 2, 1999) (allowing an amendment to substitute Christina Washington-Koger for Ms. Jane Doe Washington because (1) defense counsel sent plaintiff discovery materials that included a report listing Corrections Officer Christina Washington-Koger as a witness to the attack and (2) the name "Jane Doe Washington" sufficiently identified Officer "Washington-Koger" that defense counsel knew or should have known that plaintiff would later seek to name Officer Koger as a defendant); *Campbell v. Coughlin,* 88 Civ. 0697(MJL), 1994 WL 114831 at *2 (S.D.N.Y. March 31, 1994); *Dupree v. Walters,* 116 F.R.D. 31, 34 (S.D.N.Y.1987); *Morrison v. Lefevre,* 592 F.Supp. 1052, 1057 (S.D.N.Y.1984); *Davis v. Krauss,* 93 F.R.D. 580 (E.D.N.Y.1982); *but see Samuels v. Dalsheim,* 81 Civ. 7050(PKL), 1995 WL 1081308 at *14 (S.D.N.Y. Aug. 22, 1995) ("It is sufficient for the purpose of constructive notice that ... counsel knew or should have known that a particular category of defendants would be added to the action, without necessarily knowing the actual identity of each defendant to be added."), *citing Hodge v. Ruperto,* 739 F.Supp. 873, 881 (S.D.N.Y.1990); *Velez v. Koehler, supra,* 1991 WL 130913 at *2-*3 (plaintiff's complaint which named two officers and one John Doe officer was sufficient to put corporation counsel on notice that plaintiff intended to sue Officer O'Brien, even though corporation counsel had never spoken with Officer O'Brien).

The constructive knowledge doctrine does not appear to apply here because (1) Corporation Counsel was not representing either defendant, at any time during the limitations period and (2) had no notice of the defendants' identities during the limitations period. There was no defense attorney in this case at any point during the limitations period; Fogarty was not named in this action until January 14, 2008, six months after the statute of limitations had run. Consequently, Corporation Counsel could not have begun preparing a defense for either defendant during the limitations period and had no reason to inform McCarthy of this action. *See Garvin v. City of Philadelphia,* 354 F.3d 215, 223 (3d Cir.2003) (In the Third Circuit, the central inquiry is whether "the attorney's relationship with the newly named defendant gives rise to the inference that the attorney, within the 120 day period, had some communication or relationship with and thus gave notice of the action to, the newly named defendant.").

**\*7** Corporation Counsel not only did not represent either defendant during the limitations period but also lacked notice of the identities of the defendants during the 120 day period required for relation back under Rule 15(c) and during the limitations period. The only communication with Corporation Counsel during the 120 day period were the February 7, 2007 Interrogatories which only generally identified the officers as two Caucasian officers, "one about 5'5-5'8, 200-220 pounds with light hair. The other officer is about 5'8-5'10, 160-200 pounds with plain clothes." (February 7,

Not Reported in F.Supp.2d, 2008 WL 5062601 (S.D.N.Y.)
**(Cite as: 2008 WL 5062601 (S.D.N.Y.))**

2007 Interrogatories); *See Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989) (finding lack of notice where "there is no indication that counsel knew or should have known that the defendants in each group would be named as co-defendants in the other action"). The key piece of identifying information, the date of plaintiff's arrest, was incorrect and, as a result, Corporation Counsel was unable to locate any records relating to the alleged incident (Seligman Letter at 1, 2). Unfortunately, it was not readily apparent from the face of the interrogatories whether the date cited by plaintiff for his arrest was incorrect by a matter of days, months, or years. Indeed, even if Corporation Counsel obtained and read the complaint during the 120 day period, the vague description of the incident contained in the complaint [FN7] would not have facilitated counsel's efforts to identify which of plaintiff's arrests [FN8] generated this claim.

> [FN7]. The complaint stated that the incident occurred "on the streets of the Bronx" on July 12, 2004 [the incorrect date] and involved an assault by two police officers who chased plaintiff down and beat him in the head with a billy club and then handcuffed him (Compl. at 3). Indeed, it is not readily apparent from the complaint that the alleged assault even occurred in connection with plaintiff's arrest. The only clue, in this regard, is plaintiff's response "[m]e being assaulted and charged with assault." to the question "which claim(s) in the complaint did you grieve?" (Compl. at 4).

> [FN8]. Plaintiff was incarcerated on other charges at the time that he sent Corporation Counsel the February 7, 2007 Interrogatories (Pet. Mem. at 1, 2).

Finally, even if plaintiff had identified the correct date, Corporation Counsel would not have been able to access the records of plaintiff's arrest because these records had been sealed pursuant to N.Y. Crim. Proc. L. § 160.50(1)(c) [FN9]. Therefore,

Corporation Counsel had no notice of McCarthy's identity during the 120-day period required by Rule 15(c) or during the limitations period and no means of determining his identity.

> [FN9]. N.Y.Crim. Proc. L. § 160.50(1) provides that
>
>> Upon the termination of a criminal action or proceeding against a person in favor of such person ...
>>
>> (c) all official records and papers ... relating to the arrest or prosecution, including all duplicates and copies thereof, on file with the division of criminal justice services, any court, police agency, or prosecutor's office shall be sealed and not made available to any person or public or private agency.

Plaintiff cites *Green v. New York City Dep't of Corrections,* 93 Civ. 3360(SAS), 1997 WL 96548 at *3 (S.D.N.Y. March 5, 1997) in support of his argument that Corporation Counsel need not know the identity of the individual defendant to be added because Corporation Counsel "has already appeared in this action and engaged in defending Fogarty on substantially identical claims" (Plf. Mem. at 6). In *Green,* however, Corporation Counsel was already representing the other named defendants during the limitations period. In this case, Corporation Counsel did not begin representing any defendant until after the limitations period had expired. In addition, the Court in *Green* found that Corporation Counsel should have known which particular officers were involved in the assault because they had all filed "Use of Force Reports" on the dates of the incidents identified in the complaint. The Court explained that "[u]nder *Gleason,* the defendants' attorney must have a reasonable basis to know which correction officers will be added as defendants in order for plaintiff's amended complaint to relate back under the doctrine of constructive notice." 1997 WL 96548 at *3. In this case, by contrast, Corporation Counsel had no basis upon which to distinguish the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

John Doe officers named in the complaint from all of the other officers on duty in the 46 precinct.

**\*8** Notice of this action cannot be imputed to McCarthy, who was not named until almost a full year after the 120-day period had run, and as a result, the requirements of Rule 15(c) for relation back have not been met. Plaintiff's amendment, therefore, is untimely and must be denied as futile.

### 2. Mistake

The parties devote most of their respective briefs to the issue of whether plaintiff's failure to name McCarthy within the limitations period was due to a "mistake" concerning his identity as required by Rule 15(c). Defendant argues that plaintiff's inability to name McCarthy in a timely manner was due to a lack of knowledge, not a mistake within the meaning of Rule 15(c). Plaintiff argues that he has satisfied the "mistake" requirement of Fed.R.Civ.P. 15(c) because he engaged in diligent efforts to obtain the identity of the John Doe officer but was frustrated in those efforts due to a mistake regarding the date of his arrest (Plf. Mem. at 7; Plf. Reply. Mem. at 3).

As the Second Circuit explained in *Barrow v. Weathers-field Police Dep't,* 66 F.3d 466 (2d Cir.1995), *modified,* 74 F.3d 1366 (2d Cir.1996) the definition of "mistake" as used in Fed.R.Civ.P. 15(c) "does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities ." *See also Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (applying *Barrow* to preclude an amendment outside the limitations period "even when a suit is brought by [a] *pro se* litigant").

Courts in this Circuit have subsequently narrowed the holding in *Barrow.* The Court in *Byrd v. Abate,* 964 F.Supp. 140, 145-146 (S.D.N.Y.1997), for example, distinguished *Barrow* on the ground that in *Barrow* the plaintiff had "failed to make any efforts to discover [the officers'] names until well after the statute of limitations had run" whereas, in

*Byrd* the plaintiff "made a series of efforts to obtain the identity of the individual officer without prompting, and well before the end of the limitations period." *Byrd v. Abate, supra,* 964 F.Supp. at 145. The Court explained that Byrd had (1) requested the name of the officer nine months prior to the end of the limitations period and (2) after Corporation Counsel claimed that the name of the officer was unknown, requested the prison's log books to determine the officer's name. Finally, in *Byrd,* unlike in *Barrow,* the identity of the officer was "information uniquely within the knowledge of corporation counsel" and, therefore, Corporation Counsel's failure to respond to plaintiff's request for the prison log book until after the statute of limitations had run, justified allowing the amendment to relate back. *Byrd v. Abate, supra,* 964 F.Supp. at 146. *See also Gonzalez v. Officer in Charge of Barber Shop on Duty on May 13, 1999,* 99 Civ. 3455(DLC), 2000 WL 274184 at \*4-\*5 (S.D.N.Y. March 13, 2000) ("Courts that have addressed the relation-back question in the *pro se* context after the decision in *Barrow* have concluded that a mistake includes the failure of a *pro se* plaintiff to amend 'John Doe' pleadings within the limitations period because of an inability to discover the officers' names").

**\*9** Even after *Byrd,* however, *Barrow's* holding that lack of knowledge of a defendant's identity is not a "mistake" within the meaning of Rule 15(c)(3) continues to be routinely followed, especially where a plaintiff fails to search diligently for the John Doe defendant's identity. *See* 3-15 James Wm. Moore *et al., Moore's Federal Practice-Civil* § 15.19[d] (3d ed. 2008) ("This strict definition of mistake [adopted by many courts following *Barrow*] is based in part on the view that the plaintiff should exercise diligence in discovering the names of the defendants"); *see also Walters v. NYC Health Hosp. Corp.,* 02 Civ. 751(DF), 2006 WL 846711 at \*3-4 (S.D.N.Y. March 31, 2006) (Rule 15(c)'s mistake requirement was not satisfied because plaintiff failed to diligently investigate all leads; defendant produced the medical records containing the indi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

vidual defendant's name as well as a list of the res-
idents and attending physicians on duty the night of
plaintiff's injury well before the expiration of the
statute of limitations); *Sloane v. Town of Green-
burgh,* 01 Civ. 11551(MBM), 2005 WL 1837441 at
*4 (S.D.N.Y. July 27, 2005) (Denying the motion
to amend because plaintiff knew or should have
known defendant's identity through disclosures
made by defendants well before the limitations
period expired including an "incident form", a
Greenburgh Police Department Supervisor's Report
and a copy of the surveillance tape showing the
pepper spray incident, all of which identified the
defendant); *Sepulveda v. City of New York,* 01 Civ.
3117(GBD), 2003 WL 22052870 at *3 (S.D.N.Y.
Sept. 2, 2003) (there was no "mistake" concerning
the party's identity because the identities of the two
officers "were easily discoverable and provided to
plaintiff" well before the end of the limitations
period); *Cole v. Miraflor,* 99 Civ. 0977(RWS),
2001 WL 138765 at *5 (S.D.N.Y. Feb. 19, 2001)
(plaintiff's amendment did not relate back where
plaintiff did not attempt to discover the identities of
John Doe defendants until after the statute of limit-
ations had expired; New York Attorney General's
lack of cooperation held to be immaterial); *Yanez v.
Columbia Coastal Transp. Inc.,* 68 F.Supp.2d 489,
494 (D.N.J.1999); *Sidney v. Wilson,* 228 F.R.D.
517, 520 n. 5 (S.D.N.Y.2005).

The facts in this case fall in between *Barrow*
and *Bvrd.* Unlike in *Bvrd,* the plaintiff here was
aware that he needed to name the individual de-
fendants before the expiration of the limitations
period.[FN10] Unlike *Barrow,* however, the plaintiff
here diligently pursued the identities of the John
Doe officers. He was frustrated in these efforts by a
combination of factors including (1) plaintiff's own
failure to initiate this action until a full twenty-eight
months after the incident and his failure to serve in-
terrogatories until only three months remained in
the limitations period; (2) plaintiff's interrogatories
specified an incorrect date for his arrest; and (3)
Corporation Counsel's failure to respond to
plaintiff's second set of interrogatories or his FOIA

request. Because I find the lack of notice in this
case to be dispositive, I need not decide whether the
facts in this case qualify as a "mistake" for pur-
poses of relation back under Rule 15(c).

> FN10. The Honorable Lewis A. Kaplan's
> January 30, 2007 Order specifically in-
> structed plaintiff that "[o]nce informed of
> the defendants' identities and addresses,
> plaintiff must file an amended complaint
> identifying his John Does by their proper
> names .... Plaintiff's failure to file an
> amended complaint within sixty (60) days
> of receiving the identifying information
> from the Office of Corporation Counsel
> may result in the dismissal of his com-
> plaint." (Docket Item 4 at 2).

IV. *Conclusion*

**\*10** For the aforementioned reasons, the
amended complaint adding Officer McCarthy does
not relate back to the complaint naming the "John
Doe" officers, under Rule 15(c). Accordingly, the
claims brought against Officer McCarthy are un-
timely and plaintiff's motion to amend the com-
plaint to include Officer McCarthy must therefore
be denied.

SO ORDERED.

S.D.N.Y.,2008.
Velez v. Fogarty
Not Reported in F.Supp.2d, 2008 WL 5062601
(S.D.N.Y.)

END OF DOCUMENT